**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| | ) | |
| KOLAWOLE J. AKINADEWO | ) | |
| 133 Webster Street, NW, Apt 9 | ) | |
| Washington, DC 20011-7355 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ROTIMI OLORUNFEMI | ) | |
| 6102 Roanoke Avenue | ) | |
| Riverdale, MD 20737 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ROUZBEH MAZANDERAN | ) | |
| P.O. Box 1723 | ) | |
| Beltsville, MD 20704 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ANDRE RUFFIN | ) | |
| 1407 Morse Street, NE | ) | Case No. 1:13-cv-01752-ESH |
| Washington, DC 20002 | ) | Honorable Ellen S. Huvelle |
| | ) | |
| and | ) | Jury Trial Demanded |
| | ) | |
| EARTHA CLARK | ) | |
| 2021 Vermont Avenue, NE | ) | |
| Washington, DC 20001 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| GIRMA TESSEMA | ) | |
| 4404 Hillside Court | ) | |
| Alexandria, VA 22306 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| JESSE BLACK | ) | |
| 12003 Quartette Lane | ) | |
| Bowie, MD 20720 | ) | |
| | ) | |
| and | ) | |

|  |  |
|---|---|
| MANNY ZEWDU<br>5801 Quantrell Avenue, Apt 205<br>Alexandria, VA 22312-2739 | )<br>)<br>)<br>) |
| and | )<br>) |
| ADDIS GEBRESALASSIE<br>401 12th Street South<br>Arlington, VA 22202, | )<br>)<br>)<br>) |
| and | )<br>) |
| WASHINGTON D.C. METRO AREA<br>TAXI OPERATORS ASSOCIATION<br>2120 Bladensburg Road, NE #204<br>Washington DC 20018 | )<br>)<br>)<br>)<br>) |
| *Plaintiffs;* | )<br>) |
| v. | )<br>) |
| THE DISTRICT OF COLUMBIA<br>Agent for Service: Irvin B. Nathan<br>441 4th Street, N.W.<br>Washington, DC 20001 | )<br>)<br>)<br>)<br>) |
| and | )<br>) |
| DISTRICT OF COLUMBIA<br>TAXICAB COMMISSION<br>Agent for Service: Ron M. Linton<br>2041 Martin Luther King Jr Avenue, SE<br>Suite 204<br>Washington, DC 20020 | )<br>)<br>)<br>)<br>)<br>) |
| *Defendants.* | )<br>) |

## AMENDED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

### I. INTRODUCTION

1.      The newly organized Washington, DC Metro Area Taxi Operators Association ("Association") and the individual named taxicab drivers bring this action to invalidate certain regulations imposed by the Defendant District of Columbia Taxicab Commission ("Commission"). The Commission improperly promulgated the regulations through emergency rulemaking procedures and implemented the regulations without providing the affected taxicab operators the reasonable opportunity to comply with these regulations.

2.      Since May 2013, the Commission has issued two arbitrary and capricious regulations. First, the Commission required all taxicabs to be equipped with the Modern Taximeter System ("MTS"). *See* D.C. Mun. Regs. § 31-603 (2013). Second, the Commission required all taxicabs to install new Dome Lights. *See* D.C. Mun. Regs. § 31-605. The cost of compliance with these regulations is borne entirely by the individual taxi drivers and noncompliance with these flawed regulations exposes the drivers to penalties, including the impoundment of their vehicles, the imposition of fines, and the revocation or non-renewal of their taxicab licenses.

3.      Under the circumstances, full compliance with the MTS and Dome Light regulations is impossible within the arbitrary deadlines set by the Commission – September 1, 2013 and November 1, 2013, respectively.  The MTS consists of a meter, credit card reader, and tablet with log-in functions, all of which are dependent on cellular reception to function properly. *See* D.C. Mun. Reg. § 31-603. If an MTS' meter, credit card reader, and tablet are not fully functioning, the driver operating that taxicab is violating Commission regulations

and subject to penalties.  *See* D.C. Mun. Reg. § 31-603.10. Thus, whenever a taxicab drives through areas of no or weak cellular reception, the meter stops recording mileage, the credit card reader stops being able to process payments, and the log-in feature no longer functions. Given the realities of inconsistent cellular service in the District of Columbia, this is an everyday problem for Plaintiffs, who lose just compensation on fares due to meter failures and credit card denials and lose countless hours spent driving around looking for better cellular service. Yet, under the newly promulgated regulations, Plaintiffs are not only forced to purchase and install the MTS system, but Plaintiffs are at risk of impoundment, fines, and license revocation because the MTS system required by the Commission malfunctions.

4.     Similarly, Plaintiffs who have made multiple good-faith efforts to acquire a Dome Light have not been able to obtain a Dome Light as of November 1, 2013 because of a shortage of Dome Lights and installers. The Commissions has authorized two manufacturers and twelve installation locations for the Dome Light. These authorized businesses must service approximately 5,000 taxicabs. Individual plaintiffs have expended as many as six hours each trying to acquire a Dome Light and have been unable to do so because the Dome Lights have simply been out-of-stock. Notwithstanding this fact, one Plaintiff had his taxicab impounded because it lacked a Dome Light despite regardless of his good faith efforts at trying to acquire a Dome Light prior to the November 1st implementation date. Several other Plaintiffs have been forced to forfeit the use of their taxicabs until they can attain a Dome Light, at an indefinite date, because of the risk of imminent impoundment

5.     As a result, the MTS and Dome Light regulations arbitrarily and capriciously deprive the taxicab drivers of the use and enjoyment of their private property, the right to earn

a livelihood following the ordinary occupations of life, and reasonable and just compensation for their services. The combined effect of these regulations imposes a heavy burden on the taxicab drivers. The mandates deprive the individual owner-operators of important private property interests that go beyond purely financial interests. These owner-operators will be forced to cease operations because of the penalties imposed under the flawed regulations. As a result, taxi drivers who, due to no fault of their own are unable to timely comply with these regulations, may be entirely deprived of their ability to earn a living for an indefinite period of time.

6.     The Plaintiffs, by and through their contractual representative, Teamster Local Union 922, have repeatedly requested that the Defendant Commission stay the penalties under the regulations until all taxicab drivers in the District of Columbia have a reasonable and realistic opportunity comply with the regulations. The Commission has refused to stay the regulations and, instead, has imposed sanctions and penalties on DC taxicab drivers despite their best efforts to comply with the regulatory scheme.

## II. JURISDICTION AND VENUE

7.     The subject matter jurisdiction of this Court is invoked pursuant to the provisions of D.C. Code § 11-921(a) (LexisNexis 2012). This Court has jurisdiction over all matters in equity. *Id.*

8.     Personal jurisdiction is invoked pursuant to the provisions of D.C. Code § 13-423(a) (LexisNexis 2012); all parties to the dispute are citizens of the District of Columbia or conduct business entirely or primarily within the District of Columbia, and the actions giving rise to the suit occurred therein.

9. Venue is proper in this court, as the relevant events took place in the District of Columbia.

## III. THE PARTIES

10. This action is brought by ten individual taxicab drivers and the Washington DC Metro Taxi Operators Association ("Plaintiffs") against the District of Columbia Taxi Commission ("Defendant"). This dispute arises out of Defendant's issuance of numerous arbitrary and capricious regulations against taxicab drivers operating in the District of Columbia.

11. Plaintiff Kolawole J. Akinadewo is a taxicab driver in the District of Columbia. Mr. Akinadewo lives in Washington, DC and has operated a taxicab in the District of Columbia for the last 35 years. Mr. Akinadewo owns his vehicle.

12. Plaintiff Andre Ruffin is a taxicab driver in the District of Columbia. Mr. Ruffin lives in Washington, DC and has operated a taxicab in the District of Columbia for the last 29 years. Mr. Ruffin owns his vehicle.

13. Plaintiff Eartha Clark is a taxicab driver in the District of Columbia. Ms. Clark lives in Washington, DC and has operated a taxicab in the District of Columbia for the last 40 years. Ms. Clark owns her vehicle.

14. Plaintiff Addis Gebresalassie is a taxicab driver in the District of Columbia. Mr. Gebresalassie lives in Arlington, VA, but has operated a taxicab in the District of Columbia for the last 13 years. Mr. Gebresalassie owns his vehicle.

15. Plaintiff Manny Zewdu is a taxicab driver in the District of Columbia. Mr. Zewdu lives in Alexandria, VA, but has operated a taxicab in the District of Columbia for the

last 8 years. Mr. Zewdu owns his vehicle.

16.     Plaintiff Rotimi Olorunfemi is a taxicab driver in the District of Columbia. Mr. Olorunfemi lives in Riverdale, MD, but has operated a taxicab in the District of Columbia for the last 14 years. Mr Olorunfemi owns his vehicle.

17.     Plaintiff Rouzbeh Mazanderan is a taxicab driver in the District of Columbia. Mr. Mazanderan lives in Beltsville, MD, but has operated a taxicab in the District of Columbia for the last 40 years. Mr. Mazanderan owns his vehicle.

18.     Plaintiff Girma Tessema is a taxicab driver in the District of Columbia. Mr. Tessema lives in Alexandria, VA, but has operated a taxicab in the District of Columbia for the last 10 years. Mr. Tessema owns his vehicle.

19.     Plaintiff Jesse Black is a taxicab driver in the District of Columbia. Mr. Black lives in Bowie, MD, but has operated a taxicab in the District of Columbia for the last 40 years.

20.     Plaintiff Washington DC Metro Taxi Operators Association is an unincorporated association of District of Columbia taxicab drivers. Plaintiff Association represents at least 1,000 taxicab drivers in the District of Columbia.

21.     The individual Plaintiffs and the members of the Plaintiff Association, who are citizens of the District of Columbia or conduct business entirely or primarily within the District of Columbia, have individually suffered, and continue to suffer, injury described herein from the Defendant's issuance and enforcement of the arbitrary regulations.

22.     Plaintiff Association has standing to obtain relief on an associational basis because (1) the Association has individual members would have standing to sue in their own

7

right, (2) the interest Plaintiff Association seeks to protect is germane to Plaintiff's purpose (representing the interests of District taxicab drivers), and (3) neither the claims asserted nor the relief requested require the individual members to participate.

23. Plaintiffs seek to certify a class of persons who are currently licensed to operate a taxicab in the District of Columbia.

24. Plaintiffs state that the class is too numerous to be joined individually as the potential class is over five thousand (5,000) persons. There are issues of fact and law common to all class members. The claims of the Plaintiffs are typical of claims of the members of the proposed class. Plaintiffs can adequately represent the interests of the class.

25. Defendant District of Columbia is a municipal corporation, organized under the laws of the District of Columbia and the United States.  Defendant is authorized to sue and be sued.  Mayor Vincent C. Gray, in his official capacity, is an agent of Defendant.  The Commission is a subordinate agency of Defendant.

26. Defendant District of Columbia Taxicab Commission is an agency of the District of Columbia, organized under the laws of the District of Columbia and the United States. Defendant is authorized to sue and be sued. In his capacity as Chairman of the Commission, Ron M. Linton is an agent of Defendant.


## IV. FACTUAL ALLEGATIONS

27. The Council of the District of Columbia ("City Council") passed the D.C. Taxicab Commission Establishment Act ("Establishment Act") in 1985. The Establishment Act charges the Commission with the duty to "[e]stablish reasonable rates for taxicab service

8

for the transportation of passengers and their property within the District, including all charges incidental and directly related to the provision of taxicab services." D.C. Code § 50-307(c)(l). The Establishment Act aims to protect the interests of the riding public by "insuring that all rules, regulations, and laws specifically relating to taxicabs be vigorously and fairly enforced; that discrimination in taxicab passenger service be strictly proscribed and penalized; and that adequate and high quality taxi passenger service be provided to all quadrants and neighborhoods of the District." D.C. Code § 50-302(a)(l). Additionally, the Establishment Act authorized the Commission to "maintain a taxicab transportation system which provides owners and operators of taxicabs with reasonable and just compensation for their services ...." D.C. Code § 50-302(a)(2). The Establishment Act vests "exclusive authority for intrastate regulation of the public vehicle-for-hire industry" in the Commission. *See* D.C. Code § 50-304.

28.     The District of Columbia Administrative Procedure Act ("DC APA") requires that agencies provide at least 30 days' notice of "proposed action" prior to the adoption or repeal of any rule unless good cause justifies less notice. D.C. Code § 2-505(a). The notice must contain "a citation to the legal authority under which the rule is being proposed." *Id*. Agencies may propose emergency rules that go into effect immediately, but only if "necessary for the immediate preservation of the public peace, health, safety, welfare, or morals." § 2-505(c).

## **Dome Light Regulations**

29.     On July 18, 2012, the Commission adopted a Notice of Emergency and Proposed Rulemaking, which became effective on July 25, 2012 and was published in the

D.C. Register on July 27, 2012 at 59 D.C. Reg  8851. The amendment proposed, among other things, to establish a new Dome Light mandate and update penalties and fines. 59 D.C. Reg 8851. The Commission justified its use of emergency rulemaking as follows: "This emergency rulemaking action is necessary to protect the public safety and welfare of the residents of and visitors to the District of Columbia. Specifically, the past 3-5 years have seen an exponential increase in consumer complaints about the quality and safety of District taxicab vehicles and operators." *Id*.

30.     On October 2, 2012, the Commission adopted a Second Notice of Emergency and Proposed Rulemaking. It was published for a second time on October 5, 2012, at 59 D.C. Reg. 11594 and took effect immediately. The Commission justified its use of emergency rulemaking as follows: "This emergency rulemaking action is necessary to protect the public safety and welfare of the residents of and visitors to the District of Columbia. Specifically, the past 3-5 years have seen an exponential increase in consumer complaints about the quality and safety of District taxicab vehicles and operators." 59 D.C. Reg. 11594.

31.     On November 14, 2012, the Commission issued a Notice of Formal Rulemaking in which it adopted the aforementioned emergency rulemaking as final. The final rules became effective upon publication of notice in the D.C. Register on February 1, 2013 at 60 D.C. Reg. 1173-1174.

32.     Pursuant to the February 1, 2013 Notice of Formal Rulemaking, the following regulations relevant to this action were promulgated in the Code of D.C. Municipal Regulations:

605.1 No later than April 30, 2013, all licensed taxicabs in the District of Columbia shall be equipped with the Commission-approved Dome Lights and Taxi Number

10

System that meets the specifications listed below and any further specifications provided by the Commission...

605.2  The required Dome Light shall only be installed by Dome Light Installation businesses authorized by the Commission to install the approved Dome Light pursuant to Chapter 15 of this title.

605.5  The LED portion of the Dome Light shall display "Taxi For Hire" at all times when the taxicab is available for hire and the LED portion of the Dome Light shall go "dark" when the taxicab is not available for hire because the taxicab is carrying a passenger, is on call, or is off duty not intending to take on passengers. The Dome Light may contain a driver activated switch on the side of the Dome Light that will allow the complete Dome Light to remain dark when the vehicle is either off-duty or is being utilized for personal use.

605.6 Whenever a taxicab operator removes his or her vehicle from service and is proceeding to a place of his or her choosing without intending to take on passengers, the "Taxi For Hire" light shall go "dark."

605.7 Whenever a taxicab is responding to a dispatch call or proceeding to a prior arranged transport, the "Taxi For Hire" light shall go "dark."

605.8  No taxicab shall be operated unless its Dome Light is in proper working condition. The operation of a taxicab with a broken Dome Light shall give rise to a rebuttable presumption that the driver knew of the condition and operated the taxicab with such knowledge.

608.4  No person shall drive, move, or permit the operation or use of any taxicab which is mechanically unsafe, improperly equipped, or otherwise unfit to be operated, including failure to have an operating meter and Taxi Smart Meter System. Such vehicles shall be towed off the public streets and impounded pursuant to the Taxicab and Passenger Vehicle for Hire Impoundment Act of 1992, effective March 16, 1993 (D.C. Law 9-199; D.C. Official Code § 50-331(a)(6) (2009 Repl.; 2012 Supp.)).

33.     D.C. Mun. Reg § 31-605.1 provides that all licensed taxicabs in the District of Columbia must be equipped with the Commission-approved Dome Lights by April 30, 2013.

34.     The regulatory deadline of April 30, 2013 conflicts with subsequent non-regulatory communications by Commission.  In a May 28, 2013 press release, the Commission announced two certified manufacturers of the Dome Light, stating that

installation of the Dome Light can begin June 1, 2013, and providing that "[a]ll DC taxis are required to be outfitted with the new standardized Dome Light by August 31, 2013." Government of The District of Columbia Taxicab Commission, *DC Taxicab Commission Announces Dome Light Manufacturers* (May 28, 2013), available at http://washingtondispatcher.com/clients/washingtondispatcher/DomeLightsPressRelease.pdf.

35.     More incongruously, the Commission's website provides that "[a]ll licensed DC taxicabs are required to have the new standardized Dome Light installed by November 1, 2013." District of Columbia Taxicab Commission, *Dome Light* (2013) http://dctaxi.dc.gov/page/dome-light.

## Modern Taximeter System (MTS) Regulations

36.     Included in the July 18, 2012, Notice of Emergency and Proposed Rulemaking issued by the Commission were regulations implementing the Taxi Smart Meter System.  On May 24, 2013, the Commission adopted another Notice of Emergency and Proposed Rulemaking, which became effective on May 31, 2013 and was published in the D.C. Register on June 7, 2013 at 60 D.C. Reg. 8692.   The purpose of this subsequent emergency rulemaking was to amend problems with earlier emergency rulemaking, "[t]his Emergency and Proposed Rulemaking is necessary for the immediate preservation and promotion of the public peace, safety, and welfare of the residents of and visitors to the District of Columbia by updating the regulatory framework to implement the modern taximeter system (MTS), preventing legal incongruities that will halt the implementation of the MTS, and providing the residents and visitors the consumer and safety improvements intended by the D.C. Council."

60 D.C. Reg. 8692.

37.     On July 31, 2013, the Commission adopted a Notice of Proposed Rulemaking,

which became effective August 9, 2013 and was published in the D.C. Register on August 16,

2013 at 60 D.C. Reg. 11984. The emergency rulemaking expired on November 27, 2013,

absent earlier amendment or repeal. This rulemaking was in response to taxicab companies

and independent owners who "requested further time to comply based on exigent

circumstances," but the new rules only provided a mechanism under which an "approved

payment service provider (PSP), who will apply on behalf of their clients for an extended

installation deadline." 60 D.C. Reg. 11984.

38.      The Commission adopted final regulations pertaining to MTS on May 17,

2013, and published the final regulations in the D.C. Register on May 17, 2013 at 60 D.C.

Reg 6993 – 7021.

39.     Pursuant to the May 17, 2013 Notice of Formal Rulemaking, the following

regulations relevant to this action have been promulgated in the Code of D.C. Municipal

Regulations:

603.2 MTS implementation. Beginning on September 1, 2013 ("implementation
date"):

(a)      Each taxicab shall operate only with an MTS unit that allows a
passenger to make a cash payment or cashless payment, which shall
be the decision of the passenger;

(b)      Each MTS unit shall be obtained from a PSP that has current
approval for the MTS and is operating in compliance with this
section and Chapter 4;

(c)      Each MTS unit, including the passenger console and safety feature
required by § 603.8 (n), shall be installed by an authorized MTS
installation business which certifies that it meets the applicable
provisions of this title....

603.6 All costs associated with obtaining an MTS unit, including installation and certification (including those associated with adding the passenger console and safety feature required by § 603.8(n)), operation, compliance with a provision of this title or other applicable law, compliance with an Office order, repair, lease, service and support, maintenance, and upgrade, shall be the responsibility of the taxicab company or independent owner, but may be allocated by written agreement among the taxicab company or independent owner, the PSP that provides it, or any other person.

603.9 MTS service and support requirements.

Each MTS shall function with the service and support of the PSP, which shall at all times operate in compliance with Chapter 4, and shall maintain a data connection to each MTS unit that shall:

> (a) Validate the status of the operator's DCTC license (Face Card) in real-time by connecting to the Taxicab Commission Information System (TCIS) to ensure the license is not revoked or suspended, and that the operator is in compliance with the insurance requirements of Chapter 9;

> (b) Validate the status of the taximeter component of the MTS unit (such as hired, vacant, or time-off) in real-time to ensure that it cannot be used until the prior trip and the payment process connected with it have ended;

> (c) Transmit to the TCIS every twenty-four (24) hours via a single data feed consistent in structure across all PSPs, in a manner as established by the Office, the following data:

> > (1) The date;

> > (2) The operator identification (Face Card) number and PVIN, reported in a unique and anonymous manner allowing the PSP to maintain a retrievable record of the operator and vehicle;

> > (3) The name of the taxicab company, association, or fleet if applicable;

> > (4) The PSP-assigned tour ID number and time at beginning of tour of duty;

> > (5) The time and mileage of each trip;

> > (6) The time of pickup and drop-off of each trip;

> > (7) The geospatially-recorded place of pickup and drop-off of each trip which may be generalized to census tract level;

14

(8) The number of passengers;

(9) The unique trip number assigned by the PSP;

(10) The taximeter fare and an itemization of the rates and charges pursuant to § 801;

(11) The form of payment (cash payment, cashless payment, voucher, or digital payment), and, if a digital payment, the name of the DDS;

(12) The time at the end of each tour of duty;

(d) Provide the Office with the information necessary to insure that the PSP pays and the Office receives the taxicab passenger surcharge for each taxicab trip, regardless of how the fare is paid; and

(e) Allow the PSP to comply with the integration and other requirements for processing digital payments pursuant to § 408.16.

603.10 Prohibitions under this section.

(a) No operator shall provide taxicab service without an approved MTS unit installed and certified by an authorized MTS installation business.

(b) No operator shall operate a vehicle if the MTS unit is not functioning properly.

(c) No operator shall provide service unless both the operator and the vehicle are on the PSP's inventory when the trip is booked by dispatch or street hail.

(d) No operator shall limit service or refuse to provide service based on the passenger's choice of payment method.

(e) No operator shall access or attempt to access a passenger's payment card information after the payment has been processed.

(f) No operator shall participate in a transaction involving taxicab service in the District where the fare, rates, charges, or payment does not comply with the applicable provisions of this title, including this chapter, and §§ 603 and 801.

(g) No operator shall associate with a PSP if such operator is, at that time, associated with a taxicab company that provides payment card processing for its associated operators, and has applied for or received approval to act as a

PSP under Chapter 4.

(h) No taxicab shall be equipped with more than one (1) MTS unit.

(i) No taxicab company or independent owner shall knowingly permit its vehicle to be operated in violation of this section or Chapter 4.

(j) No owner or operator shall alter or tamper with a component of an MTS unit or make any change in the vehicle that prevents the MTS unit from operating in compliance with this title.

(k) No operator shall operate a taxicab in which the MTS has been tampered with, broken, or altered. The operation of a taxicab with a tampered, broken, or altered MTS shall give rise to a rebuttable presumption that the operator knew of the tampering, breaking, or alteration.

40.    With the installation of the MTS, DC taxi drivers including, the Plaintiff drivers and other class members, are obligated to pay to the Commission twenty five cents ($0.25) for every cash or credit card fare. D.C. Mun. Regs. § 31-801.7(b)(2).

## Impossibility of Full Compliance with MTS and Dome Light Requirements within Regulatory Deadlines

41.    Problems with MTS malfunctioning and Dome Light availability have made full industry compliance within the Commission's regulatory deadlines effectively impossible.

42.    DC taxi drivers, including the Plaintiff drivers and other class members, who have installed the MTS in order to comply with Commission requirements continue to run afoul of the Commission's regulations because the MTS malfunctions.

43.    As explained above, the MTS consists of a meter, credit card reader, and tablet with log-in functions, all of which are dependent on cellular reception to function properly. *See* D.C. Mun. Reg. § 31-603.

44.    The MTS is plagued with poor cellular reception quality and frequent log-in problems, including failing to timely start when a passenger first enters the vehicle, failing to

16

timely start when a taxicab driver begins his or her workday, losing cellular reception during a fare and failing to record all metered mileage, losing cellular reception at the end of a trip and failing to make credit payment possible, and taking an unreasonable amount of time to print receipts thereby causing a taxicab driver to block traffic at the end of trips.

45.     Due to the poor cellular reception quality and frequent log-in problems with the MTS, Plaintiffs have been forced to refuse patrons who cannot pay cash (Mazanderan Aff. 2), lose money on fares when poor cellular reception quality causes the meter to improperly record mileage (Gebresalassie Aff. ¶2 ; Mazanderan Aff. ¶2; Zewdu Aff. ¶2), take fares "off-meter" and charge customers for fares on a non-meter basis (Olorunfemi Aff. ¶1-2), take credit card payments using credit cards readers other than those integrated into MTS (Olorunfemi Aff. ¶1-2), drive in and around the District of Columbia without a working MTS system (Zewdu Aff. ¶2; Olorunfemi Aff. ¶1-2), and stall traffic while waiting for the MTS system to function (Zewdu Aff. ¶2).

46.     Because of some or all of the aforementioned acts, DC taxi drivers, including the Plaintiff drivers and other class members, who have installed the MTS within the arbitrary deadline set by the Commission, are nevertheless in violation of D.C. Mun. Reg § 31-60. The regulation requires that a taxicab be equipped with a functioning MTS that maintains a data connection sufficient to record metered fares and allows for digital payments. In addition, D.C. Mun. Reg § 31-603.10 prohibits the operation of  a taxicab if the MTS unit is not functioning properly, limits service or refuses to provide service based on the passenger's choice of payment method, or participates in a transaction involving taxicab service in the District of Columbia where the fare, rates, charges, or payment does not comply with the

Commission's regulations.

47.    Under the circumstances, despite good faith efforts at compliance, DC taxi drivers, including the Plaintiff drivers and other class members, were unable to comply with the September 1, 2013 deadline to equip a taxicab with a fully functioning MTS that meets the Commission's technical specification.

48.    Full industry compliance with the Dome Light requirement by the November 1, 2013 deadline was similarly impossible under the circumstances.

49.    The Commission has authorized two manufacturers and twelve installation locations for the Dome Light. *See* District of Columbia Taxicab Commission*, DC Taxicab Commission Announces Dome Light Manufacturers*, available at http://washingtondispatcher .com/clients/washingtondispatcher/DomeLightsPressRelease.pdf; District of Columbia Taxicab Commission, *Installation Locations* (2013) http://dctaxi.dc.gov/sites/default/ files/dc/sites/dc%20taxi/page_content/attachments/Installation%20Locations-AA_1.pdf.

50.    Despite a regulatory deadline that all licensed taxicabs in the District of Columbia must be equipped with Commission-approved Dome Lights by April 30, 2013, on May 28, 2013, the Commission admitted that installation of Dome Lights under the regulations was not feasible and extended the time for compliance until June 1, 2013. *See DC Taxicab Commission Announces Dome Light Manufacturers*, available at http://washington dispatcher.com/clients/washingtondispatcher/DomeLightsPressRelease.pdf.

51.    Commission policies that extended the regulatory deadline from April 30, 2013 to August 31, 2013 to November 1, 2013 have failed to explain the departures from the Commission's previously announced policies and have stated no basis and purpose for the

new unilaterally and arbitrarily selected deadlines.

52.     Under the realities of the marketplace for taxicab parts, full industry compliance with the Dome Light requirement by November 1, 2013 was impossible.  DC taxi drivers, including the Plaintiff drivers and other class members, who have made multiple good-faith efforts to acquire a Dome Light have not been able to obtain a Dome Light as of November 1, 2013 because of a shortage of Dome Lights and installers.

53.     DC taxi drivers, including the Plaintiff drivers and other class members, have expended as many as six hours seeking to acquire Dome Lights during October 2013 and have been consistently turned away by installers who state that there are not enough available Dome Lights for purchase as of November 1, 2013. Installers have placed DC taxi drivers on waitlists of indefinite lengths and been unable to provide any definite date after November 1, 2013 when the Dome Lights will be available for installation.

54.     Despite good faith efforts at compliance, DC taxi drivers, including the Plaintiff drivers and other class members, have not been to locate and install a Dome Light by the November 1, 2013 deadline because of the market shortage of authorized product and installers.

**Operational Flaws with the MTS and Dome Light
Arbitrarily Put Plaintiffs' Safety and Livelihood at Risk**

55.     On knowledge and belief, the Commission's enforcement of the Dome Light regulations includes ticketing and/or fining taxi drivers whose Dome Lights are not completely dark and who fail to pick up nearby passengers who hail taxicabs.

56.     The driver-activated switch on the side of the Dome Light that allows the Dome Light to remain dark when a taxicab is off-duty, which is required by D.C. Muc. Reg. §

30-605.5, can only be accessed if the driver exits the taxicab, walks around to the passenger-side door of the taxicab, and reaches the switch on the side of the Dome Light nearest the passenger-side door.

57.    To turn the dome dark when a taxicab is off-duty, taxicab drivers must therefore exit their vehicles at the end of the work shift at whatever location their last trip ended, regardless of the safety of that location, weather conditions, or the time of day that the trip is completed.

58.    Further, the Dome Light required by D.C. Mun. Reg § 31-605 does not include any emergency distress function or other mechanism to alert emergency services. D.C. Mun. Reg § 31-605 requires DC taxi drivers, including the Plaintiff drivers and other class members, to remove previously used domes that included an emergency function. The emergency function could be activated from inside the taxicab to display a blinking light and "Call 911" sign outside the taxicab.  Taxicab drivers used this function to alert authorities and other vehicles when passenger conduct threatened their lives or property.  This, or a substantially similar distress function, is not available with the Dome Light required by D.C. Mun. Reg § 31-605.

59.    The Dome Light required by D.C. Mun. Reg § 31-605 is also not detachable like the domes previously used by DC taxi drivers, including the Plaintiff drivers and other class members.  As result, DC taxi drivers, including the Plaintiff drivers and other class members, are no longer able to remove the Dome Light from the roof of their taxicabs at the end of the workday.  DC taxi drivers, including the Plaintiff drivers and other class members, previously removed the domes from the roof of their taxicabs and used magnetic covers to

20

hide other taxi insignia at the end of the workday to protect themselves from thieves that would target them for carrying large amounts of cash.  Following the installation of the irremovable Dome Light, one or more DC taxi drivers, including the Plaintiff drivers and other class members, has been followed and robbed while driving home at the end of the workday.

60.     The D.C. Mun. Reg § 31-605 requirement of a Dome Light that can be turned dark only by exiting the taxicab, lacks an emergency function, and is irremovable is patently unsafe and puts DC taxi drivers, including the Plaintiff drivers and other class members, at unnecessary risk of robbery, battery, and assault.

61.     On knowledge and belief, the Commission failed to consider the material issue of taxicab driver safety when requiring in rule D.C. Mun. Reg § 31-605 that all taxicabs must be equipped with a Dome Light that can only be turned dark from the outside and includes no emergency distress function.

62.     On knowledge and belief, the Commission also failed to consider the material issue of trips traveling and ending in areas of the District of Columbia that have no or weak cellular reception.

63.     The MTS system is based on cellular reception and poor reception quality has caused and continues to cause DC taxi drivers, including the Plaintiff drivers and other class members, to lose just compensation on fares when the meter fails to function properly to count mileage in areas with weak cellular reception.  *See also* Martin Di Caro, *For Cab Drivers, Rollout Of Credit Card Payments Has Been Anything But Smooth* (October 31, 2013), available at http://wamu.org/news/13/10/31/technical_glitches_continue_to_bedevil_

credit_card_payments_in_dc_taxicabs.

64.     DC taxi drivers, including the Plaintiff drivers and other class members, have further lost and continue to lose just compensation on fares that end in areas with weak cellular reception if the passenger lacks cash because the credit cards readers do not function.

**Irreparable Harm Despite Good Faith Efforts at Compliance**

65.     As a result of the aforementioned Dome Light and MTS regulations, DC taxi drivers, including the Plaintiff drivers and other class members, have been substantially and irreparably harmed.

66.     DC taxi drivers, including the Plaintiff drivers and other class members, have expended substantial amounts of time and resources seeking to comply with aforementioned regulations.  The drivers have not been able to comply with one or more of the requirements despite good faith efforts to do so. First, drivers who have installed the MTS equipment from the exclusive vendors designated by the Commission have experienced significant malfunctions and irregularities in its performance. Consequently, these drivers are unfairly subject to the sanctions contained in the regulations despite every effort to install and maintain the equipment mandated by the regulations. Second, the limited Dome Light vendors available under the regulations lack sufficient inventory of Dome Lights. Further, the regulations restrict the number of Dome Light installers.  These Commission-based deficiencies have precluding taxicab drivers from complying with the relevant regulations. These deficiencies, however, are in no way attributable to the DC taxi drivers, including the Plaintiff drivers and other class members.

67.     The Commission is directly responsible for the harm imposed on the DC taxi

drivers, including the Plaintiff drivers and other class members, because it is responsible for restricting authorized Dome Light retailers and installers, making technical specifications for MTS equipment, and setting deadlines for compliance.

68.     As a result of their failure to comply despite good-faith efforts to comply, DC taxi drivers, including the Plaintiff drivers and other class members, have been prosecuted or are at risk of prosecution under D.C. Mun. Reg. § 31-612. Pursuant to D.C. Mun. Reg. § 31-612, a taxi driver who operates a vehicle without approved equipment is subject to fines between $100 and $750, impoundment of his vehicle, confiscation of his or her MTS unit or other meter, and suspension, revocation, or non-renewal of his license.

69.     Specifically, as a result of their inability to comply with the aforementioned regulations despite good faith efforts, DC taxi drivers, including the Plaintiff drivers and other class members, have either had their taxis impounded and/or been forced to curtail their use and enjoyment of their taxis indefinitely because of the risk of impoundment, license revocation, and license non-renewal.

70.     As applied, the aforementioned regulations are contrary to DC taxi drivers' including the Plaintiff drivers' and other class members' right to property.

71.     The regulations further deprive DC taxi drivers, including the Plaintiff drivers and other class members, of their right to earn a livelihood by following the ordinary occupations of life by depriving them of the tools of their livelihood.

72.     DC taxi drivers, including the Plaintiff drivers and other class members, have also suffered extensive economic damages a result of fares lost due to malfunctioning MTS equipment.

73.     Because of the regulations, the general public is in danger of suffering irreparable harm because the regulations create a taxicab shortage. Many taxicabs not in compliance have ceased operating until compliance can be achieved.  The circumstances of a Dome Light shortage and malfunctioning MTS equipment, however, make compliance by the enforcement dates impossible.

74.     On November 1, 2013, the Dome Light regulations went into effect. All taxicab drivers who have not been able to comply with the regulations are subject to penalties, including impoundment of their cars.

## V. STATEMENT OF CLAIMS

### COUNT ONE

**Regulations § 31-603 and § 31-605 Violate § 2-510(a)(3)(B)**
**of the D.C. Administrative Procedures Act**

75.     The allegations of Paragraphs 1-74 of this Complaint are by reference incorporated herein as allegations of this Count.

76.     D.C. Code § 2-510(a)(3)(B) provides that an agency action is unlawful and must be set aside if it contrary to a constitutional right, power, privilege, or immunity.

77.     The Commission's Dome Light and MTS regulations regulate the Plaintiffs' private property to such an extent that they deprive Plaintiffs of the complete usefulness of their private property without just compensation.

78.     The regulations have a severe economic impact on the property rights of the individual taxicab owner-operators.  Plaintiffs have experienced total loss of their taxicabs

because of impoundment and/or forfeited the use of their taxicabs until they can acquire Dome Lights because of fear of impoundment, penalty, and revocation of their taxicab licenses. As a result, DC taxi drivers, including the Plaintiff drivers and other class members, have been deprived of the complete use of their private property without just compensation.

79.     The regulation interferes with the individual taxicab owner-operators reasonable, investment-back expectations regarding use of the property. DC taxi drivers, including the Plaintiff drivers and other class members, invested in their taxicab vehicles with the reasonable expectation of earning a livelihood with that property. The Dome Light and MTS regulations now render those vehicles useless if the vehicles cannot meet the new specifications by the September 1 and November 1, 2013 deadlines. Yet, compliance with the regulations by the arbitrary deadline is impracticable given the Dome Light inventory shortage and the technical malfunctions of the MTS.  Under the circumstances, there is no way for DC taxi drivers, including the Plaintiff drivers and other class members, to achieve full compliance with the Dome Light and MTS regulations despite good faith efforts. Yet, until they do, their vehicles are useless.

80.     The regulations provide very limited benefit to society and place the burden of the regulations solely upon the individual taxicab owner-operators. While the taxicab standardization sought by the regulations may be viewed as a desirable social goal, society gains nothing from unachievable regulatory requirements. Further, the full burden of the regulation rests solely upon the individual taxicab owner-operators. *See* D.C. Mun. Reg. § 30-603.6. Further, the Commission arbitrarily increased the burden on individual taxicab owner-operators by naming only a limited number of authorized sellers and installers for both the

Dome Lights and MTS, thereby driving down supply and driving up demand.

81.     Despite good faith efforts by individual taxicab owner-operators, many of these owner-operators have not been able to comply with the regulations.

82.     DC taxi drivers, including the Plaintiff drivers and other class members, are entitled to injunctive relief ordering the Commission to stay the regulations until the taxicab drivers have had a reasonable to comply with the regulations, in order for the regulations to cease depriving Plaintiffs, under the circumstances, of private property without just compensation.

## COUNT TWO

### Regulations § 31-603 and § 31-605 Violate the Establishment Act and § 2-510(a)(3)(C) of the D.C. Administrative Procedures Act

83.     The allegations of Paragraphs 1-82 of this Complaint are by reference incorporated herein as allegations of this Count.

84.     D.C. Code § 2-510(a)(3)(C) provides that an agency action is unlawful and must be set aside if it is in excess of statutory jurisdiction, authority, or limitations.

85.     The Establishment Act authorizes the Commission "[t]o maintain a taxicab transportation system which provides owners and operators of taxicabs with reasonable and just compensation for their services." D.C. Code § 50-302.

86.     DC taxi drivers, including the Plaintiff drivers and other class members, lose just compensation for their services when their taxicabs are impounded for failing to have a Dome Light - despite the impossibility of full industry compliance by the arbitrary deadline. DC taxi drivers, including the Plaintiff drivers and other class members, lose compensation for fares because the MTS fails to record mileage and allow credit card transactions.

Regulations § 31-603 and § 31-605 deprive DC taxi drivers, including the Plaintiff drivers and other class members, of reasonable and just compensation for services provided, in excess of the Commission's rulemaking authority.

## COUNT THREE

**Regulation § 31-605 Violates § 2-510(a)(3)(A) the D.C. Administrative Procedures Act**

87.     The allegations of Paragraphs 1-86 of this Complaint are by reference incorporated herein as allegations of this Count.

88.     D.C. Code § 2-510(a)(3)(A) provides that an agency action is unlawful and must be set aside if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

89.     Defendant acted arbitrarily, capriciously, and otherwise not in accordance with the law by arbitrarily requiring that all taxicabs be equipped with Dome Lights by November 1, 2013 and requiring that all taxicabs not in compliance be subject to impoundment and license revocation because the Commission acted without giving reasoned consideration to the material problem of significant inventory problems with Dome Lights that prevent compliance despite good faith efforts to comply and without giving any reason or basis for that arbitrary deadline.

90.     Defendant acted arbitrarily, capriciously, and otherwise not in accordance with the law by enacting a Dome Light requirement without giving reasoned consideration to the material problem of driver safety.

91.     Defendant has further acted arbitrarily, capriciously, and otherwise not in

accordance with the law by enacting a Dome Light requirement and compliance deadline through unsubstantiated emergency rulemaking.

92.     D.C. Code § 2-505 provides that an agency may engage in emergency rulemaking only if "the adoption of a rule is necessary for the immediate preservation of the public peace, health, safety, welfare, or morals" and may only adopt such rules "as may be necessary in the circumstances."

93.     Defendant has failed to state any specific problem relating to public peace, health, safety, welfare, or morals that required immediate resolution through emergency rulemaking that mandated Dome Lights.


**COUNT FOUR**

**Regulation § 31-603 Violates § 2-510(a)(3)(A) the D.C. Administrative Procedures Act**

94.     The allegations of Paragraphs 1-94 of this Complaint are by reference incorporated herein as allegations of this Count.

95.     Defendant acted arbitrarily, capriciously, and otherwise not in accordance with the law by arbitrarily requiring that all taxicabs be equipped with a fully functioning MTS system by September 1, 2013 and requiring that all taxicabs not in compliance be subject to impoundment and license revocation because the Commission acted without giving reasoned consideration to the material problem of MTS malfunctioning that prevents compliance despite good faith efforts to comply and without giving any reason or basis for that arbitrary deadline.

96.     Defendant acted arbitrarily, capriciously, and otherwise not in accordance with

the law by enacting an MTS requirement without giving reasoned consideration to the material problem of cellular reception problems causing taxicab drivers to lose just compensation for fares when the MTS-related meter or credit card reader fails to function.

97.     Defendant has further acted arbitrarily, capriciously, and otherwise not in accordance with the law by enacting an MTS requirement and compliance deadline through unsubstantiated emergency rulemaking.

98.     Defendant has failed to state any specific problem relating to public peace, health, safety, welfare, or morals that required immediate resolution through emergency rulemaking that mandated an MTS system by September 1, 2013.

## VI. PRAYER FOR RELIEF

A.     Temporarily enjoin and restrain Defendant from enforcing the MTS Regulation and the Dome Light Regulation during the course of this litigation;

B.     Permanently enjoin and restrain Defendant from enforcing the MTS Regulation and the Dome Light Regulation until it can assure that the MTS system is reliably functional and that there are sufficient supplies of Dome Lights available for installation;

C.     Award damages to all of the Plaintiffs and similar class members who have incurred damages due to impoundment and forfeiture as a result of the risk of impoundment;

D.     Award damages to all of the Plaintiffs and similar class members who have incurred damages due lost fares as a result of MTS malfunctioning;

E.     Award attorney's fees and court costs to Plaintiffs; and

F.     An Order awarding any other relief as the Court deems just, equitable, and proper.

## VII. JURY DEMAND

Plaintiffs request trial by jury for each issue so triable.

Dated:  November 15, 2013

<div style="margin-left:40%">

Respectfully submitted,

_____/s/ Richard C. Welch_____
Richard C. Welch (DC Bar No. 485756)
Lauren B. Powell (DC Bar No. 1008301)
Mooney, Green, Saindon, Murphy
  & Welch, P.C.
1920 L Street, N.W. Suite 400
Washington, D.C.  20036
(202) 783-0010
rwelch@mooneygreen.com
lpowell@mooneygreen.com

*Counsel for Plaintiffs*

</div>

**CERTIFICATE OF SERVICE**

I, Richard C. Welch, do hereby certify that on this 15th day of November, 2013, a true and correct copy of the foregoing AMENDED COMPLAINT has been served via electronic service through ECF/Pacer on:


Douglas Stuart Rosenbloom
OFFICE OF THE ATTORNEY GENERAL
FOR THE DISTRICT OF COLUMBIA
Public Interest Division
441 4th Street, NW
One Judiciary Square- 6th Floor South
Washington, DC 20001

<div align="right">

    /s/ Richard C. Welch    
Richard C. Welch

</div>