Filed
D.C. Superior Court
11/06/2013 18:14PM
Clerk of the Court

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
Civil Division

| | |
|---|---|
| KOLAWOLE J. AKINADEWO, *et al.*,<br><br>  Plaintiffs,<br><br>  v.<br><br>DISTRICT OF COLUMBIA,<br><br>  and<br><br>DISTRICT OF COLUMBIA<br>TAXICAB COMMISSION,<br><br>  Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 2013 CA 7525 B<br>) Judge Mott<br>) Next scheduled event: Nov. 13, 2013,<br>) Hearing on TRO/Judge in Chambers<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## NOTICE OF FILING
## NOTICE OF REMOVAL OF A CIVIL ACTION

The Clerk of the Court will please take note that on November 6, 2013, Defendants in the above-captioned matter filed a "Notice of Removal and Related Case" ("Notice") of the above-captioned civil action in the United States District Court for the District of Columbia pursuant to 28 U.S.C. §§ 1441(a) and 1446. A copy of the Notice is attached hereto as "Exhibit A," and incorporated herein by reference. In accordance with 28 U.S.C. § 1446(d), this Court "shall effect the removal and . . . proceed no further unless and until the case is remanded."

DATE: November 6, 2013

Respectfully Submitted,

IRVIN B. NATHAN
Attorney General for the District of Columbia

ELLEN EFROS
Deputy Attorney General, Public Interest Division

/s/ *Grace Graham*

GRACE GRAHAM [D.C. Bar No. 472878]
Chief, Equity Section
441 Fourth Street, NW
Sixth Floor South
Washington, D.C. 20001
Telephone: (202) 442-9784
Facsimile:  (202) 741-8892
Email: grace.graham@dc.gov


/s/ *Douglas S. Rosenbloom*

DOUG ROSENBLOOM, D.C. Bar No. 1016235
Assistant Attorney General
441 Fourth Street, NW
Sixth Floor South
Washington, D.C. 20001
Telephone: (202) 724-1342
Facsimile:  (202) 730-0623
Email: douglas.rosenbloom@dc.gov

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2013, I have caused to be served, by electronic mail

and by electronic service via the Court's e-filing system, a true copy of the foregoing document

upon:

      RICHARD C. WELCH
      LAUREN B. POWELL
      OLGA METELITSA
      Mooney, Green, Saindon,
      Murphy & Welch, P.C.
      1920 L Street, NW Suite 400
      Washington, D.C. 20036
      (202) 783-0010
      rwelch@mooneygreen.com
      lpowell@mooneygreen.com
      ometelitsa@mooneygreen.com

                                    */s/ Douglas S. Rosenbloom*
                                    DOUG ROSENBLOOM, D.C. Bar No. 1016235
                                    Assistant Attorney General

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| KOLAWOLE J. AKINADEWO, *et al.*, | ) |
| Plaintiffs, | ) |
| v. | ) |
| DISTRICT OF COLUMBIA, | ) Civil Action No. 13-CV-1752 |
| and | ) |
| DISTRICT OF COLUMBIA TAXICAB COMMISSION, | ) |
| Defendants. | ) |

## NOTICE OF REMOVAL AND RELATED CASE

Defendants District of Columbia and District of Columbia Taxicab Commission (collectively, "Defendants"), by and through counsel, hereby submit this Notice of Removal and Related Case pursuant to 28 U.S.C. §§ 1441(a) and 1446 Federal Rule of Civil Procedure 83, and Local Rule of Civil Procedure 40.5.

As grounds for removal of the above-captioned matter, Defendants state as follows:

1. A civil action brought in the Superior Court for the District of Columbia over which this Court has original jurisdiction may be removed to this Court pursuant to 28 U.S.C. § 1441(a) if all defendants who have been properly served jointly file (or consent to) a notice of removal within 30 days of service. *See* 28 U.S.C. § 1446(b).

2. This Court has original jurisdiction over all civil actions arising under the Constitution and laws of the United States, 28 U.S.C. § 1331, and may exercise supplemental

jurisdiction over all claims that form part of the same case or controversy as claims within the Court's original jurisdiction, 28 U.S.C. § 1367(a).

3. On November 5, 2013, in the Superior Court for the District of Columbia, Plaintiffs filed a Complaint and Motion for Temporary Restraining Order and Preliminary Injunction against Defendants in the case of *Kolawole J. Akinadewo, et al. v. District of Columbia, et. al.* 2013 CA 007525 B.

4. The Complaint alleges a "regulatory taking without just compensation" (Count I) and an "arbitrary deprivation of property without due process of law" (Count II), which sound, respectively, under the eminent domain and due process clauses of the Fifth Amendment[1] of the U.S. Constitution.  Compl. ¶¶ 75-89.

5. The Court, therefore, has original jurisdiction over this action because Counts I and II of the Complaint arise under the Constitution and laws of the United States.  28 U.S.C. § 1331.  Accordingly, removal pursuant to 28 U.S.C. § 1441(a) is proper.[2]

Further, Defendants hereby provide notice that the above-captioned civil matter is related *Azam et al. v. District of Columbia Taxicab Commission, et al.,* Civ. A. No. 13-1558 (D.D.C. Oct. 9, 2013), currently pending before the Honorable Ellen S. Huvelle of this Court.  The undersigned counsel will file a notice of related cases in the *Azam* matter, as well.  The instant litigation is related and should be consolidated with *Azam* because both lawsuits are putative class actions challenging the legality of the same District of Columbia Taxicab Commission regulations – specifically, the taxicab modernization regulations requiring all taxicab operators to obtain, install, and operate a Modern Taximeter System and uniform dome lights  LCvR 40.5 (3)

---

[1] Plaintiffs actually cite the 14th Amendment (which does not apply to the District of Columbia) in Count II. Compl. ¶84.
[2] The Court likewise has supplemental jurisdiction over Counts III and IV of the Complaint because it forms part of the same case or controversy as the claims alleged in Counts I and II.  *See* 28 U.S.C. § 1367(a).

("Civil . . . cases are deemed related when the earliest is still pending on the merits in the District

Court and they . . . (ii) involve common issues of fact, or (iii) grow out of the same event or

transaction . . . .").

In light of the foregoing, Defendants hereby remove the above-captioned matter to this

Honorable Court pursuant to 28 U.S.C. §§ 1441(a) and 1446.

DATE: November 06, 2013                          Respectfully Submitted,

                                                 IRVIN B. NATHAN
                                                 Attorney General for the District of Columbia

                                                 ELLEN EFROS
                                                 Deputy Attorney General, Public Interest Division

                                                 /s/ Grace Graham
                                                 GRACE GRAHAM [D.C. Bar No. 472878]
                                                 Chief, Equity Section
                                                 441 Fourth Street, NW
                                                 Sixth Floor South
                                                 Washington, D.C. 20001
                                                 Telephone: (202) 442-9784
                                                 Facsimile:  (202) 741-8892
                                                 Email: grace.graham@dc.gov

                                                 /s/ Douglas S. Rosenbloom
                                                 DOUG ROSENBLOOM, D.C. Bar No. 1016235
                                                 Assistant Attorney General
                                                 441 Fourth Street, NW
                                                 Sixth Floor South
                                                 Washington, D.C. 20001
                                                 Telephone. (202) 724-1342
                                                 Facsimile:  (202) 730-0623
                                                 Email: douglas.rosenbloom@dc.gov

                                                 Counsel for Defendants

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
*TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA*
**OFFICE OF THE JUDGE-IN-CHAMBERS**
*OFICINA DEL JUEZ DE TURNO*

_____
**Plaintiff / *Demandante***

vs.                                    Case No. / *No. de caso* _____

_____
**Defendant / *Demandado***

## NOTICE OF HEARING / *AVISO DE AUDIENCIA*

You are hereby notified that Plaintiff has filed a/an/ *Por el presente, se le notifica que el/la Demandante ha presentado un/a*:

☑ Application for a Temporary Restraining Order (T.R.O.) / *Solicitud para una Orden de Restricción Temporal (T.R.O por sus siglas en inglés)*

☐ Motion for a Preliminary Injunction / *Petición para un Mandato Judicial Preliminar*

☐ Other / *Otro*: _____

The following Hearing has been scheduled for/has been continued to / *Se ha programado/aplazado la siguiente audiencia para*:

☑ _____ at / *a la(s)* _____ a.m. /p.m. a / *para*
   (date / *fecha*)              (time / *hora*)

    ☑ Hearing on the Application for Temporary Restraining Order / *una audiencia sobre la solicitud para una Orden de Restricción Temporal*

    ☐ Status Hearing on the Motion for Preliminary Injunction / *una audiencia sobre la petición para un Mandato Judicial Preliminar*

    ☐ Other / *Otro*: _____

will be heard by / *se ventilará ante*:

    ☑ Judge-in-Chambers / *el juez de turno*

    ☐ the calendar Judge / *el juez asignado*, Judge / *Juez* _____, calendar / *calendario* _____

at the following location / *en el siguiente lugar*:

    ☑ Judge-in-Chambers Room 4220 (4th Floor)/ *Juez de turno, Oficina 4220 (4to Piso)* – 500 Indiana Ave. NW

    ☐ 500 Indiana Ave. NW, Courtroom / *Sala* _____

    ☐ Building / *Edificio* A: 515 5th St. NW, Courtroom / *Sala* _____

    ☐ Building / *Edificio* B: 510 4th St. NW, Courtroom / *Sala* _____

Case: 2013 CA 007525 B

**If you wish to be heard, your presence is required / *Si desea hablar ante el juez, se requerirá su presencia.***

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
*TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA*
**OFFICE OF THE JUDGE-IN-CHAMBERS**
*OFICINA DEL JUEZ DE TURNO*

_____
**Plaintiff /** *Demandante*

vs.                                    Case No. / *No. de caso* _____

_____
**Defendant /** *Demandado*

**NOTICE OF HEARING /** *AVISO DE AUDIENCIA*

You are hereby notified that Plaintiff has filed a/an/ *Por el presente, se le notifica que el/la Demandante ha presentado un/a*:

☒   Application for a Temporary Restraining Order (T.R.O.) / *Solicitud para una Orden de Restricción Temporal (T.R.O por sus siglas en inglés)*

☐   Motion for a Preliminary Injunction / *Petición para un Mandato Judicial Preliminar*

☐   Other / *Otro*: _____

The following Hearing has been scheduled for/has been continued to / *Se ha programado/aplazado la siguiente audiencia para*:

☒   _____ at / *a la(s)* _____ a.m./p.m. a / *para*
          (date / *fecha*)                            (time / *hora*)

        ☒   Hearing on the Application for Temporary Restraining Order / *una audiencia sobre la solicitud para una Orden de Restricción Temporal*

        ☐   Status Hearing on the Motion for Preliminary Injunction / *una audiencia sobre la petición para un Mandato Judicial Preliminar*

        ☐   Other / *Otro*: _____

will be heard by / *se ventilará ante*:

        ☒   Judge-in-Chambers / *el juez de turno*

        ☐   the calendar Judge / *el juez asignado*, Judge / *Juez* _____, calendar / *calendario* ____

at the following location / *en el siguiente lugar*:

        ☒   Judge-in-Chambers Room 4220 (4th Floor)/ *Juez de turno, Oficina 4220 (4to Piso)* – 500 Indiana Ave. NW

        ☐   500 Indiana Ave. NW, Courtroom / *Sala* _____

        ☐   Building / *Edificio* A: 515 5th St. NW, Courtroom / *Sala*_____

        ☐   Building / *Edificio* B: 510 4th St. NW, Courtroom / *Sala*_____

**If you wish to be heard, your presence is required / *Si desea hablar ante el juez, se requerirá su presencia.***

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
*TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA*
**OFFICE OF THE JUDGE-IN-CHAMBERS**
*OFICINA DEL JUEZ DE TURNO*

_____
**Plaintiff /** *Demandante*

vs.                                      Case No. / *No. de caso* _____

_____
**Defendant /** *Demandado*

## NOTICE OF HEARING / *AVISO DE AUDIENCIA*

You are hereby notified that Plaintiff has filed a/an/ *Por el presente, se le notifica que el/la Demandante ha presentado un/a*:

☑ Application for a Temporary Restraining Order (T.R.O.) / *Solicitud para una Orden de Restricción Temporal (T.R.O por sus siglas en inglés)*

☐ Motion for a Preliminary Injunction / *Petición para un Mandato Judicial Preliminar*

☐ Other / *Otro*: _____

The following Hearing has been scheduled for/has been continued to / *Se ha programado/aplazado la siguiente audiencia para*:

☒ _____ at / *a la(s)* _____ a.m. /~~p.m.~~ a / *para*
    (date / *fecha*)                    (time / *hora*)

     ☒ Hearing on the Application for Temporary Restraining Order / *una audiencia sobre la solicitud para una Orden de Restricción Temporal*

     ☐ Status Hearing on the Motion for Preliminary Injunction / *una audiencia sobre la petición para un Mandato Judicial Preliminar*

     ☐ Other / *Otro*: _____

will be heard by / *se ventilará ante*:

     ☒ Judge-in-Chambers / *el juez de turno*

     ☐ the calendar Judge / *el juez asignado*, Judge / *Juez* _____, calendar / *calendario* _____

at the following location / *en el siguiente lugar*:

     ☒ Judge-in-Chambers Room 4220 (4th Floor)/ *Juez de turno, Oficina 4220 (4to Piso)* – 500 Indiana Ave. NW

     ☐ 500 Indiana Ave. NW, Courtroom / *Sala* _____

     ☐ Building / *Edificio* A: 515 5th St. NW, Courtroom / *Sala* _____

     ☐ Building / *Edificio* B: 510 4th St. NW, Courtroom / *Sala* _____

**If you wish to be heard, your presence is required / Si desea hablar ante el juez, se requerirá su presencia.**

**IN THE S  ERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**
**500 INDIANA AVENUE NW ROOM 5000**
**WASHINGTON, DC 20001**
**(202) 879-1133**

THE OFFICE OF
JUDGE-IN-CHAMBERS

2013 NOV -7 P 3: 17

Kolawole J. Akinadewo, et al.
 Plaintiff(s)

Case Number: 2013 CA 007525 B

vs

 District of Columbia, et al.
 Defendant(s)

AFFIDAVIT OF SERVICE

I, Lorenzo Kenerson, the undersigned, hereby certify that on November 6, 2013 at 3:05 PM, I executed service of process upon Defendant **DISTRICT OF COLUMBIA TAXICAB COMMISSION** by personally serving Jacques T. Lerner, Esq., General Counsel and Authorized Representative, at 2041 Martin Luther King Jr. Ave. SE #204, Washington, DC 20020 by delivering to and leaving with personally, copies of Summons, Complaint, and Initial Order and Addendum with Notice of Hearing, Motion for Temporary Restraining Order and for Preliminary Injunction, Memorandum of Points and Authorities in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, and Order. Jacques T. Lerner, Esq. is described as a White male, approximately 6' 0" tall, 200-225 pounds, brown eyes, black hair, and 50 years of age. The undersigned further certifies that my place of business is 4626 Wisconsin Avenue NW #300, Washington, DC 20016 (telephone 202-887-0700); that I am over the age of 18 years; and that I am not a party to this action.

I solemnly declare and affirm under penalties of perjury that the matters and facts set forth herein are true to the best of my knowledge, information, and belief.

Date: November 6, 2013

LORENZO KENERSON
Washington Pre-Trial Services, Inc.

NOTARY

Sworn and subscribed before me
on November 6, 2013

_____ (seal)

Kirk A. Hornbeck
Notary Public: District of Columbia
My Commission Expires 10/31/14

FILED
CIVIL ACTIONS BRANCH
NOV 05 2013
Superior Court
of the District of Columbia
Washington, DC.

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

KOLAWOLE J. AKINADEWO, et. al

*Plaintiffs*

v.

DISTRICT OF COLUMBIA
TAXICAB COMMISSION

Case No.

**ORAL HEARING REQUESTED**

COMPLETED

## MOTION FOR TEMPORARY RESTRAINING ORDER
~~AND/OR PRELIMINARY INJUNCTION~~

Pursuant to Superior Court Civil Rules 12-I and 65, Plaintiffs request the Court issue a temporary restraining order ~~and preliminary injunction~~ to enjoin the enforcement of D.C. Municipal Regulations 31-603 and 31-605 until D.C. taxicab drivers, including Plaintiff drivers are given a reasonable and realistic time to comply.

As more fully set out in the accompanying memorandum of points and authorities, the grounds for this motion are:

1.     The regulations adopted by Defendants are arbitrary and capricious as applied to D.C. taxicab drivers, including Plaintiff drivers.  The regulations have a severe impact on Plaintiffs' property rights and deprive Plaintiffs of their ability to earn "reasonable and just compensation" as required by D.C. Code §50-302(a)(2).

2.     If the regulations unlawfully adopted by Defendants are allowed to continue in effect, the Plaintiffs will suffer irreparable injury, including the loss of their ongoing business.



3.      The Defendants will suffer no harm by delaying the implementation of the regulations until the Plaintiffs have a reasonable opportunity to comply.  The deadlines unilaterally implemented by the Commission for compliance are arbitrary and Plaintiffs simple seek to preserve the *status quo*.

4.      The public interest will not be disserved by the issuance of an injunction while D.C. taxi drivers, including Plaintiff drivers, have a reasonable and realistic opportunity to comply with the regulations.  To the contrary, the public interest will affirmatively be served by having available taxi drivers for D.C. taxi riders.

Pursuant to Rule 12-I(a) the undersigned certifies, that despite diligent efforts, the consent of Defendants.

WHEREFORE, Plaintiffs respectfully requests that the Court grant Plaintiffs Motion for Temporary Restraining Order and Preliminary Injunction.

Respectfully submitted,

Richard C. Welch (DC Bar No. 485756)
Lauren B. Powell (DC Bar No. 1008301)
Olga Metelitsa (DC Bar No. 1016248)
Mooney, Green, Saindon, Murphy & Welch, P.C.
1920 L Street, N.W. Suite 400
Washington, D.C.  20036
(202) 783-0010
rwelch@mooneygreen.com
lpowell@mooneygreen.com
Dated: November 5, 2013          ometelitsa@mooneygreen.com

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

KOLAWOLE J. AKINADEWO, et. al

_Plaintiffs_

v.

DISTRICT OF COLUMBIA
TAXICAB COMMISSION

_Defendant._

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER ~~AND PRELIMINARY INJUNCTION~~

Pursuant to Rule 65 of the Superior Court Rules of Civil Procedure, Plaintiffs, by their undersigned counsel, submit this Memorandum of Points and Authorities in Support of their Motion for Temporary Restraining Order ~~and Preliminary Injunction.~~

## FACTUAL BACKGROUND

### I.   Modern Taxi Meter System

#### a.   Promulgation of MTS Regulation

On May 17, 2013, the District of Columbia Taxicab Commission ("Commission") issued a Notice of Formal Rulemaking in which it adopted a new regulation regarding the Modern Taximeter System ("MTS") for taxicabs, which was later codified at D.C. Municipal Regulation Section 31-603. 60 D.C. Reg 6993 – 7021 (May 17, 2013). The new MTS regulation required that beginning on September 1, 2013, "[e]ach taxicab shall operate only with an MTS unit that allows a passenger to make a cash payment or cashless payment, which shall be the decision of the passenger." D.C. Mun. Reg. § 31-603.2. The MTS consists of a meter, credit card reader, and

tablet with log-in functions, all of which are dependent on cellular reception in order to function properly. *See* D.C. Mun. Reg. § 31-603. All costs associated with obtaining an MTS unit, including installation, certification, operation, and compliance with applicable law are the burden of the individual taxicab owners. *Id*. at § 31-603.6. Further, with the installation of the MTS, taxicab drivers are obligated to pay to the Commission twenty five cents ($0.25) for every cash or credit card fare. D.C. Mun. Regs. § 31-801.7(b)(2).

### b. Inability to Comply with the MTS Regulation Despite Good Faith Compliance

The MTS is plagued with poor cellular reception quality and frequent log-in problems, including failing to timely start when a passenger first gets into the vehicle, failing to timely start when a taxicab driver begins his or her workday, losing cellular reception during a fare and failing to record all metered mileage, losing cellular reception at the end of a fare and failing to make credit payment possible, and taking an unreasonable amount of time to print receipts and therefore causing a taxicab driver to block traffic at the end of fares. (*See* Gebresalassie Aff. ¶¶ 15-16; Mazanderan Aff. ¶ 12; Zewdu Aff. ¶¶ 13-14; Olorunfemi Aff. ¶¶ 13-14). Due to the poor cellular reception quality and frequent log-in problems with the MTS, Plaintiffs have been forced to refuse patrons who cannot pay cash (Mazanderan Aff. ¶ 12), lose money on fares when poor cellular reception quality causes the meter to fail to record mileage (Gebresalassie Aff. ¶¶ 15-16; Mazanderan Aff. ¶ 12; Zewdu Aff. ¶¶ 13-14), take fares "off-meter" and charge customers for fares on a non-meter basis (Olorunfemi Aff. ¶¶ 13-14), take credit cards payments using credit cards readers other than those integrated into MTS (Olorunfemi Aff. ¶¶ 13-14), drive in and around the District of Columbia without a working MTS system (Zewdu Aff. ¶¶ 13-14; Olorunfemi Aff. ¶¶ 13-14), and stall traffic while waiting for the MTS system to function, (Zewdu Aff. ¶¶ 13-14). By some or all of the aforementioned acts, Plaintiffs who installed the

MTS within the arbitrary deadline set by the Commission are nevertheless in violation of D.C.Muncipal Regulation Section 31-603's requirements that a taxicab be equipped with a functioning MTS that maintains a data connection sufficient to record metered fares and allow for digital payments and/or of D.C. Municipal Regulation Section 31-603.10's prohibitions on operating a taxicab if the MTS unit is not functioning properly, limiting service or refusing to provide service based on the passenger's choice of payment method, or participating in a transaction involving taxicab service in the District of Columbia where the fare, rates, charges, or payment does not comply with the Commission's regulations. Under the circumstances, despite good faith efforts at compliance, Plaintiffs were unable to comply with the September 1, 2013 deadline to equip a taxicab with a fully functioning MTS that meets the Commission's technical specification.

The penalties for failing to comply with the requirement of a fully functioning MTS are severe. Pursuant to D.C. Municipal Regulation Section 31-612, a taxi driver who operates a vehicle without approved equipment is subject to fines between $100 and $750, impoundment of his vehicle, confiscation of his MTS unit or other meter, and suspension, revocation, or non-renewal of his license.

## II.   Dome Light Requirement

### a.  Promulgation of Dome Light Regulation

On November 14, 2012, the Commission issued a Notice of Formal Rulemaking in which it adopted a new regulation regarding Dome Lights in taxicabs, which was later codified at D.C. Municipal Regulation Section 31-605. 60 D.C. Reg. 1173-1174 (February 1, 2013). The new Dome Light regulation required that "[n]o later than April 30, 2013, all licensed taxicabs in the District of Columbia shall be equipped with the Commission-approved Dome Lights and Taxi

3

Number System." D.C. Mun. Reg. § 31-605.1. The regulatory deadline of April 20, 2013 was then pushed back by subsequent non-regulatory communications by the Commission.  In a May 28, 2013 press release, the Commission announced two certified manufacturers of the Dome Light, stated that installation of the Dome Light could begin June 1, 2013, and provided that "[a]ll DC taxis are required to be outfitted with the new standardized Dome Light by August 31, 2013." Government of The District of Columbia Taxicab Commission, *DC Taxicab Commission Announces Dome Light Manufacturers* (May 28, 2013), available at http://washingtondispatcher.com/clients/washingtondispatcher/DomeLightsPressRelease.pdf. More conflictingly, the Commission's website provides that "All licensed DC taxicabs are required to have the new standardized Dome Light installed by November 1, 2013." District of Columbia Taxicab Commission, Dome Light (2013) http://dctaxi.dc.gov/page/dome-light.

### b. Inability to Comply with the Dome Light Regulation Despite Good Faith Compliance

Plaintiffs and class members who have made multiple good-faith efforts to acquire a Dome Light have not been able to acquire a Dome Light as of November 1, 2013 because of a shortage of Dome Lights and installers. (Zewdu Aff. ¶¶ 16-17; Olorunfemi Aff. ¶¶ 17-18; Akinadewo Aff.¶  14; Gebresalassie Aff.¶ 17; Tessema Aff. ¶ 10). The Commission has authorized just two manufacturers and twelve installation locations for the Dome Light, who must service approximately 5,000 taxicabs. *See DC Taxicab Commission Announces Dome Light Manufacturers*, available at http://washingtondispatcher.com/clients/washingtondispatcher/DomeLightsPressRelease.pdf; District of Columbia Taxicab Commission, *Installation Locations* (2013) http://dctaxi.dc.gov/sites/default/files/dc/sites/dc%20taxi/page_content/attachments/Installation%20Locations-AA_1.pdf. The effect of these restrictions has been to impair Plaintiffs' ability to comply with the regulations. Installers have required Plaintiffs to join

waitlists of indefinite lengths and been unable to state how many days or weeks after November

1, 2013 Dome Lights will be available for installation. (*See* Tessema Aff. ¶ 10, Zewdu Aff. ¶¶

16-17). For instance, Plaintiff Girma Tessema tried but could not get an appointment to have the

Dome Light installed by the deadline. (Tessema Aff. ¶ 10). As a result, Plaintiff's Tessema's taxi

was impounded on the morning of November 1, 2013 and Plaintiff Tessema will lose the use of

his taxi until an installer can give him an appointment off the waitlist for Dome Lights. (Tessema

Aff. ¶ 10). Plaintiff Tessema does not know when he will receive an appointment and must

simply wait by the phone. (*Id.*)

Similarly, Plaintiff Manny Zewdu made approximately ten visits in October 2013 to five

authorized retailers in search of a Dome Light and was consistently told that the Dome Lights

were out of stock. (Zewdu Aff. ¶¶ 16-17). Even after expending six hours searching for a Dome

Light, Plaintiff Zewdu was not able to locate a Dome Light as of November 1, 2013. (*Id.*) Under

these circumstances of the marketplace, Plaintiffs have been unable to comply with the

regulation regardless of efforts at good faith compliance.

Yet, under D.C. Mun. Reg. § 31-612, impoundment is a guaranteed consequence of

operating a vehicle without approved equipment. As a result, not only has Plaintiff Tessema had

his taxicab impounded, but Plaintiffs Gebresalassie, Olorunfemi, Akinadewo, and Ruffin have all

been forced to forfeit the use of their taxicabs until they can obtain a Dome Light at an indefinite

date because of the risk of imminent impoundment (Tessema Aff. ¶¶ 11-12; Gebresalassie Aff. ¶

17; Olorunfemi Aff. ¶¶ 21-24; Akinadewo Aff. ¶ 15).

## III.   Request for a Stay

On September 27, 2013, Ferline Buie, acting on behalf the affected taxicab drivers, sent a

letter to the Commission requesting a stay of the regulations. (Affidavit of Ferline Buie (Buie

Aff.) ¶ 5). On October 16, 2013, Ms. Buie and a group of taxicab drivers met with City Administrator Allan Lew to again request a stay of the regulations. (Buie Aff. ¶ 6).  On or about October 29, 2013, Ms. Buie received a letter from the Commission that reflected a refusal to stay the regulations. (Buie Aff. ¶ 8). Ms. Buie contacted the Commission by telephone and it reiterated its position that it would not stay the regulations  (Buie Aff. ¶ 9).  Since November 1. 2013, the Plaintiffs, through their representatives, have continued to seek a stay of enforcement of the dome light and MTS regulations. (Buie Aff. ¶ 10).

## ARGUMENT

**I.**     **Legal Standard**

Plaintiffs seek a temporary restraining order ~~and preliminary injunction~~ against Defendant pursuant to Rule 65 of the Superior Court Rules of Civil Procedure.

To obtain a preliminary injunction, the moving party must establish:

> (1) that there is a substantial likelihood [they] will prevail on the merits; (2) that [they are] in danger of suffering irreparable harm during the pendency of the action; (3) that more harm will result to [them] from the denial of the injunction than will result to the defendant from its grant; and, in appropriate cases, (4) that the public interest will not be disserved by the issuance of the requested order.

*In re Estate of Reilly.* 933 A.2d 830, 834 (D.C. 2007). To obtain a temporary restraining order, Plaintiffs must make the same showing, except that they must show a danger of irreparable harm during the time required to brief, argue, and decide their motion for preliminary injunction, and that the Defendants will not suffer greater harm during the same time period.

As demonstrated below, Plaintiffs have satisfied all requirements for a temporary restraining order ~~and preliminary injunction~~ and the Court should issue an order directing the Defendant to refrain from enforcing the regulations at issue.

II.     **Plaintiffs Are Likely to Succeed on the Merits.**

    a. **The Timeframe for Implementation of Regulations 31-603 and 31-605 Is Arbitrary and Capricious.**

Regulation 31-603 mandates that each D.C. taxi driver, including Plaintiff drivers, purchase and have the required MTS equipment installed and operational by the unilaterally imposed date of October 1, 2013 (the "implementation date"). The approved MTS unit must be purchased from a payment system provider (PSP) approved by the Defendant and installed by a MTS installation business approved by the Defendant. By October 1, 2013, each taxicab driver was required to have a fully functioning MTS unit that includes, but is not limited to, a mechanism for the passenger to select their preferred payment method (either cash or credit card), uses a 3G or better cellular data connection and is equipped with a global positioning satellite (GPS).

The MTS is a synchronized system that connects the onboard meter with a computerized payment mechanism through a cellular data connection. A specific requirement of the new system is that passengers cannot be charged an amount through the MTS unit other than that displayed on the taximeter. D.C. Mun. Reg. §31-603.8(e). In fact, a driver that seeks to collect a fare other than the one displayed on the meter is subject to penalties for noncompliance. As the evidence submitted demonstrates, however, the MTS unit is currently dysfunctional and ineffective.

Because of poor reception and frequent log-in problems, D.C. taxi drivers including the Plaintiff drivers and other class members have been forced to bear the burdens of these admitted deficiencies by, among other things, refusing to transport patrons who cannot pay cash for the stated fare (Mazanderan Aff. ¶ 2), losing money on fares when the meter fails to properly and

7

accurately record mileage (Gebresalassie Aff. ¶ 2 ; Mazanderan Aff. ¶ 2; Zewdu Aff. ¶ 2), taking

fares "off-meter" and charging customers on a different basis (Olorunfemi Aff. ¶¶ 1-2), taking

credit card payments using other credit cards readers not integrated into MTS (Olorunfemi Aff.

¶¶ 1-2), driving in and around the District of Columbia without a working MTS system (Zewdu

Aff. ¶¶ 2; Olorunfemi Aff. ¶¶ 1-2), and stalling and impeding traffic while waiting for the MTS

system to function  (Zewdu Aff. ¶¶ 2).

  Section 603.10 of the Regulations issued by the Defendant prohibits the operation of a

taxi if the MTS unit is not functioning properly. Due to the operational deficiencies, D.C. taxi

drivers including the Plaintiff drivers and other class members are forced to either violate D.C.

Regulations by not having a "functioning" MTS or refrain from driving. A driver risks serious

penalties including, impoundment of his or her vehicle, confiscation of the MTS unit, fines up to

$750, and suspension, revocation or non-renewal of his or her taxi license despite the fact that

the driver has completely satisfied the obligation to purchase and install the required equipment

from the vendors designated by the Defendant. Consequently, despite their good faith efforts to

comply with the Regulations, D.C. taxi drivers including the Plaintiff drivers and other class

members are vulnerable to the complete confiscation of their livelihood and property.

  Similarly, D.C. Municipal Regulation Section 31-605 required drivers' taxis, including

Plaintiff drivers' taxis, to be equipped with Commission-approved Dome Lights and Taxi

Number Systems no later than November 1, 2013.  Like the MTS units, the Dome Lights must be

installed by a limited number of vendors unilaterally selected and approved by the Defendant.

Despite the Commission's inherent knowledge of the number of taxis that would need to install

the Dome Lights, Defendant failed to arrange for an adequate number of authorized dealers and

installers. This failure resulted in a shortage of Dome Lights available for installation and the

vendors authorized by the Defendant were incapable handling the request for installation in any reasonably timely manner. As a result, D.C. taxi drivers including the Plaintiff drivers and other class members who have made multiple good-faith efforts to acquire a Dome Light by the arbitrary deadline set by the Commission have been unable to comply with the regulation. There are simply not enough Dome Lights or installers for the approximately 7,000 D.C. taxi drivers affected by the regulations. Once again, Defendant bears the burden of the inadequacy of the number of approved vendors because it exclusively controlled the installation process. Its failure to secure sufficient vendors and inventory has caused injury and harm to the drivers, including the Plaintiff drivers.

Again, D.C. taxi drivers including the Plaintiff drivers and other class members are forced to risk the imposition of penalties or abstain from operating their vehicles. For example, Plaintiff Girma Tessema is currently on a waitlist to have his dome light installed. Plaintiff Tessema, however, was unable to get an appointment by the November 1, 2013 deadline. Plaintiff Tessema's taxi was impounded on the morning of November 1, 2013 and he will lose the use of his taxi until he is removed from the waitlist. (Tessema Aff. ¶ 2). Similarly, Plaintiff Manny Zewdu made approximately ten visits in October 2013 to five authorized retailers in search of a Dome Light and was consistently told by each vendor that it was out of stock. (Zewdu Aff. ¶ 2-3). Even after expending six hours searching for a Dome Light, Plaintiff Zewdu was not able to locate one as of November 1, 2013. (*Id.*)

Given the circumstances, full compliance with the regulations is impossible within the arbitrary deadline set by the Commission. The Commission mandated the type of units and lights as well as the businesses authorized to install these devices. D.C. taxi drivers, including the Plaintiff drivers and other class members, cannot reasonably be expected to comply with the

regulatory deadlines set by the Commission while facing operational impediments out of their control.

### b. Regulations 31-603 and 31-605 Are Arbitrary and Capricious Because They Deprive Plaintiffs of Their Right to Just Compensation and Fail to Adequately Protect Drivers from Unsafe Environments.

The Establishment Act charges the Commission with the duty to "[e]stablish reasonable rates for taxicab service for the transportation of passengers and their property within the District, including all charges incidental and directly related to the provision of taxicab services." D.C. CODE § 50-307(c)(l) (LexisNexis 2012). Additionally, the Establishment Act endeavors to "maintain a taxicab transportation system which provides owners and operators of taxicabs with reasonable and just compensation for their services. . . ." § 50-302(a)(2).

The chronic mechanical failures of the MTS units, however, deprive D.C. taxi drivers including the Plaintiff drivers and other class members of just compensation for their services in violation of the Establishment Act. As explained in section II (b), drivers are forced to take less than fair compensation for their services due to malfunctioning MTS units. When there is an interruption in the cellular data connection, the meter and credit card machines stop running. Notwithstanding the malfunction of the equipment, drivers must continue to drive passengers to their designated location while the meter is inoperable. Moreover, the Regulation specifically mandates passengers may not be charged any amount through the MTS unit other than that shown on the taximeter. D.C. taxi drivers including the Plaintiff drivers and other class members, therefore, are required to accept an amount below the fair value of their services. Further, if passengers do not have cash, drivers may not receive any compensation. This is unquestionably a violation of the Establishment Act.

In addition, Regulation 31-605 fails to adequately protect drivers from unsafe conditions. The regulation requires that the LED portion of the dome light go "dark" when the taxicab is not available for hire. D.C. Mun. Reg §31-605.5 The on/off switch on the Commission-mandated Dome Light, however, is located outside of the vehicle on the passengers-side. In order to completely turn off the Dome Light, drivers must get out of their vehicles, walk around to the passengers-side, and physically turn off the Dome Light. This unnecessarily requires drivers to place themselves in potentially dangerous situations to comply with the arbitrary requirement of the regulations.

### c. As Applied, Regulations 31-603 and 31-605, Deprive Plaintiffs of Their Constitutional Right to Property Without Just Compensation.

The Fifth Amendment prohibits the taking of private property for public use without just compensation. Courts consider two general factors to determine whether a regulatory taking has occurred: (1) the "character of the governmental action;" and (2) "the economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectation." *Potomac Dev. Corp. v. District of Columbia*, 28 A.3d 531, 539 (D.C. 2011).

As applied, the MTS and Dome Light regulations violate D.C. taxi drivers', including the Plaintiff drivers' and other class members', constitutional property rights. Specifically, given the significant technical malfunctions of the MTS units and shortage of Dome Lights and installation vendors, full compliance with the regulations is impossible within the arbitrary deadline set by the Commission. As a result, drivers are subject to significant penalties for non-compliance despite their good-faith efforts. As shown above, D.C. taxi drivers including the Plaintiff drivers and other class members have either had their taxis impounded and/or been

forced to curtail the use and enjoyment of their taxis indefinitely because of the risk of impoundment, license revocation, and license non-renewal.

## III.   Plaintiffs Will Suffer Irreparable Injury in the Absence of an Injunction.

Harm is irreparable if the threat of injury is imminent and well-founded, and the injury itself would be incapable of being redressed after a final hearing on the merits. *Wieck v. Sterenbuch*, 350 A.2d 384, 388 (D.C. 1976). A violation of constitutional rights constitutes a *per se* irreparable harm. *District of Columbia v. Eastern Trans-Waste of Md., Inc.*, 758 A.2d 1, 15 (D.C. 2000). In this case, D.C. Taxi drivers have been deprived of their property rights without just compensation. As described in Part II(c)-(d), the regulations violate drivers', including Plaintiff drivers', constitutional property rights. Drivers have either already been deprived of their taxicabs because of impoundment or face imminent danger of being deprived of their taxi cabs due to impoundment, license revocation and license non-renewal.

Additionally, economic loss constitutes irreparable harm if the economic loss threatens the very existence of the movant's business or deprives the movant of a livelihood. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974); *District of Columbia v. Eastern Trans-Waste of Md., Inc.*, 758 A.2d 1, 15 (D.C. 2000); *Zirkle v. District of Columbia*, 830 A.2d 1250, 1257 (D.C. 2003); *Bonds v. Heyman*, 950 F. Supp. 1202 (D.D.C. 1997). *See also Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) (A "substantial loss of business and perhaps even bankruptcy" absent preliminary injunctive relief shows "irreparable injury.")

In addition to violating drivers' right to property, the new regulations create a danger of irreparable harm to drivers' ability to earn a livelihood. State authority to make municipal regulations and ordinances cannot arbitrarily interfere with the constitutional rights to carry on a lawful business, make contracts, or use and enjoy property. *Dobbins v. Los Angeles*, 195 U.S.

223 (1904). The property right to earn a livelihood, by following the ordinary occupations of life,

is protected by the Constitution under the guarantees of the 14th Amendment. *Terrace v.*

*Thompson*, 263 U.S. 197 (1923).

Taxicab drivers are independent owners of their businesses and their livelihood is directly

tied to their ability to use their property. Drivers have already had their taxis impounded, been

forced to refrain from using their taxis for fear of imminent impoundment, or been forced to

curtail their use of their property because of malfunctioning equipment.  Section 31-612 would

further subject Plaintiffs to the revocation and non-renewal of their licenses for operating without

approved equipment. Given the nature of the taxi driver profession, there is no way for D.C. taxi

drivers including the Plaintiff drivers and other class members to follow their professions

without the use of their taxis or without hacking licenses. Thus, D.C. taxi drivers including the

Plaintiff drivers and other class members are put in the impossible position of either refraining

from their professions indefinitely until dome light supply can meet demand and MTS systems

function properly as required by the Commission, or losing their licenses and future ability to be

taxi drives. The economic therefore lose their entire livelihoods as a result of the regulations.

Finally, irreparable harm in a private action may be based on harm to the general public.

*Mississippi Power & Light Co. v. United Gas Pipe Line Co.* 760 F.2d 618, 623 (5th Cir. 1985).

Courts analyze whether there would be irreparable harm to the public if the preliminary

injunction is denied. *Northern Indiana Pub. Service Co. v. Carbon County Coal Co.*, 799 F.2d

265, 280 (7th Cir. 1986); *see also*, in *Mississippi Power & Light Co. v. United Gas Pipe Line*

*Co.,* 760 F.2d at 623 (holding a preliminary injunction to prevent future overcharges was proper

even though the only "irreparable injury" claimed was the adverse impact of future overcharges

on the public).

Here. the general public is in danger of suffering irreparable harm because the regulations create a taxi shortage by requiring compliance and creating circumstances where good faith compliance, given the timeframe is impossible. D.C. taxi drivers including the Plaintiff drivers and other class members have either had their taxis impounded or been forced to curtail hacking because their taxis cannot meet the regulations' requirements despite good faith efforts. As a result, there are currently fewer taxis on the streets available to the general public. As a result of this shortage, members of the general public will suffer irreparable harm if preliminary relief is not granted because there will be no way to remedy the harms created by the shortage following the conclusion of this legal action.

IV.     **The Balance of Harms Favors Plaintiffs.**

The Defendant will suffer no harm from a temporary delay in the adaptation of the new taxicab regulations. Plaintiffs seek only to preserve the *status quo*.  The Commission and D.C. taxi drivers can continue to operate under the previous regulations for the additional time period needed for the new MTS units to operate effectively and more dome lights be produced and installed.  Time is not of the essence here; the September 1, 2013 and November 1, 2013 deadline announced by the Commission are simply unilaterally selected and imposed arbitrary dates.

V.     **The Public Interest Will not Be Disserved by the Issuance of an Injunction.**

The public interest will not be disserved by the issuance of a temporary restraining order and an injunction pending final judgment in this case. To the contrary, having taxis available for hire and uniform and consistent payment options will affirmatively serve the public interest. If the regulations are not stayed, taxi drivers will be forced to take their cars out of service while they wait to get off installation waiting lists and for the glitches in the MTS units to be resolved.

14

## VI.   No Security Bond Should be Required

Rule 65(c) of the D.C. Superior Court Rules of Civil Procedure governs the requirement

of posting a security bond for a~~ preliminary injunction~~ or temporary restraining order. It is

identical to Fed. R. Civ. P. 65(c), and our courts routinely follow federal court precedents in

construing this rule. *See* e.g., *L 'Enfant Plaza Properties, Inc. v. Fitness Systems*, Inc., 354 A.2d

233,236-37 (D.C. 1976). It is well-established that, "under appropriate circumstances bond may

be excused, notwithstanding the literal language of Rule 65(c)." *Wayne Chemical, Inc. v.*

*Columbus Agency Service Corp.*, 567 F.2d .692, 701 (7th Cir. 1977).

When determining whether or not to require a bond courts consider two factors: (1) the

possible loss to the enjoined party; and (2) the hardship that a bond requirement imposes on the

applicant. *See Crowley v. Local No. 82, Furniture & Piano*, 679 F.2d 978 (1st Cir. 1982), *rev'd*

*on other grounds*, 467 U.S. 526, 81 L. Ed. 2d 457, 104 S. Ct. 2557 (1984). When the applicant

would face financial difficulty posting bond and the harm to the defendant is low - courts have

not required the posting of a bond. *Id*. (upholding denial of bond where Union members would

have had financial difficulty posting it, and where defendants faced low burden from absence of

security); *see also*, *International Controls v. Vesco*, 490 F.2d 1334, 1356 (2d Cir. 1974), *cert.*

*denied*, 417 U.S. 932, 41 L. Ed. 2d 236, 94 S. Ct. 2644 (1974) (noting that "the district court may

dispense with security where there has been no proof of likelihood of harm to the party

enjoined") (citations omitted); *Urbain v. Knapp Brothers Mfg.*, 217 F.2d 810 (6th Cir. 1954) (no

bond required where defendant would not appear to face material damage); *Continental Oil v.*

*Frontier Refinery*, 338 F.2d 780 (10th Cir. 1964) (no bond required where likelihood of harm to

defendant is absent).

Here, Plaintiffs are taxicab drivers who make on average $20,000 to $30,000 a year. Additionally, the imposition of the regulations has caused financial hardship for the Plaintiffs. Because full compliance within the arbitrary timeframe of the Commission is impossible, Plaintiffs are forced to take their cars off the road or pay steep fines. This directly affects Plaintiffs ability to earn a livelihood.

Further, Defendant will not suffer material harm if this Court dispenses the security bond requirement. Plaintiffs are simply seeking to preserve the *status quo* until they have been given a reasonable amount of time to comply under the circumstances. If a bond is required, the Court should exercise its discretion and require only a nominal bond. *See. e.g.*, *Natural Resources Defense Council. Inc. v. Morton*, 337 F. Supp. 167 (D.D.C. 1971) ($100 bond); *Environmental Defense Fund v. Corps of Engineers of the U.S. Army*, 331 F. Supp. 925 (D.D.C. 1971) ($1 bond).

## CONCLUSION

For the reasons stated above, Plaintiffs' motion for a temporary restraining order ~~and preliminary injunction~~ should be granted.  Defendants' should be restrained and enjoined, pending further order of the Court, from implementing and enforcing D.C. Municipal Regulations. 31-603 and 31-605.

Respectfully submitted,

Richard C. Welch (DC Bar No. 485756)
Lauren B. Powell (DC Bar No. 1008301)
Olga Metelitsa (DC Bar No. 1016248)
Mooney, Green, Saindon, Murphy & Welch, P.C.
1920 L Street, N.W. Suite 400
Washington, D.C.  20036
(202) 783-0010
rwelch@mooneygreen.com
lpowell@mooneygreen.com
Dated: November 5, 2013          ometelitsa@mooneygreen.com

17

## CERTIFICATE OF SERVICE

I, Richard C. Welch, do hereby certify that on this 5nd day of November, 2013, a true and correct copy of PLAINTIFFS' MOTION AND MEMORANDUM OF POINTS AND AURHORITIES OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER ~~AND PRELIMINARY INJUNCTION~~ has been served via personal service with Plaintiffs Complaint and Summons on:

DISTRICT OF COLUMBIA
TAXICAB COMMISSION
2041 Martin Luther King Jr Avenue, SE
Suite 204
Washington, DC 20020

Richard C. Welch

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

KOLAWOLE J. AKINADEWO, et. al

*Plaintiffs*

v.

DISTRICT OF COLUMBIA
TAXICAB COMMISSION

Case No.

## ORDER

Having reviewed Plaintiffs' Motion for Temporary Restraining Order, as well as the accompanying Memorandum of Points and Authorities, it is this _____ day of _____ , 2013 hereby

**ORDERED,** that Plaintiffs Motion shall be GRANTED; and further

**ORDERED,** that Defendant is hereby RESTRAINED from implementing and enforcing D.C. Mun. Reg 31-603 and 31-605; and further

~~**ORDERED,** that the Court shall conduct a hearing on the request for a Preliminary Injunction on November 18, 2013 at 10 AM; and further~~

**ORDERED.** that this Temporary Restraining Order shall take effect immediately without the posting of a bond and shall expire 10 days henceforth pending further Order of the Court.

_____                          _____
Date                                             Judge, D.C. Superior Court

AFFIDAVIT OF ADDIS GEBRESALASSIE

I, ADDIS GEBRESALASSIE , declare the following in support of the lawsuit and injunction sought by the D.C. Taxi Operators Association:

1.     My name is Addis Gebresalassie.

2.     My mailing address is 401 12th Street South, Arlington Virginia 22202.

3.     I am 44 years old.

4.     My cell phone number is (703) 930-0135 .

5.     My taxi license number is 71912.

6.     I have been a licensed taxi cab driver for approximately 13 years. I have been a licensed taxi cab driver for approximately 13 years in the District of Columbia. I own one taxi. I am an independent contractor for Silver Cab Company.

7.     I have installed a Modern Taxi Meter System ("MTS"). I had the system installed on October 7, 2013.

8.     I already had a credit card –reader but I was forced to get a entirely new system.

9.     I had it installed at Transco.

10.     Before I went to Transco, I had an appointment to have the MTS system installed on September 25, 2013 with Glicke. Glicke is a PSP provider. Grand Cab Company is a subcontractor with Glicke. I had to sign a contract with Grand because the prices are the same for each company. I had to pay Grand $280 for an installation fee.

11.     On September 25, 2013, when I arrived at Glicke they told me I had to sign a new contract with them and pay $350 and that they would not be able to get the installation



1

done that day.  I did not pay it because I already paid money to Grand for installation.  I left

and did not have the system installed on that day.

12.     After I left Glicke I called all of the 9 PSP to ask where I could get the MTS

installed before the October 1st deadline.  All of the companies said they were backed –up

and couldn't install the system until after the deadline.  The fist available appointment was

October 7, 2013.  I lost 5-6 day of driving to find a company and sign a contract with a

company that would install the system.  I lost approximately $1,200.00 during this time.

13.     On October 7, 2013 I got my MTS installed at Transco.  It cost me $450 to have it

installed.  I called Grand and asked for my $280 dollars back.  Grand refunded my money.  I

have not picked it up yet because I have to drive back Grande to get the money.

14.     It took Transco 6 hours to install the system.  I lost approximately $120 during

this time.

15.     My new MTS is currently not working properly.  I was given a phone that

connects to the credit card reader and the meter.  The phone does not get signal. If the phone

does not have signal then the meter does not work and neither does the credit card.  This

means that I have to drive passengers while the meter is not working.  I lose money.   This

happens approximately 50% of the times.  This problem began from day one.

16.     To fix the problem I have to take out the battery.  I have tried to call Transco and

they do not have a customer service line.  I have gone back to Transco and told them about

the problem.  Transco told me to take the battery out, put it back, and wait for 30 minutes

before driving.

17.     I do not have the Dome Light currently installed on my taxi.  I don't have it

installed because the first appointment I could get was November 4, 2013.  I have an



2

appointment scheduled on that day.  It is going to cost me $475 to buy and have it installed.  I went to approximately 5-6 places before I got my appoint with Silver to have the Dome Light installed. I cannot drive my car until I get the Dome Light installed.  I will not drive for 4 days while I wait for my appointment.  I will lose approximately $800 in those 4 days.

18.      I have not had my taxi painted.  I do not have to have it painted until my next inspection, which is November 16, 2013.  I looked at Amco and other companies and it will cost at least $400 to have the taxi painted.

I SWEAR UNDER PENALTY OF PERJURY THAT THE INFORMATION CONTAINED IN THIS DOCUMENT IS TRUE AND  CORRECT.

Dated: November 1, 2013                          Addis Gebresalassie

Subscribed and sworn to before me this ___1st___ day of Nov, 2013.

Signature of Notary Public

Notary Public, District of Columbia

My commission expires on _____

3

### AFFIDAVIT OF FERLINE BUIE

I, Ferline Buie, declare the following in support of the lawsuit and injunction sought by the Washington D.C. Taxi Operators Association:

1.      I am President and Business Manager of Teamsters Local Union 922 ("Local 922") affiliated with the International Brotherhood of Teamsters. I have been President of Local 922 since 2001.

2.      In September 2013, the Local Union was approached by a group of District of Columbia taxicab drivers requesting assistance with creating an association to advocate on their behalf concerning issues in the taxi industry. In particular, the drivers sought our assistance to address their grievances against the District of Columbia Taxi Commission concerning the recently issued regulations requiring new "smart meters" and new dome lights to be installed in all taxicabs.

3.      The main complaint of these drivers was their inability to comply with the onerous regulations issued by the Taxi Commission in a timely manner as well as the deficiencies of the new MTS system. Many of the taxi drivers have been unable to comply with the regulations and are subject to severe penalties, including the impoundment of their vehicles, for failure to comply with these regulations. In particular, the MTS system appears to be fraught with technical difficulties which make it impossible for the drivers to access and operate the system properly. Consequently, drivers who have complied with the MTS regulations are now vulnerable to the regulatory penalties through no fault of their own. Similarly, the dome light regulations are causing numerous drivers to be subject to penalties despite their efforts to comply with the provisions.

4.      In addition, the cost associated with these regulations is borne by the owner operator taxi drivers. As a result, these taxi operators have expended considerable funds

endeavoring to comply with the regulations. The deficiencies in the regulatory scheme have caused a diminution in their incomes and a threat to their livelihoods.

5.      On or about September 27, 2013, I corresponded with the DC Taxi Commission requesting that the Commission exercise its discretion to stay the regulations. A true and correct copy of that letter is attached.

6.      On October 16, 2013, I, along with several taxicab drivers, met with District of Columbia City Administrator Alan Lew regarding the deficiencies in the new regulations. At that meeting, we explained the problems with the MTS system and the new dome light regulations. In particular, the drivers asked if they could go on the public open market to buy their credit machines. Under the MTS regulations, drivers are limited to a few vendors specifically selected by the Taxi Commission. Mr. Lew said he was willing to continue to meet with the taxi drivers, but gave no direct answer to these concerns. Mr. Lew also said that he would speak with the Taxi Commission about these matters.

7.      On October 29, 2013, approximately 1,000 taxicabs formally created the Washington, D.C. Taxi Operators Association ("Association"). The Association contracted with Local 922 to provide organization and support services to the Association.

8.      Also on October 29, 2013, I received a letter from Taxi Commission Chairman Ron Linton dated October 28, 2013, responding to my letter of September 27. In his letter, Mr. Linton states that he was willing to meet to discuss the regulations affecting the taxicab drivers. His letter, however, did not reflect any willingness to stay the enforcement of the regulations pending any such discussion.

9.      On October 30, 2013, I contacted Mr. Linton's office regarding the request to stay the enforcement of the penalties imposed by the regulations. Although Mr. Linton would not

speak with me, I was told by his executive assistant that the Taxi Commission would not stay the regulations.

10.     Also on October 30, 2013, I sent a letter to Mayor Vincent Gray requesting a meeting to discussing the following issues: (1) a moratorium on the penalties associated with the new regulations; (2) compensation to the drivers for cost incurred by the regulations; and (3) appointment of a taxicab driver to the Taxi Commission. I have not received a response to this letter.

11.     The failure of any responsible DC official to address these serious and immediate concerns has left the drivers and the Association with no choice but to seek judicial relief. It is simply unfair and unjust for the Taxi Commission to penalize drivers when the MTS system is malfunctioning and often inoperable. It is similarly unfair and unjust to penalize drivers for the failure to comply with the dome light regulations when it the regulations expose them to safety concerns and the simple installation of the dome lights is a protracted process. The drivers as well as the public citizenry of the District of Columbia deserve better from the Taxi Commission. The drivers are ready, willing and able to pursue compliance with legitimate regulations in a timely fashion. They cannot, however, make the MTS systems work when it is deficient and they are at the mercy of the vendors who install the dome lights. These concerns, coupled with the safety realities associated with the regulations, require that the penalties associated with the regulations be stayed for a reasonable period of time.

I SWEAR UNDER PENALTY OF PERJURY THAT THE INFORMATION CONTAINED IN THIS DOCUMENT IS TRUE AND CORRECT.

Ferline Buie

Dated: November 4, 2013                  Ferline Buie

## AUTOMOTIVE, PETROLEUM, CYLINDER AND BOTTLED GAS, CHEMICAL DRIVERS, HELPERS AND ALLIED WORKERS AND PUBLIC TRANSPORTATION EMPLOYEES LOCAL UNION 922

2120 BLADENSBURG ROAD, NE, WASHINGTON, D.C. 20018

AFFILIATED WITH: INTERNATIONAL BROTHERHOOD OF TEAMSTERS • TEAMSTERS JOINT COUNCIL NO. 55

PHONE 202-526-9200      FAX 202-526-9253

FERLINE BUIE
PRESIDENT AND
BUSINESS MANAGER

RUDOLPH GARDNER
SECRETARY-TREASURER

MAJOR AKBAR MUHAMMAD
VICE PRESIDENT

MAXINE LYONS
RECORDING SECRETARY

RICHARD WIGGINS
FELIX ODENARIAN
CRAIG PHILSON
TRUSTEES

Ron M. Linton, Chairman
D.C. Taxicab Comission
2041 Martin Luther King Jr Avenue, SE,
Suite 204
Washington, DC 20020

Dear Mr. Linton:

I am President of Teamsters Local Union 922.   Our Union has agreed to provide representative services to the Washington DC Metro Taxi Operators Association.   The Washington DC Metro Taxi Operators Association consists of taxi cab operators throughout the city of Washington, DC.

We believe that certain regulations imposed on taxi cab operators by the DC Taxi Cab Commission are arbitrary, capricious and contrary to the law.   Specifically, we believe that the regulations regarding dome lights, credit card payments and uniform vehicle colors should be stayed to allow a review of these regulations.   In order to avoid litigation, the Washington DC Metro Taxi Operators Association requests that the regulations be stayed to allow a resolution that does not disproportionately adversely affect the City's taxi cab drivers.

To that end, we would like the opportunity to present evidence regarding the impact of these regulations on the taxi cab drivers.   Thank you for your attention to this matter.   I look forward to your response.

Sincerely,

Ferline Buie

Ferline Buie

cc:     Honorable Vincent Gray
        Ralph Burns

Paul Cohn
Cyril Crocker
Elliott Ferguson
Gladys Mack
Anthony Muhammad
Betty Smalls
Stanley W. Tapscott
Richard C. Welch ✓

# AFFIDAVIT OF KOLAWOLE J. AKINADEWO

I, Kolawole J. Akinadewo, declare the following in support of the lawsuit and injunction sought by the D.C. Taxi Operators Association:

1.      My name is Kolawole J. Akinadewo.

2.      My address is 133 Webster Street, NW, Apt 9, Washington, DC 20011-7355.

3.      I am 69 years old.

4.      My telephone number is (202) 726-2599. My cell phone number is (202) 425-3539.

5.      I have been a licensed taxi cab driver in the District of Columbia for approximately 35 years.

6.      My taxi license number is 51675.

7.      I own one taxi.

8.      I am associated with Yellow Cab Company.

9.      I do not have an MTS system installed in my cab.

10.      I already have a Yellow Cab Company "MTD" system in my cab, which connects the meter, a credit card reader, and the dispatch system.

11.      In or about July or August 2013, I was told by Yellow Cab Company not to install an MTS or dome in my car because they would fight the regulations so that Yellow Cab Company could keep the MTD system and color.

12.      On or about October 21, 2013, I spoke to Vaughn Williams, owner of Yellow Cab Company, who told me to not make any changes because Yellow Cab Company was still fighting the regulations.

1

13.     On or about October 30, 2013, I spoke with a member of William's staff, who told me that I would probably need to get the dome.

14.     On or about October 30, I visited Jindal Andre Automotive to inquire about getting a dome. I was quoted $397 for the dome, be installed on November 3, 2013. I was forced to make a down payment of $200 to reserve my dome.

15.     As of November 1, 2013 and until my cab is outfitted with a dome, I will not drive a taxi because I am at risk of getting a ticket and getting my car impounded.

16.     If I cannot drive my cab until November 4, 2013 because I am waiting for the dome to be installed, I will lose approximated $300 in revenue.

17.     For the MTS, dome, and painting requirements, I have been very confused as to what is specifically required and what the deadlines are. The information I get from the D.C. Taxicab Commission's website and news directly conflicts with the information that Yellow Cab Company is telling me.

18.     Because Yellow Cab Company controls my dispatching, meter, and credit card reader, and because I am under contract with Yellow Cab Company, I am restricted in trying to make changes without their support.

$K \cdot A$

I SWEAR UNDER PENALTY OF PERJURY THAT THE INFORMATION CONTAINED IN THIS DOCUMENT IS TRUE AND CORRECT.

Dated: November 1, 2013                    Kolawole J. Akinadewo

Subscribed and sworn to before me this _1st_ day of _Nov_ 2013.

Signature of Notary Public

Notary Public, District of Columbia

My commission expires on



3

17.     In total, I spent approximately 6 hours visiting dome retailers and trying to assess when they would have a dome in stock or how I could join the waitlist. Because of the time I spent trying to comply with the dome requirement, I lose approximately $70 to $80 in revenue.

18.     For instance, with Lincoln, I visited the first time and was told to come back four days later to get the dome installed. When I came back four days later, Lincoln did not have a dome for me. I then visited Lincoln against, approximately 8 or 9 days later, seeking a dome and was once again turned away.

19.     As of today, November 1, 2013, I still have not been able to locate a retailer that can install a dome for me today.

20.     Even if I was able to locate a dome in stock, I find the cost prohibitively expensive. I was quoted $470 for the dome.

21.     For the MTS, dome, and painting requirements, I have been very confused as to what is specifically required. For instance, I only learned through word of mouth that the MTS tablet and the MTS meter needed to be synchronized, or else I could be fined. I am unclear about the painting requirements, particularly in regard to the deadlines.

22.     I have tried to read the D.C. Register to learn about the new requirements, but I find it difficult to follow the differences between the proposed and final versions of the regulations.

3

I SWEAR UNDER PENALTY OF PERJURY THAT THE INFORMATION CONTAINED IN THIS DOCUMENT IS TRUE AND CORRECT.

MANNY ZEWDU

Dated: November 1, 2013                     Manny Zewdu


Subscribed and sworn to before me this ___1st___ day of Nov 2013.

Signature of Notary Public

Notary Public, District of Columbia

My commission expires on _____

Gretchen R. Waller
Notary Public, District of Columbia
My Commission Expires 5/31/2014

4

AFFIDAVIT OF ROTIMI OLORUNFEMI

I, Rotimi Olorunfemi, declare the following in support of the lawsuit and injunction sought by the D.C. Taxi Operators Association:

1.      My name is Rotimi Olorunfemi.

2.      My address is 6102 Roanoke Avenue, Riverdale, MD 20737.

3.      I am 57 years old.

4.      My telephone number is (240) 882-4435.

5.      I have been a licensed taxi cab driver for approximately 18 years.

6.      I have been a licensed taxi cab driver in the District of Columbia for approximately 14 years.

7.      My taxi license number is H93323.

8.      I own one taxi.

9.      I am associated with Allied Cab Company.

10.     I had a car accident on July 28, 2013 while I was driving my cab in the course of my employment. My cab was rear-ended in a multiple car accident and severely damaged.  I have not been able to use a cab from July 28, 2013 through present day. I have not been able to repair my cab or buy a new cab because I am still waiting for the other side's insurance to pay out.

11.     In the interim, I have been renting and driving a cab from Silver Cab Company for $180 a week.

12.     The cab that I am driving does have an MTS system, which was installed by Silver Cab Company.

R. O

13.     The MTS system is not working properly. I have experienced several occasions where a fare has ended and a passenger has not been able to successfully pay using the MTS system because of poor reception. In these cases, I was forced to use the Square payment system on my iPhone because some of these clients did not have cash.

14.     Additionally, on approximately four or five occasions, I have not been able to log-in to the MTS system while picking up passengers at or around Union Station.  On approximately two or three occasions, I have lost customers because they got up and walked out of the cab while I trying to log-in to MTS. On about two other occasions, I was forced give rides without the use of a working meter. On those occasions, the passengers were in a hurry and told me how much they normally paid to get to their destinations from Union Station. I was forced to trust the passenger regarding the normal fare because I did not have a working meter and could not afford to lose a passenger. On those occasions, the passenger paid with cash or with Square.

15.     The cab that I am driving does not have a dome installed.

16.     The Silver Cab Company has refused to outfit the cab I am driving with a dome. The Silver Cab Company stated that they are currently installing domes for other drivers who will pay the $400 fee to have a dome installed in their personally-owned cabs and that I will need to wait before they have time to install a dome in the cab that they are renting to me.

17.     From October 28 to November 1, 2013, I have visited Silver Cab Company every day to try to get a dome.  Each visit took approximately 30 minutes to one hour, plus approximately another 40 minutes commuting to and from Silver Cab Company's site. Because of this time spent trying to get a dome, I lost approximately $20 to $30 in revenue with each visit.

R. O

18.     Because Silver Cab Company is the owner of the cab that I am renting, I am not free to go to another retailer to purchase and install a dome independently.

19.     As of today, November 1, 2013, I am not able to acquire a dome for the cab that I am driving.

20.     Because I am driving without a dome, I am at risk for getting a ticket and getting the car impounded.

21.     As a result, I was forced to return the cab to Silver Cab Company on the morning of November 1, 2013 because I did not want to risk getting a ticket for not having a dome. Starting November 1, 2013, I have not had a cab to drive.

22.     I will wait until Silver Cab Company can outfit the cab with a dome before I start driving a taxi again.

23.     Silver Cab Company has stated that they will likely not be able outfit the cab with a dome on November 1, 2013 or during the week of November 4th.

24.     If the cab is not outfitted with a dome on November 1, 2013 or during the following week, I will lose at least $1,000 to $1,100 in revenue because I will have no cab to drive.

25.     For the MTS, dome, and painting requirements, I have been very confused as to what is specifically required and what the deadline are. I have tried to the read the D.C. Taxicab Commission's website, but the information there often conflicts with what is reported in the news and on radio stations like NPR. The information that I hear from the taxi cab companies regarding actual enforcement of these requirements further conflicts with what I read and hear from other sources.

3

I SWEAR UNDER PENALTY OF PERJURY THAT THE INFORMATION CONTAINED IN
THIS DOCUMENT IS TRUE AND CORRECT.

_11-01-13_

Dated: November 1, 2013                           Rotimi Olorunfemi

PATRICIA M. DENNIS
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires September 14, 2016

Subscribed and sworn to before me this 1st day of November
2013.

Signature of Notary Public

Notary Public, District of Columbia

My commission expires on September 14, 2016



(

4

AFFIDAVIT OF GIRMA TESSMA

I, GIRMA TESSEMA, declare the following in support of the lawsuit and injunction

sought by the D.C. Taxi Operators Association:

1.      My name is Girma Tessema.

2.      My mailing address is 4404 Hillside Court, Alexandria Virginia 22306.

3.      I am 56 years old.

4.      My cell phone number is (571) 338-0939.

5.      My taxi license number is 72944.

6.      I have been a licensed taxi cab driver for more than10 years. I have been a

licensed taxi cab driver for more than 10 years in the District of Columbia. I own one taxi. I

am an independent contractor for Allied/UVC Cab Company.

7.      I have installed a Modern Taxi Meter System ("MTS").  I had the system installed

in September. The MTS was installed by ~~Allied~~ U.V. C. It cost $120 for the system and the

installation. It took me approximately two weeks to get the appointment for the installation

and it took one day to install.  I lost approximately $150 on that day.

8.      I am currently having problems with the MTS. When the system is down the

meter and the credit card machine do not work.  This happens three different times.  I told my

company that the system has not been working properly.

9.      The first time this system stopped working it took a day to fix. Sometimes to fix

the problem my company has to call the PSP.  This happened the second time the system

stopped working.  It took approximately 3-4 hours.  The third time it took about a ½ day to

fix. I lost approximately $300 trying to get my system fixed.

1



10.     I do not have the new Dome Light currently installed on my taxi.  I tried to make an appointment to have the light put on, but I couldn't get an appointment before the deadline.  I don't know when they will be able to install the system.  I am on a list with my company to have the new dome light installed.  I have to wait for them to call me to come in.

11.     On November 1, 2013 I was driving passengers to Union Station.  I was pulled over by an inspector.  The inspector made my passengers get into another cab.  I was fined $25 and my cab was impounded.  It costs $140 to have my cab impounded and more money each day it stays there.  I was told I cannot pick up my cab until Monday November 4, 2013.

12.     The only way I can get my cab is to have it towed.  I may have to have my cab towed to my house and then I would have to get it cab towed again to the company for installation.   I am not sure how much it will cost to have my cab towed, but it costs $150 for a flat fee and then additional amounts based on mileage.  My car is impounded in DC and I live in Alexandria.

13.     I cannot work until I get an appointment to have the dome light installed and I do not know when that will be. I have to wait for the company to call me.  I am on a list.



I SWEAR UNDER PENALTY OF PERJURY THAT THE INFORMATION CONTAINED IN THIS DOCUMENT IS TRUE AND CORRECT.

Dated: November 1, 2013                    Girma Tessema


Subscribed and sworn to before me this ___1st___ day of _Nov_, 2013.

Signature of Notary Public

Notary Public, District of Columbia

My commission expires on

3

AFFIDAVIT OF ROUZBEH MAZANDERAN

I, Rouzbeh Mazanderan, declare the following in support of the lawsuit and injunction sought by the D.C. Taxi Operators Association:

1.      My name is Rouzbeh Mazanderan.

2.      My mailing address is P.O. Box 1723, Beltsville, Maryland 20704. My home address is 11107 Queen Anne Avenue, Beltsville, Maryland 20705.

3.      I am 73 years old.

4.      My cell phone number is (202) 294-9772. My home phone number is (301) 595-1167.

5.      My taxi license number is 57623.

6.      I have been a licensed taxi cab driver for 43 years. I have been a licensed taxi cab driver for 40 years in the District of Columbia. I own one taxi.

7.      I have installed a Modern Taxi Meter System ("MTS.")

8.      I already had a meter, but I was forced to take it out.

9.      I bought the MTS from Dial Cab Company DC and had the same entity install it for me. It took 3 hours to have the MTS installed. I paid $550 for both the parts and labor for installing the MTS.

10.     In the time I waited to have the MTS installed, I lost approximately $75 in revenues.

11.     The MTS is not working properly. It takes 10 minutes for the MTS to restart every time that I restart the car. For instance, on October 31, 2013, I was waiting in a taxi stand at Washington Plaza Hotel with my engine off, and a passenger got in my cab.  I had to

1



ask the passenger to wait while the MTS system turned back on. The passenger got frustrated with waiting, left my cab, and flagged down a cab that was driving down the street. This same situation has happened to me on multiple occasions at both the Washington Plaza Hotel and the Marriot Hotel on 515 20th Street, NW, Washington, DC.

12.     MTS is also not working properly because in some locations, I have no reception. When I drive into a location with no reception, the MTS stops recording mileage and I lose money for that fare. Further, because of the reception problems, passengers cannot reliably pay with credit cards at all end locations. Before a passenger gets into my cab, I have to ask him or her if he or she can pay cash and if he or she cannot, I have to turn down the ride.

13.     I do not have the dome installed in my cab because the dome is prohibitively expensive for me.

14.     I made approximately 6 phone calls to different vendors to ascertain prices and availability. The cheapest that I was quoted for the cost of the dome was $385, but some vendors are charging as much as $500 for the same dome.

15.     Further, the dome is impractical given my health. With my current dome, I can turn it to "off-duty" using a switch that's under my steering wheel. For the new required dome, I would need to exit my vehicle and physically switch it to off-duty from outside the car. This is a problem for me because I have a significant amount of knee pain in my right knee, and which makes it difficult to walk. Needing to exit the cab multiple times a day to turn the switch will aggravate my condition and puts me at risk of falling. This process will be even more difficult for me if it is raining or snowing.

I SWEAR UNDER PENALTY OF PERJURY THAT THE INFORMATION CONTAINED IN THIS DOCUMENT IS TRUE AND  CORRECT.

Dated: November 1, 2013                     Rouzbeh Mazanderan

PATRICIA M. DENNIS
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires September 14, 2016

Subscribed and sworn to before me this ____ day of _____ 2013.

Signature of Notary Public

Notary Public, District of Columbia

My commission expires on _____

District of Columbia: SS
Subscribed and sworn to before me, in my presence,
this _____ day of_____, _____

_____
Patricia M. Dennis, Notary Public, D.C.
My commission expires September 14, 2016.

3

**FILED**
CIVIL ACTIONS BRANCH

NOV 0 5 2013

Superior Court
of the District of Columbia
Washington, DC.

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

KOLAWOLE J. AKINADEWO, et. al

*Plaintiffs*

v.

DISTRICT OF COLUMBIA
TAXICAB COMMISSION

Case No.

**ORAL HEARING REQUESTED**

COMPLETED

**MOTION FOR ~~TEMPORARY RESTRAINING ORDER~~**
**AND FOR PRELIMINARY INJUNCTION**

Pursuant to Superior Court Civil Rules 12-I and 65, Plaintiffs request the Court issue a

~~temporary restraining order~~ and preliminary injunction to enjoin the enforcement of D.C.

Municipal Regulations 31-603 and 31-605 until D.C. taxicab drivers, including Plaintiff drivers

are given a reasonable and realistic time to comply.

As more fully set out in the accompanying memorandum of points and authorities, the

grounds for this motion are:

1.      The regulations adopted by Defendants are arbitrary and capricious as applied to

D.C. taxicab drivers, including Plaintiff drivers.  The regulations have a severe impact on

Plaintiffs' property rights and deprive Plaintiffs of their ability to earn "reasonable and just

compensation" as required by D.C. Code §50-302(a)(2).

2.      If the regulations unlawfully adopted by Defendants are allowed to continue in

effect, the Plaintiffs will suffer irreparable injury, including the loss of their ongoing business.


Case: 2013 CA 007525 B

3.      The Defendants will suffer no harm by delaying the implementation of the regulations until the Plaintiffs have a reasonable opportunity to comply.  The deadlines unilaterally implemented by the Commission for compliance are arbitrary and Plaintiffs simple seek to preserve the *status quo*.

4.      The public interest will not be disserved by the issuance of an injunction while D.C. taxi drivers, including Plaintiff drivers, have a reasonable and realistic opportunity to comply with the regulations.  To the contrary, the public interest will affirmatively be served by having available taxi drivers for D.C. taxi riders.

Pursuant to Rule 12-I(a) the undersigned certifies, that despite diligent efforts, the consent of Defendants.

WHEREFORE, Plaintiffs respectfully requests that the Court grant Plaintiffs Motion for Temporary Restraining Order and Preliminary Injunction.

Respectfully submitted,

Richard C. Welch (DC Bar No. 485756)
Lauren B. Powell (DC Bar No. 1008301)
Olga Metelitsa (DC Bar No. 1016248)
Mooney, Green, Saindon, Murphy & Welch, P.C.
1920 L Street, N.W. Suite 400
Washington, D.C.  20036
(202) 783-0010
rwelch@mooneygreen.com
lpowell@mooneygreen.com
Dated: November 5, 2013          ometelitsa@mooneygreen.com

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

KOLAWOLE J. AKINADEWO, et. al

*Plaintiffs*

v.

DISTRICT OF COLUMBIA
TAXICAB COMMISSION

*Defendant.*

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR ~~TEMPORARY RESTRAINING ORDER AND~~ PRELIMINARY INJUNCTION

Pursuant to Rule 65 of the Superior Court Rules of Civil Procedure, Plaintiffs, by their undersigned counsel, submit this Memorandum of Points and Authorities in Support of their Motion for ~~Temporary Restraining Order~~ and Preliminary Injunction.

## FACTUAL BACKGROUND

I. **Modern Taxi Meter System**

   a. **Promulgation of MTS Regulation**

On May 17, 2013, the District of Columbia Taxicab Commission ("Commission") issued a Notice of Formal Rulemaking in which it adopted a new regulation regarding the Modern Taximeter System ("MTS") for taxicabs, which was later codified at D.C. Municipal Regulation Section 31-603. 60 D.C. Reg 6993 – 7021 (May 17, 2013). The new MTS regulation required that beginning on September 1, 2013, "[e]ach taxicab shall operate only with an MTS unit that allows a passenger to make a cash payment or cashless payment, which shall be the decision of the passenger." D.C. Mun. Reg. § 31-603.2. The MTS consists of a meter, credit card reader, and

tablet with log-in functions, all of which are dependent on cellular reception in order to function properly. *See* D.C. Mun. Reg. § 31-603. All costs associated with obtaining an MTS unit, including installation, certification, operation, and compliance with applicable law are the burden of the individual taxicab owners. *Id.* at § 31-603.6. Further, with the installation of the MTS, taxicab drivers are obligated to pay to the Commission twenty five cents ($0.25) for every cash or credit card fare. D.C. Mun. Regs. § 31-801.7(b)(2).

### b. Inability to Comply with the MTS Regulation Despite Good Faith Compliance

The MTS is plagued with poor cellular reception quality and frequent log-in problems, including failing to timely start when a passenger first gets into the vehicle, failing to timely start when a taxicab driver begins his or her workday, losing cellular reception during a fare and failing to record all metered mileage, losing cellular reception at the end of a fare and failing to make credit payment possible, and taking an unreasonable amount of time to print receipts and therefore causing a taxicab driver to block traffic at the end of fares. (*See* Gebresalassie Aff. ¶¶ 15-16; Mazanderan Aff. ¶ 12; Zewdu Aff. ¶¶ 13-14; Olorunfemi Aff. ¶¶ 13-14). Due to the poor cellular reception quality and frequent log-in problems with the MTS, Plaintiffs have been forced to refuse patrons who cannot pay cash (Mazanderan Aff. ¶ 12), lose money on fares when poor cellular reception quality causes the meter to fail to record mileage (Gebresalassie Aff. ¶¶ 15-16; Mazanderan Aff. ¶ 12; Zewdu Aff. ¶¶ 13-14), take fares "off-meter" and charge customers for fares on a non-meter basis (Olorunfemi Aff. ¶¶ 13-14), take credit cards payments using credit cards readers other than those integrated into MTS (Olorunfemi Aff. ¶¶ 13-14), drive in and around the District of Columbia without a working MTS system (Zewdu Aff. ¶¶ 13-14; Olorunfemi Aff. ¶¶ 13-14), and stall traffic while waiting for the MTS system to function, (Zewdu Aff. ¶¶ 13-14). By some or all of the aforementioned acts, Plaintiffs who installed the

MTS within the arbitrary deadline set by the Commission are nevertheless in violation of D.C.Muncipal Regulation Section 31-603's requirements that a taxicab be equipped with a functioning MTS that maintains a data connection sufficient to record metered fares and allow for digital payments and/or of D.C. Municipal Regulation Section 31-603.10's prohibitions on operating a taxicab if the MTS unit is not functioning properly, limiting service or refusing to provide service based on the passenger's choice of payment method, or participating in a transaction involving taxicab service in the District of Columbia where the fare, rates, charges, or payment does not comply with the Commission's regulations. Under the circumstances, despite good faith efforts at compliance, Plaintiffs were unable to comply with the September 1, 2013 deadline to equip a taxicab with a fully functioning MTS that meets the Commission's technical specification.

The penalties for failing to comply with the requirement of a fully functioning MTS are severe. Pursuant to D.C. Municipal Regulation Section 31-612, a taxi driver who operates a vehicle without approved equipment is subject to fines between $100 and $750, impoundment of his vehicle, confiscation of his MTS unit or other meter, and suspension, revocation, or non-renewal of his license.

## II.   Dome Light Requirement

### a.   Promulgation of Dome Light Regulation

On November 14, 2012, the Commission issued a Notice of Formal Rulemaking in which it adopted a new regulation regarding Dome Lights in taxicabs, which was later codified at D.C. Municipal Regulation Section 31-605. 60 D.C. Reg. 1173-1174 (February 1, 2013). The new Dome Light regulation required that "[n]o later than April 30, 2013, all licensed taxicabs in the District of Columbia shall be equipped with the Commission-approved Dome Lights and Taxi

3

Number System." D.C. Mun. Reg. § 31-605.1. The regulatory deadline of April 20, 2013 was then pushed back by subsequent non-regulatory communications by the Commission.  In a May 28, 2013 press release, the Commission announced two certified manufacturers of the Dome Light, stated that installation of the Dome Light could begin June 1, 2013, and provided that "[a]ll DC taxis are required to be outfitted with the new standardized Dome Light by August 31, 2013." Government of The District of Columbia Taxicab Commission, *DC Taxicab Commission Announces Dome Light Manufacturers* (May 28, 2013), available at http://washingtondispatcher.com/clients/washingtondispatcher/DomeLightsPressRelease.pdf. More conflictingly, the Commission's website provides that "All licensed DC taxicabs are required to have the new standardized Dome Light installed by November 1, 2013."  District of Columbia Taxicab Commission, Dome Light (2013) http://dctaxi.dc.gov/page/dome-light.

### b.  Inability to Comply with the Dome Light Regulation Despite Good Faith Compliance

Plaintiffs and class members who have made multiple good-faith efforts to acquire a Dome Light have not been able to acquire a Dome Light as of November 1, 2013 because of a shortage of Dome Lights and installers. (Zewdu Aff. ¶¶ 16-17; Olorunfemi Aff. ¶¶ 17-18; Akinadewo Aff.¶ 14; Gebresalassie Aff.¶ 17; Tessema Aff. ¶ 10). The Commission has authorized just two manufacturers and twelve installation locations for the Dome Light, who must service approximately 5,000 taxicabs. *See DC Taxicab Commission Announces Dome Light Manufacturers*, available at http://washingtondispatcher.com/clients/washingtondispatcher/Dome LightsPressRelease.pdf; District of Columbia Taxicab Commission, *Installation Locations* (2013) http://dctaxi.dc.gov/sites/default/files/dc/sites/dc%20taxi/page_content/attachments/ Installation%20Locations-AA_1.pdf. The effect of these restrictions has been to impair Plaintiffs' ability to comply with the regulations. Installers have required Plaintiffs to join

waitlists of indefinite lengths and been unable to state how many days or weeks after November 1, 2013 Dome Lights will be available for installation. (*See* Tessema Aff. ¶ 10, Zewdu Aff. ¶¶ 16-17). For instance, Plaintiff Girma Tessema tried but could not get an appointment to have the Dome Light installed by the deadline. (Tessema Aff. ¶ 10). As a result, Plaintiff's Tessema's taxi was impounded on the morning of November 1, 2013 and Plaintiff Tessema will lose the use of his taxi until an installer can give him an appointment off the waitlist for Dome Lights. (Tessema Aff. ¶ 10). Plaintiff Tessema does not know when he will receive an appointment and must simply wait by the phone. (*Id.*)

Similarly, Plaintiff Manny Zewdu made approximately ten visits in October 2013 to five authorized retailers in search of a Dome Light and was consistently told that the Dome Lights were out of stock. (Zewdu Aff. ¶¶ 16-17). Even after expending six hours searching for a Dome Light, Plaintiff Zewdu was not able to locate a Dome Light as of November 1, 2013. (*Id.*) Under these circumstances of the marketplace, Plaintiffs have been unable to comply with the regulation regardless of efforts at good faith compliance.

Yet, under D.C. Mun. Reg. § 31-612, impoundment is a guaranteed consequence of operating a vehicle without approved equipment. As a result, not only has Plaintiff Tessema had his taxicab impounded, but Plaintiffs Gebresalassie, Olorunfemi, Akinadewo, and Ruffin have all been forced to forfeit the use of their taxicabs until they can obtain a Dome Light at an indefinite date because of the risk of imminent impoundment (Tessema Aff. ¶¶ 11-12; Gebresalassie Aff. ¶ 17; Olorunfemi Aff. ¶¶ 21-24; Akinadewo Aff. ¶ 15).

### III.   <u>Request for a Stay</u>

On September 27, 2013, Ferline Buie, acting on behalf the affected taxicab drivers, sent a letter to the Commission requesting a stay of the regulations. (Affidavit of Ferline Buie (Buie

Aff.) ¶ 5). On October 16, 2013, Ms. Buie and a group of taxicab drivers met with City

Administrator Allan Lew to again request a stay of the regulations. (Buie Aff. ¶ 6).  On or about

October 29, 2013, Ms. Buie received a letter from the Commission that reflected a refusal to stay

the regulations. (Buie Aff. ¶ 8). Ms. Buie contacted the Commission by telephone and it

reiterated its position that it would not stay the regulations  (Buie Aff. ¶ 9).  Since November 1.

2013, the Plaintiffs, through their representatives, have continued to seek a stay of enforcement

of the dome light and MTS regulations. (Buie Aff. ¶ 10).

## ARGUMENT

### I.  Legal Standard

Plaintiffs seek a temporary restraining order and preliminary injunction against

Defendant pursuant to Rule 65 of the Superior Court Rules of Civil Procedure.

To obtain a preliminary injunction, the moving party must establish:

> (1) that there is a substantial likelihood [they] will prevail on the merits; (2) that
> [they are] in danger of suffering irreparable harm during the pendency of the
> action; (3) that more harm will result to [them] from the denial of the injunction
> than will result to the defendant from its grant; and, in appropriate cases, (4) that
> the public interest will not be disserved by the issuance of the requested order.

*In re Estate of Reilly*, 933 A.2d 830, 834 (D.C. 2007). To obtain a temporary restraining

order, Plaintiffs must make the same showing, except that they must show a danger of

irreparable harm during the time required to brief, argue, and decide their motion for

preliminary injunction, and that the Defendants will not suffer greater harm during the

same time period.

As demonstrated below, Plaintiffs have satisfied all requirements for a temporary

restraining order and preliminary injunction and the Court should issue an order directing

the Defendant to refrain from enforcing the regulations at issue.

II.      **Plaintiffs Are Likely to Succeed on the Merits.**

   a.  **The Timeframe for Implementation of Regulations 31-603 and 31-605 Is Arbitrary and Capricious.**

Regulation 31-603 mandates that each D.C. taxi driver, including Plaintiff drivers, purchase and have the required MTS equipment installed and operational by the unilaterally imposed date of October 1, 2013 (the "implementation date"). The approved MTS unit must be purchased from a payment system provider (PSP) approved by the Defendant and installed by a MTS installation business approved by the Defendant. By October 1, 2013, each taxicab driver was required to have a fully functioning MTS unit that includes, but is not limited to, a mechanism for the passenger to select their preferred payment method (either cash or credit card), uses a 3G or better cellular data connection and is equipped with a global positioning satellite (GPS).

   The MTS is a synchronized system that connects the onboard meter with a computerized payment mechanism through a cellular data connection. A specific requirement of the new system is that passengers cannot be charged an amount through the MTS unit other than that displayed on the taximeter. D.C. Mun. Reg. §31-603.8(e). In fact, a driver that seeks to collect a fare other than the one displayed on the meter is subject to penalties for noncompliance. As the evidence submitted demonstrates, however, the MTS unit is currently dysfunctional and ineffective.

   Because of poor reception and frequent log-in problems, D.C. taxi drivers including the Plaintiff drivers and other class members have been forced to bear the burdens of these admitted deficiencies by, among other things, refusing to transport patrons who cannot pay cash for the stated fare (Mazanderan Aff. ¶ 2), losing money on fares when the meter fails to properly and

7

accurately record mileage (Gebresalassie Aff. ¶ 2 ; Mazanderan Aff. ¶ 2; Zewdu Aff. ¶ 2), taking

fares "off-meter" and charging customers on a different basis (Olorunfemi Aff. ¶¶ 1-2), taking

credit card payments using other credit cards readers not integrated into MTS (Olorunfemi Aff.

¶¶ 1-2), driving in and around the District of Columbia without a working MTS system (Zewdu

Aff. ¶¶ 2; Olorunfemi Aff. ¶¶ 1-2), and stalling and impeding traffic while waiting for the MTS

system to function  (Zewdu Aff. ¶¶ 2).

Section 603.10 of the Regulations issued by the Defendant prohibits the operation of a

taxi if the MTS unit is not functioning properly. Due to the operational deficiencies, D.C. taxi

drivers including the Plaintiff drivers and other class members are forced to either violate D.C.

Regulations by not having a "functioning" MTS or refrain from driving. A driver risks serious

penalties including, impoundment of his or her vehicle, confiscation of the MTS unit, fines up to

$750, and suspension, revocation or non-renewal of his or her taxi license despite the fact that

the driver has completely satisfied the obligation to purchase and install the required equipment

from the vendors designated by the Defendant. Consequently, despite their good faith efforts to

comply with the Regulations, D.C. taxi drivers including the Plaintiff drivers and other class

members are vulnerable to the complete confiscation of their livelihood and property.

Similarly, D.C. Municipal Regulation Section 31-605 required drivers' taxis, including

Plaintiff drivers' taxis, to be equipped with Commission-approved Dome Lights and Taxi

Number Systems no later than November 1, 2013.  Like the MTS units, the Dome Lights must be

installed by a limited number of vendors unilaterally selected and approved by the Defendant.

Despite the Commission's inherent knowledge of the number of taxis that would need to install

the Dome Lights, Defendant failed to arrange for an adequate number of authorized dealers and

installers. This failure resulted in a shortage of Dome Lights available for installation and the

vendors authorized by the Defendant were incapable handling the request for installation in any reasonably timely manner. As a result, D.C. taxi drivers including the Plaintiff drivers and other class members who have made multiple good-faith efforts to acquire a Dome Light by the arbitrary deadline set by the Commission have been unable to comply with the regulation. There are simply not enough Dome Lights or installers for the approximately 7,000 D.C. taxi drivers affected by the regulations. Once again, Defendant bears the burden of the inadequacy of the number of approved vendors because it exclusively controlled the installation process. Its failure to secure sufficient vendors and inventory has caused injury and harm to the drivers, including the Plaintiff drivers.

Again, D.C. taxi drivers including the Plaintiff drivers and other class members are forced to risk the imposition of penalties or abstain from operating their vehicles. For example, Plaintiff Girma Tessema is currently on a waitlist to have his dome light installed. Plaintiff Tessema, however, was unable to get an appointment by the November 1, 2013 deadline. Plaintiff Tessema's taxi was impounded on the morning of November 1, 2013 and he will lose the use of his taxi until he is removed from the waitlist. (Tessema Aff. ¶ 2). Similarly, Plaintiff Manny Zewdu made approximately ten visits in October 2013 to five authorized retailers in search of a Dome Light and was consistently told by each vendor that it was out of stock. (Zewdu Aff. ¶ 2-3). Even after expending six hours searching for a Dome Light, Plaintiff Zewdu was not able to locate one as of November 1, 2013. (*Id.*)

Given the circumstances, full compliance with the regulations is impossible within the arbitrary deadline set by the Commission. The Commission mandated the type of units and lights as well as the businesses authorized to install these devices. D.C. taxi drivers, including the Plaintiff drivers and other class members, cannot reasonably be expected to comply with the

9

regulatory deadlines set by the Commission while facing operational impediments out of their control.

**b. Regulations 31-603 and 31-605 Are Arbitrary and Capricious Because They Deprive Plaintiffs of Their Right to Just Compensation and Fail to Adequately Protect Drivers from Unsafe Environments.**

The Establishment Act charges the Commission with the duty to "[e]stablish reasonable rates for taxicab service for the transportation of passengers and their property within the District, including all charges incidental and directly related to the provision of taxicab services." D.C. CODE § 50-307(c)(l) (LexisNexis 2012). Additionally, the Establishment Act endeavors to "maintain a taxicab transportation system which provides owners and operators of taxicabs with reasonable and just compensation for their services. . . ." § 50-302(a)(2).

The chronic mechanical failures of the MTS units, however, deprive D.C. taxi drivers including the Plaintiff drivers and other class members of just compensation for their services in violation of the Establishment Act. As explained in section II (b), drivers are forced to take less than fair compensation for their services due to malfunctioning MTS units. When there is an interruption in the cellular data connection, the meter and credit card machines stop running. Notwithstanding the malfunction of the equipment, drivers must continue to drive passengers to their designated location while the meter is inoperable. Moreover, the Regulation specifically mandates passengers may not be charged any amount through the MTS unit other than that shown on the taximeter. D.C. taxi drivers including the Plaintiff drivers and other class members, therefore, are required to accept an amount below the fair value of their services. Further, if passengers do not have cash, drivers may not receive any compensation. This is unquestionably a violation of the Establishment Act.

In addition, Regulation 31-605 fails to adequately protect drivers from unsafe conditions. The regulation requires that the LED portion of the dome light go "dark" when the taxicab is not available for hire. D.C. Mun. Reg §31-605.5 The on/off switch on the Commission-mandated Dome Light, however, is located outside of the vehicle on the passengers-side. In order to completely turn off the Dome Light, drivers must get out of their vehicles, walk around to the passengers-side, and physically turn off the Dome Light. This unnecessarily requires drivers to place themselves in potentially dangerous situations to comply with the arbitrary requirement of the regulations.

### c. As Applied, Regulations 31-603 and 31-605, Deprive Plaintiffs of Their Constitutional Right to Property Without Just Compensation.

The Fifth Amendment prohibits the taking of private property for public use without just compensation. Courts consider two general factors to determine whether a regulatory taking has occurred: (1) the "character of the governmental action;" and (2) "the economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectation." *Potomac Dev. Corp. v. District of Columbia*, 28 A.3d 531, 539 (D.C. 2011).

As applied, the MTS and Dome Light regulations violate D.C. taxi drivers', including the Plaintiff drivers' and other class members', constitutional property rights. Specifically, given the significant technical malfunctions of the MTS units and shortage of Dome Lights and installation vendors, full compliance with the regulations is impossible within the arbitrary deadline set by the Commission. As a result, drivers are subject to significant penalties for non-compliance despite their good-faith efforts. As shown above, D.C. taxi drivers including the Plaintiff drivers and other class members have either had their taxis impounded and/or been

11

forced to curtail the use and enjoyment of their taxis indefinitely because of the risk of impoundment, license revocation, and license non-renewal.

### III.    Plaintiffs Will Suffer Irreparable Injury in the Absence of an Injunction.

Harm is irreparable if the threat of injury is imminent and well-founded, and the injury itself would be incapable of being redressed after a final hearing on the merits. *Wieck v. Sterenbuch*, 350 A.2d 384, 388 (D.C. 1976). A violation of constitutional rights constitutes a *per se* irreparable harm. *District of Columbia v. Eastern Trans-Waste of Md., Inc.*, 758 A.2d 1, 15 (D.C. 2000). In this case, D.C. Taxi drivers have been deprived of their property rights without just compensation. As described in Part II(c)-(d), the regulations violate drivers', including Plaintiff drivers', constitutional property rights. Drivers have either already been deprived of their taxicabs because of impoundment or face imminent danger of being deprived of their taxi cabs due to impoundment, license revocation and license non-renewal.

Additionally, economic loss constitutes irreparable harm if the economic loss threatens the very existence of the movant's business or deprives the movant of a livelihood. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974); *District of Columbia v. Eastern Trans-Waste of Md., Inc.*, 758 A.2d 1, 15 (D.C. 2000); *Zirkle v. District of Columbia*, 830 A.2d 1250, 1257 (D.C. 2003); *Bonds v. Heyman*, 950 F. Supp. 1202 (D.D.C. 1997). *See also Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) (A "substantial loss of business and perhaps even bankruptcy" absent preliminary injunctive relief shows "irreparable injury.")

In addition to violating drivers' right to property, the new regulations create a danger of irreparable harm to drivers' ability to earn a livelihood. State authority to make municipal regulations and ordinances cannot arbitrarily interfere with the constitutional rights to carry on a lawful business, make contracts, or use and enjoy property. *Dobbins v. Los Angeles*, 195 U.S.

223 (1904). The property right to earn a livelihood, by following the ordinary occupations of life, is protected by the Constitution under the guarantees of the 14th Amendment. *Terrace v. Thompson*, 263 U.S. 197 (1923).

Taxicab drivers are independent owners of their businesses and their livelihood is directly tied to their ability to use their property. Drivers have already had their taxis impounded, been forced to refrain from using their taxis for fear of imminent impoundment, or been forced to curtail their use of their property because of malfunctioning equipment.  Section 31-612 would further subject Plaintiffs to the revocation and non-renewal of their licenses for operating without approved equipment. Given the nature of the taxi driver profession, there is no way for D.C. taxi drivers including the Plaintiff drivers and other class members to follow their professions without the use of their taxis or without hacking licenses. Thus, D.C. taxi drivers including the Plaintiff drivers and other class members are put in the impossible position of either refraining from their professions indefinitely until dome light supply can meet demand and MTS systems function properly as required by the Commission, or losing their licenses and future ability to be taxi drives. The economic therefore lose their entire livelihoods as a result of the regulations.

Finally, irreparable harm in a private action may be based on harm to the general public. *Mississippi Power & Light Co. v. United Gas Pipe Line Co.* 760 F.2d 618, 623 (5th Cir. 1985). Courts analyze whether there would be irreparable harm to the public if the preliminary injunction is denied. *Northern Indiana Pub. Service Co. v. Carbon County Coal Co.*, 799 F.2d 265, 280 (7th Cir. 1986); *see also*, in *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d at 623 (holding a preliminary injunction to prevent future overcharges was proper even though the only "irreparable injury" claimed was the adverse impact of future overcharges on the public).

Here, the general public is in danger of suffering irreparable harm because the regulations create a taxi shortage by requiring compliance and creating circumstances where good faith compliance, given the timeframe is impossible. D.C. taxi drivers including the Plaintiff drivers and other class members have either had their taxis impounded or been forced to curtail hacking because their taxis cannot meet the regulations' requirements despite good faith efforts. As a result, there are currently fewer taxis on the streets available to the general public. As a result of this shortage, members of the general public will suffer irreparable harm if preliminary relief is not granted because there will be no way to remedy the harms created by the shortage following the conclusion of this legal action.

## IV.    The Balance of Harms Favors Plaintiffs.

The Defendant will suffer no harm from a temporary delay in the adaptation of the new taxicab regulations. Plaintiffs seek only to preserve the *status quo*.  The Commission and D.C. taxi drivers can continue to operate under the previous regulations for the additional time period needed for the new MTS units to operate effectively and more dome lights be produced and installed.  Time is not of the essence here; the September 1, 2013 and November 1, 2013 deadline announced by the Commission are simply unilaterally selected and imposed arbitrary dates.

## V.    The Public Interest Will not Be Disserved by the Issuance of an Injunction.

The public interest will not be disserved by the issuance of a temporary restraining order and an injunction pending final judgment in this case. To the contrary, having taxis available for hire and uniform and consistent payment options will affirmatively serve the public interest. If the regulations are not stayed, taxi drivers will be forced to take their cars out of service while they wait to get off installation waiting lists and for the glitches in the MTS units to be resolved.

## VI.   <u>No Security Bond Should be Required</u>

Rule 65(c) of the D.C. Superior Court Rules of Civil Procedure governs the requirement

of posting a security bond for a preliminary injunction or temporary restraining order. It is

identical to Fed. R. Civ. P. 65(c), and our courts routinely follow federal court precedents in

construing this rule. *See* e.g., *L 'Enfant Plaza Properties. Inc. v. Fitness Systems*, Inc., 354 A.2d

233,236-37 (D.C. 1976). It is well-established that, "under appropriate circumstances bond may

be excused, notwithstanding the literal language of Rule 65(c)." *Wayne Chemical, Inc. v.

Columbus Agency Service Corp.*, 567 F.2d .692, 701 (7th Cir. 1977).

When determining whether or not to require a bond courts consider two factors: (1) the

possible loss to the enjoined party; and (2) the hardship that a bond requirement imposes on the

applicant. *See Crowley v. Local No. 82, Furniture & Piano*, 679 F.2d 978 (1st Cir. 1982), *rev'd

on other grounds*, 467 U.S. 526, 81 L. Ed. 2d 457, 104 S. Ct. 2557 (1984). When the applicant

would face financial difficulty posting bond and the harm to the defendant is low - courts have

not required the posting of a bond. *Id*. (upholding denial of bond where Union members would

have had financial difficulty posting it, and where defendants faced low burden from absence of

security); *see also*, *International Controls v. Vesco*, 490 F.2d 1334, 1356 (2d Cir. 1974), *cert.

denied*, 417 U.S. 932. 41 L. Ed. 2d 236, 94 S. Ct. 2644 (1974) (noting that "the district court may

dispense with security where there has been no proof of likelihood of harm to the party

enjoined") (citations omitted); *Urbain v. Knapp Brothers Mfg.*, 217 F.2d 810 (6th Cir. 1954) (no

bond required where defendant would not appear to face material damage); *Continental Oil v.

Frontier Refinery*, 338 F.2d 780 (10th Cir. 1964) (no bond required where likelihood of harm to

defendant is absent).

Here, Plaintiffs are taxicab drivers who make on average $20,000 to $30,000 a year. Additionally, the imposition of the regulations has caused financial hardship for the Plaintiffs. Because full compliance within the arbitrary timeframe of the Commission is impossible, Plaintiffs are forced to take their cars off the road or pay steep fines. This directly affects Plaintiffs ability to earn a livelihood.

Further, Defendant will not suffer material harm if this Court dispenses the security bond requirement. Plaintiffs are simply seeking to preserve the *status quo* until they have been given a reasonable amount of time to comply under the circumstances. If a bond is required, the Court should exercise its discretion and require only a nominal bond. *See. e.g.*, *Natural Resources Defense Council. Inc. v. Morton*, 337 F. Supp. 167 (D.D.C. 1971) ($100 bond); *Environmental Defense Fund v. Corps of Engineers of the U.S. Army*, 331 F. Supp. 925 (D.D.C. 1971) ($1 bond).

## CONCLUSION

For the reasons stated above, Plaintiffs' motion for a temporary restraining order and preliminary injunction should be granted.  Defendants' should be restrained and enjoined, pending further order of the Court. from implementing and enforcing D.C. Municipal Regulations. 31-603 and 31-605.

Respectfully submitted,

Richard C. Welch (DC Bar No. 485756)
Lauren B. Powell (DC Bar No. 1008301)
Olga Metelitsa (DC Bar No. 1016248)
Mooney, Green, Saindon, Murphy & Welch, P.C.
1920 L Street, N.W. Suite 400
Washington, D.C.  20036
(202) 783-0010
rwelch@mooneygreen.com
lpowell@mooneygreen.com
Dated: November 5, 2013                          ometelitsa@mooneygreen.com

17

## CERTIFICATE OF SERVICE

I, Richard C. Welch, do hereby certify that on this 5nd day of November, 2013, a true and correct copy of PLAINTIFFS' MOTION AND MEMORANDUM OF POINTS AND AURHORITIES OF PLAINTIFFS' MOTION FOR ~~TEMPORARY RESTRAINING ORDER~~ ~~AND~~ PRELIMINARY INJUNCTION has been served via personal service with Plaintiffs Complaint and Summons on:

DISTRICT OF COLUMBIA
TAXICAB COMMISSION
2041 Martin Luther King Jr Avenue, SE
Suite 204
Washington, DC 20020

Richard C. Welch

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

KOLAWOLE J. AKINADEWO, et. al

*Plaintiffs*

v.

DISTRICT OF COLUMBIA
TAXICAB COMMISSION

Case No.

## ORDER

Having reviewed Plaintiffs' Motion for ~~Temporary Restaining Order~~ *Preliminary injunction* as well as the

accompanying Memorandum of Points and Authorities. it is this _____ day of _____ . 2013

hereby

    **ORDERED,** that Plaintiffs Motion shall be GRANTED: and further

    **ORDERED,** that Defendant is hereby RESTRAINED from implementing and enforcing

D.C. Mun. Reg 31-603 and 31-605: and further

    **ORDERED,** that the Court shall conduct a hearing on the request for a Preliminary

Injunction on November 15, 2013 at 10 AM: and further

    ~~**ORDERED,** that this Temporary Restraining Order shall take effect immediately~~

~~without the posting of a bond and shall expire 10 days henceforth pending further Order of the~~

~~Court.~~

_____       _____
Date                                                          Judge. D.C. Superior Court

AFFIDAVIT OF ADDIS GEBRESALASSIE

I, ADDIS GEBRESALASSIE , declare the following in support of the lawsuit and
injunction sought by the D.C. Taxi Operators Association:

1.      My name is Addis Gebresalassie.

2.      My mailing address is 401 12th Street South, Arlington Virginia 22202.

3.      I am 44 years old.

4.      My cell phone number is (703) 930-0135 .

5.      My taxi license number is 71912.

6.      I have been a licensed taxi cab driver for approximately 13 years. I have been a
licensed taxi cab driver for approximately 13 years in the District of Columbia. I own one
taxi. I am an independent contractor for Silver Cab Company.

7.      I have installed a Modern Taxi Meter System ("MTS"). I had the system installed
on October 7, 2013.

8.      I already had a credit card –reader but I was forced to get a entirely new system.

9.      I had it installed at Transco.

10.     Before I went to Transco, I had an appointment to have the MTS system installed
on September 25, 2013 with Glicke. Glicke is a PSP provider.  Grand Cab Company is a
subcontractor with Glicke.  I had to sign a contract with Grand because the prices are the
same for each company.  I had to pay Grand $280 for an installation fee.

11.     On September 25, 2013, when I arrived at Glicke they told me I had to sign a
new contract with them and pay $350 and that they would not be able to get the installation



1

done that day.  I did not pay it because I already paid money to Grand for installation.  I left and did not have the system installed on that day.

12.      After I left Glicke I called all of the 9 PSP to ask where I could get the MTS installed before the October 1st deadline.  All of the companies said they were backed –up and couldn't install the system until after the deadline.  The fist available appointment was October 7, 2013.  I lost 5-6 day of driving to find a company and sign a contract with a company that would install the system.  I lost approximately $1,200.00 during this time.

13.      On October 7, 2013 I got my MTS installed at Transco.  It cost me $450 to have it installed.  I called Grand and asked for my $280 dollars back.  Grand refunded my money.  I have not picked it up yet because I have to drive back Grande to get the money.

14.      It took Transco 6 hours to install the system.  I lost approximately $120 during this time.

15.      My new MTS is currently not working properly.  I was given a phone that connects to the credit card reader and the meter.  The phone does not get signal. If the phone does not have signal then the meter does not work and neither does the credit card.  This means that I have to drive passengers while the meter is not working.  I lose money.   This happens approximately 50% of the times.  This problem began from day one.

16.      To fix the problem I have to take out the battery.  I have tried to call Transco and they do not have a customer service line.  I have gone back to Transco and told them about the problem.  Transco told me to take the battery out, put it back, and wait for 30 minutes before driving.

17.      I do not have the Dome Light currently installed on my taxi.  I don't have it installed because the first appointment I could get was November 4, 2013.  I have an



2

appointment scheduled on that day.  It is going to cost me $475 to buy and have it installed.  I

went to approximately 5-6 places before I got my appoint with Silver to have the Dome Light

installed. I cannot drive my car until I get the Dome Light installed.  I will not drive for 4

days while I wait for my appointment.  I will lose approximately $800 in those 4 days.

18.     I have not had my taxi painted.  I do not have to have it painted until my next

inspection, which is November 16, 2013.  I looked at Amco and other companies and it will

cost at least $400 to have the taxi painted.


I SWEAR UNDER PENALTY OF PERJURY THAT THE INFORMATION CONTAINED IN
THIS DOCUMENT IS TRUE AND  CORRECT.

Dated: November 1, 2013            Addis Gebresalassie




Subscribed and sworn to before me this ___ISt___ day of Nov,
2013.

Signature of Notary Public

Notary Public, District of Columbia

My commission expires on _____

## AFFIDAVIT OF FERLINE BUIE

I, Ferline Buie, declare the following in support of the lawsuit and injunction sought by the Washington D.C. Taxi Operators Association:

1.      I am President and Business Manager of Teamsters Local Union 922 ("Local 922") affiliated with the International Brotherhood of Teamsters. I have been President of Local 922 since 2001.

2.      In September 2013, the Local Union was approached by a group of District of Columbia taxicab drivers requesting assistance with creating an association to advocate on their behalf concerning issues in the taxi industry. In particular, the drivers sought our assistance to address their grievances against the District of Columbia Taxi Commission concerning the recently issued regulations requiring new "smart meters" and new dome lights to be installed in all taxicabs.

3.      The main complaint of these drivers was their inability to comply with the onerous regulations issued by the Taxi Commission in a timely manner as well as the deficiencies of the new MTS system. Many of the taxi drivers have been unable to comply with the regulations and are subject to severe penalties, including the impoundment of their vehicles, for failure to comply with these regulations. In particular, the MTS system appears to be fraught with technical difficulties which make it impossible for the drivers to access and operate the system properly. Consequently, drivers who have complied with the MTS regulations are now vulnerable to the regulatory penalties through no fault of their own. Similarly, the dome light regulations are causing numerous drivers to be subject to penalties despite their efforts to comply with the provisions.

4.      In addition, the cost associated with these regulations is borne by the owner operator taxi drivers. As a result, these taxi operators have expended considerable funds

endeavoring to comply with the regulations. The deficiencies in the regulatory scheme have caused a diminution in their incomes and a threat to their livelihoods.

5.      On or about September 27, 2013, I corresponded with the DC Taxi Commission requesting that the Commission exercise its discretion to stay the regulations. A true and correct copy of that letter is attached.

6.      On October 16, 2013, I, along with several taxicab drivers, met with District of Columbia City Administrator Alan Lew regarding the deficiencies in the new regulations. At that meeting, we explained the problems with the MTS system and the new dome light regulations. In particular, the drivers asked if they could go on the public open market to buy their credit machines. Under the MTS regulations, drivers are limited to a few vendors specifically selected by the Taxi Commission. Mr. Lew said he was willing to continue to meet with the taxi drivers, but gave no direct answer to these concerns. Mr. Lew also said that he would speak with the Taxi Commission about these matters.

7.      On October 29, 2013, approximately 1,000 taxicabs formally created the Washington, D.C. Taxi Operators Association ("Association"). The Association contracted with Local 922 to provide organization and support services to the Association.

8.      Also on October 29, 2013, I received a letter from Taxi Commission Chairman Ron Linton dated October 28, 2013, responding to my letter of September 27. In his letter, Mr. Linton states that he was willing to meet to discuss the regulations affecting the taxicab drivers. His letter, however, did not reflect any willingness to stay the enforcement of the regulations pending any such discussion.

9.      On October 30, 2013, I contacted Mr. Linton's office regarding the request to stay the enforcement of the penalties imposed by the regulations. Although Mr. Linton would not

speak with me, I was told by his executive assistant that the Taxi Commission would not stay the regulations.

     10.    Also on October 30, 2013, I sent a letter to Mayor Vincent Gray requesting a meeting to discussing the following issues: (1) a moratorium on the penalties associated with the new regulations; (2) compensation to the drivers for cost incurred by the regulations; and (3) appointment of a taxicab driver to the Taxi Commission. I have not received a response to this letter.

     11.    The failure of any responsible DC official to address these serious and immediate concerns has left the drivers and the Association with no choice but to seek judicial relief. It is simply unfair and unjust for the Taxi Commission to penalize drivers when the MTS system is malfunctioning and often inoperable. It is similarly unfair and unjust to penalize drivers for the failure to comply with the dome light regulations when it the regulations expose them to safety concerns and the simple installation of the dome lights is a protracted process. The drivers as well as the public citizenry of the District of Columbia deserve better from the Taxi Commission. The drivers are ready, willing and able to pursue compliance with legitimate regulations in a timely fashion. They cannot, however, make the MTS systems work when it is deficient and they are at the mercy of the vendors who install the dome lights. These concerns, coupled with the safety realities associated with the regulations, require that the penalties associated with the regulations be stayed for a reasonable period of time.

I SWEAR UNDER PENALTY OF PERJURY THAT THE INFORMATION CONTAINED IN THIS DOCUMENT IS TRUE AND CORRECT.

Dated: November 4, 2013           Ferline Buie

# AUTOMOTIVE, PETROLEUM, CYLINDER AND BOTTLED GAS, CHEMICAL DRIVERS, HELPERS AND ALLIED WORKERS AND PUBLIC TRANSPORTATION EMPLOYEES LOCAL UNION 922

2120 BLADENSBURG ROAD, N.E. WASHINGTON, D.C. 20018

AFFILIATED WITH: INTERNATIONAL BROTHERHOOD OF TEAMSTERS • TEAMSTERS JOINT COUNCIL NO. 55

PHONE: 202-526-9200 • FAX: 202-526-9253

**FERLINE BUIE**
PRESIDENT AND
BUSINESS MANAGER

**RUDOLPH GARDNER**
SECRETARY-TREASURER

MAJOR AKBAR MUHAMMAD
VICE PRESIDENT

MAXINE LYONS
RECORDING SECRETARY

RICHARD WIGGINS
FELIX ODENARIAN
CRAIG PHILSON
TRUSTEES

Ron M. Linton, Chairman
D.C. Taxicab Comission
2041 Martin Luther King Jr Avenue, SE,
Suite 204
Washington, DC 20020

Dear Mr. Linton:

   I am President of Teamsters Local Union 922. Our Union has agreed to provide representative services to the Washington DC Metro Taxi Operators Association. The Washington DC Metro Taxi Operators Association consists of taxi cab operators throughout the city of Washington, DC.

   We believe that certain regulations imposed on taxi cab operators by the DC Taxi Cab Commission are arbitrary, capricious and contrary to the law. Specifically, we believe that the regulations regarding dome lights, credit card payments and uniform vehicle colors should be stayed to allow a review of these regulations. In order to avoid litigation, the Washington DC Metro Taxi Operators Association requests that the regulations be stayed to allow a resolution that does not disproportionately adversely affect the City's taxi cab drivers.

   To that end, we would like the opportunity to present evidence regarding the impact of these regulations on the taxi cab drivers. Thank you for your attention to this matter. I look forward to your response.

Sincerely,

*Ferline Buie*

Ferline Buie

cc:    Honorable Vincent Gray
       Ralph Burns

Paul Cohn
Cyril Crocker
Elliott Ferguson
Gladys Mack
Anthony Muhammad
Betty Smalls
Stanley W. Tapscott
Richard C. Welch

# AFFIDAVIT OF KOLAWOLE J. AKINADEWO

I, Kolawole J. Akinadewo, declare the following in support of the lawsuit and injunction sought by the D.C. Taxi Operators Association:

1.    My name is Kolawole J. Akinadewo.

2.    My address is 133 Webster Street, NW, Apt 9, Washington, DC 20011-7355.

3.    I am 69 years old.

4.    My telephone number is (202) 726-2599. My cell phone number is (202) 425-3539.

5.    I have been a licensed taxi cab driver in the District of Columbia for approximately 35 years.

6.    My taxi license number is 51675.

7.    I own one taxi.

8.    I am associated with Yellow Cab Company.

9.    I do not have an MTS system installed in my cab.

10.    I already have a Yellow Cab Company "MTD" system in my cab, which connects the meter, a credit card reader, and the dispatch system.

11.    In or about July or August 2013, I was told by Yellow Cab Company not to install an MTS or dome in my car because they would fight the regulations so that Yellow Cab Company could keep the MTD system and color.

12.    On or about October 21, 2013, I spoke to Vaughn Williams, owner of Yellow Cab Company, who told me to not make any changes because Yellow Cab Company was still fighting the regulations.

1

13.      On or about October 30, 2013, I spoke with a member of William's staff, who told me that I would probably need to get the dome.

14.      On or about October 30, I visited Jindal Andre Automotive to inquire about getting a dome. I was quoted $397 for the dome, be installed on November 3, 2013. I was forced to make a down payment of $200 to reserve my dome.

15.      As of November 1, 2013 and until my cab is outfitted with a dome, I will not drive a taxi because I am at risk of getting a ticket and getting my car impounded.

16.      If I cannot drive my cab until November 4, 2013 because I am waiting for the dome to be installed, I will lose approximated $300 in revenue.

17.      For the MTS, dome, and painting requirements, I have been very confused as to what is specifically required and what the deadlines are. The information I get from the D.C. Taxicab Commission's website and news directly conflicts with the information that Yellow Cab Company is telling me.

18.      Because Yellow Cab Company controls my dispatching, meter, and credit card reader, and because I am under contract with Yellow Cab Company, I am restricted in trying to make changes without their support.

_K . A_

I SWEAR UNDER PENALTY OF PERJURY THAT THE INFORMATION CONTAINED IN
THIS DOCUMENT IS TRUE AND CORRECT.

Dated: November 1, 2013                    Kolawole J. Akinadewo

Subscribed and sworn to before me this __1st__ day of __Nov__
2013.

Signature of Notary Public

Notary Public, District of Columbia

My commission expires on _____

3

AFFIDAVIT OF MANNY ZEWDU

I, Manny Zewdu, declare the following in support of the lawsuit and injunction sought by the D.C. Taxi Operators Association:

1. My name is Manny Zewdu.

2. My address is 5801 Quantrell Avenue, Apt 205, Alexandria, VA 22312-2739.

3. I am 40 years old.

4. My telephone number is (240) 476-7137.

5. I have been a licensed taxi cab driver in the District of Columbia for over 8 years.

6. I own one taxi.

7. I have installed the Modern Taxi Meter Service ("MTS") in my cab.

8. I purchased the MTS from VIP. I paid approximately $150 to have the MTS installed and was forced to sign a contract that allows VIP to keep a portion of my future earnings to pay off the price of the MTS equipment, which is approximately between $400 to $500.

9. I spent two days waiting at VIP while the MTS was installed. I lost approximately $300 in revenue because of the installation time.

10. I then had to return to VIP approximately 3 weeks later because the meter portion of the MTS had not been synchronized properly with the tablet portion of the MTS. I was forced to wait approximately another hour while this was fixed.

11. Before purchasing from VIP, I spent approximately 8.5 hours visiting VIP and five sellers other (USA Motors Inc., District Cab, Gleike, UVC, and Silver Auto Care Center) to learn about their contract and pricing options for the MTS so that I could select a provider. I lost

approximately $100 in revenue because of this time spent reviewing providers and trying understand the MTS fee system.

12.      Prior to installing the MTS, I used a credit card system called Square that works through my iPhone. Square charged a fee of approximately 2.7% for each ride, whereas VIP now charges me a 3.5% fee on each ride.

13.      The MTS is not working properly. Because of poor reception quality, it takes me between 1 to 2 hours each day to log-in to the MTS system using the tablet. I am forced to keep driving around until I find a spot with good reception so that I can log-in. I lose approximately $15 in revenue for each morning hour that I am forced to drive around searching for good reception. I am also frightened of driving into the District of Columbia while I search for good reception because I could get a ticket for failing to have my MTS on.

14.      The MTS system is also causing me problems because of how slowly the credit card reader operates. When a fare ends and a passenger pays, I need to wait approximately one minute for a receipt to print out for the passenger to sign. I must retain this signed receipt and give it VIP. Then I need to wait approximately another minute for another receipt to print out, to give to the passenger. Because of this delay, which is in addition to the time that I spend swiping credit card and the card approving, I start being honked at by other cars because I am backing up traffic.

15.      I have not installed the dome in my cab.

16.      I have made many attempts to purchase a dome. I made approximately 10 visits in October 2013 to Lincoln, UVC, Holiday, Imperial, and Icon Meter retailers to locate a retailer with domes in stock. I was consistently told that that the domes were out of stock or that I lacked priority and would be added to the end of the waiting list.

2

17.     In total, I spent approximately 6 hours visiting dome retailers and trying to assess when they would have a dome in stock or how I could join the waitlist. Because of the time I spent trying to comply with the dome requirement, I lose approximately $70 to $80 in revenue.

18.     For instance, with Lincoln, I visited the first time and was told to come back four days later to get the dome installed. When I came back four days later, Lincoln did not have a dome for me. I then visited Lincoln against, approximately 8 or 9 days later, seeking a dome and was once again turned away.

19.     As of today, November 1, 2013, I still have not been able to locate a retailer that can install a dome for me today.

20.     Even if I was able to locate a dome in stock, I find the cost prohibitively expensive. I was quoted $470 for the dome.

21.     For the MTS, dome, and painting requirements, I have been very confused as to what is specifically required. For instance, I only learned through word of mouth that the MTS tablet and the MTS meter needed to be synchronized, or else I could be fined. I am unclear about the painting requirements, particularly in regard to the deadlines.

22.     I have tried to read the D.C. Register to learn about the new requirements, but I find it difficult to follow the differences between the proposed and final versions of the regulations.

I SWEAR UNDER PENALTY OF PERJURY THAT THE INFORMATION CONTAINED IN
THIS DOCUMENT IS TRUE AND CORRECT.

_____ MANNY ZEWDU

Dated: November 1, 2013                     Manny Zewdu

Subscribed and sworn to before me this **1st** day of **Nov**
2013.

Signature of Notary Public

Gretchen Waller
_____

Notary Public, District of Columbia

Gretchen R. Waller

My commission expires on _____ Expires 5/31/2014

4

## AFFIDAVIT OF ROTIMI OLORUNFEMI

I, Rotimi Olorunfemi, declare the following in support of the lawsuit and injunction sought by the D.C. Taxi Operators Association:

1. My name is Rotimi Olorunfemi.

2. My address is 6102 Roanoke Avenue, Riverdale, MD 20737.

3. I am 57 years old.

4. My telephone number is (240) 882-4435.

5. I have been a licensed taxi cab driver for approximately 18 years.

6. I have been a licensed taxi cab driver in the District of Columbia for approximately 14 years.

7. My taxi license number is H93323.

8. I own one taxi.

9. I am associated with Allied Cab Company.

10. I had a car accident on July 28, 2013 while I was driving my cab in the course of my employment. My cab was rear-ended in a multiple car accident and severely damaged. I have not been able to use a cab from July 28, 2013 through present day. I have not been able to repair my cab or buy a new cab because I am still waiting for the other side's insurance to pay out.

11. In the interim, I have been renting and driving a cab from Silver Cab Company for $180 a week.

12. The cab that I am driving does have an MTS system, which was installed by Silver Cab Company.

1

13.     The MTS system is not working properly. I have experienced several occasions where a fare has ended and a passenger has not been able to successfully pay using the MTS system because of poor reception. In these cases, I was forced to use the Square payment system on my iPhone because some of these clients did not have cash.

14.     Additionally, on approximately four or five occasions, I have not been able to log-in to the MTS system while picking up passengers at or around Union Station.  On approximately two or three occasions, I have lost customers because they got up and walked out of the cab while I trying to log-in to MTS. On about two other occasions, I was forced give rides without the use of a working meter. On those occasions, the passengers were in a hurry and told me how much they normally paid to get to their destinations from Union Station. I was forced to trust the passenger regarding the normal fare because I did not have a working meter and could not afford to lose a passenger. On those occasions, the passenger paid with cash or with Square.

15.     The cab that I am driving does not have a dome installed.

16.     The Silver Cab Company has refused to outfit the cab I am driving with a dome. The Silver Cab Company stated that they are currently installing domes for other drivers who will pay the $400 fee to have a dome installed in their personally-owned cabs and that I will need to wait before they have time to install a dome in the cab that they are renting to me.

17.     From October 28 to November 1, 2013, I have visited Silver Cab Company every day to try to get a dome.  Each visit took approximately 30 minutes to one hour, plus approximately another 40 minutes commuting to and from Silver Cab Company's site. Because of this time spent trying to get a dome, I lost approximately $20 to $30 in revenue with each visit.

18.     Because Silver Cab Company is the owner of the cab that I am renting, I am not free to go to another retailer to purchase and install a dome independently.

19.     As of today, November 1, 2013, I am not able to acquire a dome for the cab that I am driving.

20.     Because I am driving without a dome, I am at risk for getting a ticket and getting the car impounded.

21.     As a result, I was forced to return the cab to Silver Cab Company on the morning of November 1, 2013 because I did not want to risk getting a ticket for not having a dome. Starting November 1, 2013, I have not had a cab to drive.

22.     I will wait until Silver Cab Company can outfit the cab with a dome before I start driving a taxi again.

23.     Silver Cab Company has stated that they will likely not be able outfit the cab with a dome on November 1, 2013 or during the week of November 4th.

24.     If the cab is not outfitted with a dome on November 1, 2013 or during the following week, I will lose at least $1,000 to $1,100 in revenue because I will have no cab to drive.

25.     For the MTS, dome, and painting requirements, I have been very confused as to what is specifically required and what the deadline are. I have tried to the read the D.C. Taxicab Commission's website, but the information there often conflicts with what is reported in the news and on radio stations like NPR. The information that I hear from the taxi cab companies regarding actual enforcement of these requirements further conflicts with what I read and hear from other sources.

I SWEAR UNDER PENALTY OF PERJURY THAT THE INFORMATION CONTAINED IN
THIS DOCUMENT IS TRUE AND CORRECT.

11-01-13

Dated: November 1, 2013                    Rotimi Olorunfemi


PATRICIA M. DENNIS
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires September 14, 2016


Subscribed and sworn to before me this 1st day of November 2013.

Signature of Notary Public

Patricia M Dennis

Notary Public, District of Columbia

My commission expires on September 14, 2016



1

4

AFFIDAVIT OF GIRMA TESSMA

I, GIRMA TESSEMA, declare the following in support of the lawsuit and injunction

sought by the D.C. Taxi Operators Association:

1.      My name is Girma Tessema.

2.      My mailing address is 4404 Hillside Court, Alexandria Virginia 22306.

3.      I am 56 years old.

4.      My cell phone number is (571) 338-0939.

5.      My taxi license number is 72944.

6.      I have been a licensed taxi cab driver for more than10 years. I have been a

licensed taxi cab driver for more than 10 years in the District of Columbia. I own one taxi. I

am an independent contractor for Allied/UVC Cab Company.

7.      I have installed a Modern Taxi Meter System ("MTS").  I had the system installed

in September. The MTS was installed by ~~Allied~~ *U.V.C*.  It cost $120 for the system and the

installation. It took me approximately two weeks to get the appointment for the installation

and it took one day to install.  I lost approximately $150 on that day.

8.      I am currently having problems with the MTS. When the system is down the

meter and the credit card machine do not work.  This happens three different times.  I told my

company that the system has not been working properly.

9.      The first time this system stopped working it took a day to fix. Sometimes to fix

the problem my company has to call the PSP.  This happened the second time the system

stopped working.  It took approximately 3-4 hours.  The third time it took about a ½ day to

fix. I lost approximately $300 trying to get my system fixed.

1



10.     I do not have the new Dome Light currently installed on my taxi.  I tried to make an appointment to have the light put on, but I couldn't get an appointment before the deadline.  I don't know when they will be able to install the system.  I am on a list with my company to have the new dome light installed.  I have to wait for them to call me to come in.

11.     On November 1, 2013 I was driving passengers to Union Station.  I was pulled over by an inspector.  The inspector made my passengers get into another cab.  I was fined $25 and my cab was impounded.  It costs $140 to have my cab impounded and more money each day it stays there.  I was told I cannot pick up my cab until Monday November 4, 2013.

12.     The only way I can get my cab is to have it towed.  I may have to have my cab towed to my house and then I would have to get it cab towed again to the company for installation.   I am not sure how much it will cost to have my cab towed, but it costs $150 for a flat fee and then additional amounts based on mileage.  My car is impounded in DC and I live in Alexandria.

13.     I cannot work until I get an appointment to have the dome light installed and I do not know when that will be. I have to wait for the company to call me.  I am on a list.



I SWEAR UNDER PENALTY OF PERJURY THAT THE INFORMATION CONTAINED IN
THIS DOCUMENT IS TRUE AND CORRECT.

Dated: November 1, 2013                     Girma Tessema


Subscribed and sworn to before me this ___1st___ day of _Nov_,
2013.

Signature of Notary Public

Notary Public, District of Columbia

My commission expires on

GREICHEN R. WALLER
NOTARY PUBLIC
DISTRICT

3

AFFIDAVIT OF ROUZBEH MAZANDERAN

I, Rouzbeh Mazanderan, declare the following in support of the lawsuit and injunction sought by the D.C. Taxi Operators Association:

1.  My name is Rouzbeh Mazanderan.

2.  My mailing address is P.O. Box 1723, Beltsville, Maryland 20704. My home address is 11107 Queen Anne Avenue, Beltsville, Maryland 20705.

3.  I am 73 years old.

4.  My cell phone number is (202) 294-9772. My home phone number is (301) 595-1167.

5.  My taxi license number is 57623.

6.  I have been a licensed taxi cab driver for 43 years. I have been a licensed taxi cab driver for 40 years in the District of Columbia. I own one taxi.

7.  I have installed a Modern Taxi Meter System ("MTS.")

8.  I already had a meter, but I was forced to take it out.

9.  I bought the MTS from Dial Cab Company DC and had the same entity install it for me. It took 3 hours to have the MTS installed. I paid $550 for both the parts and labor for installing the MTS.

10. In the time I waited to have the MTS installed, I lost approximately $75 in revenues.

11. The MTS is not working properly. It takes 10 minutes for the MTS to restart every time that I restart the car. For instance, on October 31, 2013, I was waiting in a taxi stand at Washington Plaza Hotel with my engine off, and a passenger got in my cab. I had to

1



ask the passenger to wait while the MTS system turned back on. The passenger got frustrated with waiting, left my cab, and flagged down a cab that was driving down the street. This same situation has happened to me on multiple occasions at both the Washington Plaza Hotel and the Marriot Hotel on 515 20th Street, NW, Washington, DC.

12.     MTS is also not working properly because in some locations, I have no reception. When I drive into a location with no reception, the MTS stops recording mileage and I lose money for that fare. Further, because of the reception problems, passengers cannot reliably pay with credit cards at all end locations. Before a passenger gets into my cab, I have to ask him or her if he or she can pay cash and if he or she cannot, I have to turn down the ride.

13.     I do not have the dome installed in my cab because the dome is prohibitively expensive for me.

14.     I made approximately 6 phone calls to different vendors to ascertain prices and availability. The cheapest that I was quoted for the cost of the dome was $385, but some vendors are charging as much as $500 for the same dome.

15.     Further, the dome is impractical given my health. With my current dome, I can turn it to "off-duty" using a switch that's under my steering wheel. For the new required dome, I would need to exit my vehicle and physically switch it to off-duty from outside the car. This is a problem for me because I have a significant amount of knee pain in my right knee, and which makes it difficult to walk. Needing to exit the cab multiple times a day to turn the switch will aggravate my condition and puts me at risk of falling.  This process will be even more difficult for me if it is raining or snowing.

2

I SWEAR UNDER PENALTY OF PERJURY THAT THE INFORMATION CONTAINED IN THIS DOCUMENT IS TRUE AND CORRECT.

Dated: November 1, 2013

Rouzbeh Mazanderan

PATRICIA M. DENNIS
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires September 14, 2016

Subscribed and sworn to before me this ____ 1st ____ day of ____ November ____ 2013.

Signature of Notary Public

Patricia M. Dennis

Notary Public, District of Columbia

My commission expires on ____ September 14, 2016 ____

District of Columbia: SS
Subscribed and sworn to before me, in my presence,
this _____ day of _____, _____

_____
Patricia M. Dennis, Notary Public, D.C.
My commission expires September 14, 2016.

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL ACTIONS BRANCH**

KOLAWOLE J. AKINADEWO )
133 Webster Street, NW, Apt 9 )
Washington, DC 20011-7355 )
)
and )
)
ROTIMI OLORUNFEMI )
6102 Roanoke Avenue )
Riverdale, MD 20737 )
)
and )
)
ROUZBEH MAZANDERAN )
P.O. Box 1723 )
Beltsville, MD 20704 )
)
and )
)
ANDRE RUFFIN )
1407 Morse Street, NE )              C.A. No. 2013 CA --------
Washington, DC 20002 )
)
and )
)
EARL THORNE )
128 Todd Place, NE )
Washington, DC 20002 )
)
and )
)
EARTHA CLARK )
2021 Vermont Avenue, NE )
Washington, DC 20001 )
)
and )
)
GIRMA TESSEMA )
4404 Hillside Court )
Alexandria, VA 22306 )
)
and )

FILED
CIVIL ACTIONS BRANCH

NOV 0 5 2013

Superior Court
of the District of Columbia
Washington, DC.

COMPLETED



JESSE BLACK                                          )
12003 Quartette Lane                                )
Bowie, MD 20720                                     )
                                                    )
and                                                 )
                                                    )
MANNY ZEWDU                                          )
5801 Quantrell Avenue, Apt 205                      )
Alexandria, VA 22312-2739                           )
                                                    )
and                                                 )
                                                    )
ADDIS GEBRESALASSIE                                  )
401 12th Street South                               )
Arlington, VA 22202,                                )
                                                    )
and                                                 )
                                                    )
WASHINGTON D.C. METRO AREA                           )
TAXI OPERATORS ASSOCIATION                           )
2120 Bladensburg Road, NE #204                      )
Washington DC 20018                                 )
                                                    )
                      *Plaintiffs;*                 )
                                                    )
v.                                                  )
                                                    )
THE DISTRICT OF COLUMBIA                             )
Agent for Service: Irvin B. Nathan                  )
441 4th Street, N.W.                                )
Washington, DC 20001                                )
                                                    )
and                                                 )
                                                    )
DISTRICT OF COLUMBIA                                 )
TAXICAB COMMISSION                                   )
Agent for Service: Ron M. Linton                    )
2041 Martin Luther King Jr Avenue, SE               )
Suite 204                                           )
Washington, DC 20020                                )
                                                    )
                     *Defendants.*                  )
_____            )

2

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

### I. INTRODUCTION

1.      The newly organized Washington, DC Metro Area Taxi Operators Association ("Association") and the individual named taxicab drivers bring this action to invalidate certain regulations imposed by the Defendant District of Columbia Taxicab Commission ("Commission"). The regulations were improperly promulgated by the Commission through emergency rulemaking procedures and implemented without providing the affected taxicab operators the reasonable opportunity to comply with these regulations.

2.      Since May 2013, the Commission has issued two arbitrary and capricious regulations. First, the Commission required all taxicabs to be equipped with the Modern Taximeter System ("MTS"). *See* D.C. Mun. Regs. § 31-603 (2013). Second, the Commission required all taxicabs to install new Dome Lights. *See* D.C. Mun. Regs. § 31-605. The cost of compliance with these regulations is borne entirely by the individual taxi drivers and noncompliance with these flawed regulations exposes the drivers to penalties, including the impoundment of their vehicles, the imposition of fines, and the revocation or non-renewal of their taxicab licenses.

3.      Under the circumstances, full compliance with the MTS and Dome Light regulations is impossible within the arbitrary deadlines set by the Commission – September 1, 2013 and November 1, 2013, respectively.  The MTS consists of a meter, credit card reader, and tablet with log-in functions, all of which are dependent on cellular reception in order to function properly. *See* D.C. Mun. Reg. § 31-603. If an MTS' meter, credit card reader, and

3

tablet are not fully functioning, the driver operating that taxicab is violating Commission regulations and subject to penalties. *See* D.C. Mun. Reg. § 31-603.10. Thus, whenever a taxicab drives through areas of no or weak cellular reception, the meter stops recording mileage, the credit card reader stops being able to process payments, and the log-in feature no longer functions. Given the realities of inconsistent cellular service in the District of Columbia, this is an everyday problem for Plaintiffs, who lose just compensation on fares due to meter failures and credit card denials and lose countless hours spent driving around looking for better cellular service. Yet, under the newly promulgated regulations, Plaintiffs are not only forced to purchase and install the MTS system, but Plaintiffs are at risk of impoundment, fines, and license revocation because the MTS system required by the Commission malfunctions.

4.      Similarly, Plaintiffs who have made multiple good-faith efforts to acquire a Dome Light have not been able to acquire a Dome Light as of November 1, 2013 because of a shortage of Dome Lights and installers. The Commissions has authorized two manufacturers and twelve installation locations for the Dome Light, who must service approximately 5,000 taxicabs. Individual plaintiffs have expended as many as six hours each trying to acquire a Dome Light and have been unable to do so because the Dome Lights have simply been out-of-stock. Yet, one Plaintiff has already had his taxicab impounded because it lacked a Dome Light despite his good faith efforts at trying to acquire a Dome Light. Several other Plaintiffs have all been forced to forfeit the use of their taxicabs until that can attain a Dome Light, at an indefinite date, because of the risk of imminent impoundment

5.      As a result, the MTS and Dome Light regulations arbitrarily and capriciously

deprive the taxicab drivers of the use and enjoyment of their private property, the right to earn

a livelihood following the ordinary occupations of life, and reasonable and just compensation

for their services. The combined effect of these regulations imposes a heavy burden on the

taxicab drivers. The mandates deprive the individual owner-operators of important private

property interests that go beyond purely financial interests. These owner-operators will be

forced to cease operations because of the penalties imposed under the flawed regulations. As a

result, these taxi drivers who, due to not fault of their own, are not able to timely comply with

these regulations may be entirely deprived of their ability to earn a living for an indefinite

period of time.

6.      The Plaintiffs, by and through their contractual representative, Teamster Local

Union 922, have repeatedly requested that the Defendant Commission stay the penalties under

the regulations until all taxicab drivers in the District of Columbia have a reasonable and

realistic opportunity comply with the regulations. The Commission has refused to stay the

regulations and, instead, has imposed sanctions and penalties on DC taxicab drivers despite

their best efforts to comply with the regulatory scheme.

## II. JURISDICTION AND VENUE

7.      The subject matter jurisdiction of this Court is invoked pursuant to the

provisions of D.C. Code § 11-921(a) (LexisNexis 2012). This Court has jurisdiction over all

matters in equity. *Id.*

8.      Personal jurisdiction is invoked pursuant to the provisions of D.C. Code § 13-

423(a) (LexisNexis 2012); all parties to the dispute are citizens of the District of Columbia or

conduct business entirely or primarily within the District of Columbia, and the actions giving

rise to the suit occurred therein.

9. Venue is proper in this court, as the relevant events took place in the District of Columbia.

### III. THE PARTIES

10. This action is brought by ten individual taxicab drivers and Washington DC Metro Taxi Operators Association ("Plaintiffs") against the District of Columbia Taxi Commission ("Defendant"). This dispute arises out of Defendant's issuance of numerous arbitrary and capricious mandates against taxicab drivers operating in the District of Columbia.

11. Plaintiff Addis Gebresalassie is a taxicab driver in the District of Columbia. Mr. Gebresalassie lives in Arlington, VA, but has operated a taxicab in the District of Columbia for the last 13 years. Mr. Gebresalassie owns his vehicle.

12. Plaintiff Kolawole J. Akinadewo is a taxicab driver in the District of Columbia. Mr. Akinadewo lives in Washington, DC and has operated a taxicab in the District of Columbia for the last 35 years. Mr. Akinadewo owns his vehicle.

13. Plaintiff Manny Zewdu is a taxicab driver in the District of Columbia. Mr. Zewdu lives in Alexandria, VA, but has operated a taxicab in the District of Columbia for the last 8 years. Mr. Zewdu owns his vehicle.

14. Plaintiff Rotimi Olorunfemi is a taxicab driver in the District of Columbia. Mr. Olorunfemi lives in Riverdale, MD, but has operated a taxicab in the District of Columbia for the last 14 years. Mr Olorunfemi owns his vehicle.

15. Plaintiff Rouzbeh Mazanderan is a taxicab driver in the District of Columbia.

Mr. Mazanderan lives in Beltsville, MD, but has operated a taxicab in the District of Columbia for the last 40 years. Mr. Mazanderan owns his vehicle.

16. Plaintiff Andre Ruffin is a taxicab driver in the District of Columbia. Mr. Ruffin lives in Washington, DC and has operated a taxicab in the District of Columbia for the last 29 years. Mr. Ruffin owns his vehicle.

17. Plaintiff Earl Thorne is a taxicab driver in the District of Columbia. Mr. Thorne lives in Washington, DC and has operated a taxicab in the District of Columbia for the last 30 years. Mr. Thorne owns his vehicle.

18. Plaintiff Eartha Clark is a taxicab driver in the District of Columbia. Ms. Clark lives in Washington, DC and has operated a taxicab in the District of Columbia for the last 40 years. Ms. Clark owns her vehicle.

19. Plaintiff Girma Tessema is a taxicab driver in the District of Columbia. Mr. Tessema lives in Alexandria, VA, but has operated a taxicab in the District of Columbia for the last 10 years. Mr. Tessema owns his vehicle.

20. Plaintiff Jesse Black is a taxicab driver in the District of Columbia. Mr. Black lives in Bowie, MD, but has operated a taxicab in the District of Columbia for the last 40 years.

21. Plaintiff Washington DC Metro Taxi Operators Association is an unincorporated association of District of Columbia taxicab drivers. Plaintiff Association represents at least 1,000 taxicab drivers in the District of Columbia.

22. The individual Plaintiffs and the members of the Plaintiff Association, who are citizens of the District of Columbia or conduct business entirely or primarily within the

District of Columbia, have individually suffered, and continue to suffer, injury described herein from the Defendant's issuance and enforcement of the arbitrary regulations.

23.      Plaintiff Association has standing to obtain relief on an associational basis because (1) the Association has individual members would have standing to sue in their own right, (2) the interest Plaintiff Association seeks to protect is germane to Plaintiff's purpose (representing the interests of District taxicab drivers), and (3) neither the claims asserted nor the relief requested require the participation of individual members.

24.      Plaintiffs seek to certify a class of persons who are currently licensed to operate a taxicab in the District of Columbia.

25.      Plaintiffs state that the class is too numerous to be joined individually as the potential class is over five thousand (5000) persons. There are issues of fact and law common to all class members. The claims of the Plaintiffs are typical of claims of the members of the proposed class. Plaintiffs can adequately represent the interests of the class.

26.      Defendant District of Columbia is a municipal corporation, organized under the laws of the District of Columbia and the United States.  Defendant is authorized to sue and be sued.  Mayor Vincent C. Gray, in his official capacity, is an agent of Defendant.  The Commission is a subordinate agency of Defendant.

27.      Defendant District of Columbia Taxicab Commission is an agency of the District of Columbia, organized under the laws of the District of Columbia and the United States. Defendant is authorized to sue and be sued. In his capacity as Chairman of the Commission, Ron M. Linton is an agent of Defendant.

## IV. FACTUAL ALLEGATIONS

28.     The Council of the District of Columbia ("City Council") passed the D.C. Taxicab Commission Establishment Act ("Establishment Act") in 1985. The Establishment Act charges the Commission with the duty to "[e]stablish reasonable rates for taxicab service for the transportation of passengers and their property within the District, including all charges incidental and directly related to the provision of taxicab services." D.C. Code § 50-307(c)(l). The Establishment Act aims to protect the interests of the riding public by "insuring that all rules, regulations, and laws specifically relating to taxicabs be vigorously and fairly enforced; that discrimination in taxicab passenger service be strictly proscribed and penalized; and that adequate and high quality taxi passenger service be provided to all quadrants and neighborhoods of the District." D.C. Code § 50-302(a)(l). Additionally, the Establishment Act endeavors to "maintain a taxicab transportation system which provides owners and operators of taxicabs with reasonable and just compensation for their services ...." § 50-302(a)(2). In furtherance of these policy objectives, the Establishment Act vests "exclusive authority for intrastate regulation of the public vehicle-for-hire industry" in the Commission. *See* D.C. Code § 50-304.

29.     The District of Columbia Administrative Procedure Act ("DC APA") requires that agencies provide at least 30 days' notice of "proposed action" prior to the adoption or repeal of any rule unless good cause justifies less notice. D.C. Code § 2-505(a). The notice must contain "a citation to the legal authority under which the rule is being proposed." *Id.* Agencies may propose emergency rules that go into effect immediately, but only if "necessary for the immediate preservation of the public peace, health, safety, welfare, or morals." § 2-

9

505(c).

## Dome Light Regulations

30.     On July 18, 2012, the Commission adopted a Notice of Emergency and
Proposed Rulemaking, which became effective on July 25, 2012 and was published in the
D.C. Register on July 27, 2012 at 59 D.C. Reg 8851. The amendment proposed, among other
things, to establish a new Dome Light mandate and update penalties and fines. 59 D.C. Reg
8851. The Commission justified its use of emergency rulemaking as follows: "This
emergency rulemaking action is necessary to protect the public safety and welfare of the
residents of and visitors to the District of Columbia. Specifically, the past 3-5 years have seen
an exponential increase in consumer complaints about the quality and safety of District
taxicab vehicles and operators." *Id.*

31.     On October 2, 2012, the Commission adopted a Second Notice of Emergency
and Proposed Rulemaking. It was published for a second time on October 5, 2012, at 59 D.C.
Reg. 11594 and took effect immediately. The Commission justified its use of emergency
rulemaking as follows: "This emergency rulemaking action is necessary to protect the public
safety and welfare of the residents of and visitors to the District of Columbia. Specifically, the
past 3-5 years have seen an exponential increase in consumer complaints about the quality and
safety of District taxicab vehicles and operators." 59 D.C. Reg. 11594.

32.     On November 14, 2012, the Commission issued a Notice of Formal
Rulemaking in which it adopted the aforementioned rulemaking as final. The final rules
became effective upon publication of notice in the D.C. Register on February 1, 2013 at 60
D.C. Reg. 1173-1174.

33.     Pursuant to the February 1, 2013 Notice of Formal Rulemaking, the following

regulations relevant to this action were promulgated in the Code of D.C. Municipal

Regulations:

> 605.1 No later than April 30, 2013, all licensed taxicabs in the District of Columbia
> shall be equipped with the Commission-approved Dome Lights and Taxi Number
> System that meets the specifications listed below and any further specifications
> provided by the Commission...
>
> 605.2  The required Dome Light shall only be installed by Dome Light Installation
> businesses authorized by the Commission to install the approved Dome Light pursuant
> to Chapter 15 of this title.
>
> 605.5  The LED portion of the Dome Light shall display "Taxi For Hire" at all times
> when the taxicab is available for hire and the LED portion of the Dome Light shall go
> "dark" when the taxicab is not available for hire because the taxicab is carrying a
> passenger, is on call, or is off duty not intending to take on passengers. The Dome
> Light may contain a driver activated switch on the side of the Dome Light that will
> allow the complete Dome Light to remain dark when the vehicle is either off-duty or is
> being utilized for personal use.
>
> 605.6 Whenever a taxicab operator removes his or her vehicle from service and is
> proceeding to a place of his or her choosing without intending to take on passengers,
> the "Taxi For Hire" light shall go "dark."
>
> 605.7 Whenever a taxicab is responding to a dispatch call or proceeding to a prior
> arranged transport, the "Taxi For Hire" light shall go "dark."
>
> 605.8  No taxicab shall be operated unless its Dome Light is in proper working
> condition. The operation of a taxicab with a broken Dome Light shall give rise to a
> rebuttable presumption that the driver knew of the condition and operated the taxicab
> with such knowledge.
>
> 608.4  No person shall drive, move, or permit the operation or use of any taxicab
> which is mechanically unsafe, improperly equipped, or otherwise unfit to be operated,
> including failure to have an operating meter and Taxi Smart Meter System. Such
> vehicles shall be towed off the public streets and impounded pursuant to the Taxicab
> and Passenger Vehicle for Hire Impoundment Act of 1992, effective March 16, 1993
> (D.C. Law 9-199; D.C. Official Code § 50-331(a)(6) (2009 Repl.; 2012 Supp.)).

34.     D.C. Mun. Reg § 31-605.1 provides that all licensed taxicabs in the District of

Columbia must be equipped with the Commission-approved Dome Lights by April 30, 2013.

35.     The regulatory deadline of April 30, 2013 conflicts with subsequent non-regulatory communications by Commission.  In a May 28, 2013 press release, the Commission announced two certified manufacturers of the Dome Light, stated that installation of the Dome Light can begin June 1, 2013, and provides that "[a]ll DC taxis are required to be outfitted with the new standardized Dome Light by August 31, 2013." Government of The District of Columbia Taxicab Commission, *DC Taxicab Commission Announces Dome Light Manufacturers* (May 28, 2013), available at http://washingtondispatcher.com/clients/washingtondispatcher/DomeLightsPressRelease.pdf.

36.     More incongruously, the Commission's website provides that "[a]ll licensed DC taxicabs are required to have the new standardized Dome Light installed by November 1, 2013." District of Columbia Taxicab Commission, *Dome Light* (2013) http://dctaxi.dc.gov/page/dome-light.

**Modern Taximeter System (MTS) Regulations**

37.     Included in the July 18, 2012, Notice of Emergency and Proposed Rulemaking issued by the Commission were regulations implementing the Taxi Smart Meter System.  On May 24, 2013, the Commission adopted another Notice of Emergency and Proposed Rulemaking, which became effective on May 31, 2013 and was published in the D.C. Register on June 7, 2013 at 60 D.C. Reg. 8692.   The purpose of this subsequent emergency rulemaking was to amend problems with earlier emergency rulemaking, "[t]his Emergency and Proposed Rulemaking is necessary for the immediate preservation and promotion of the

public peace, safety, and welfare of the residents of and visitors to the District of Columbia by updating the regulatory framework to implement the modern taximeter system (MTS), preventing legal incongruities that will halt the implementation of the MTS, and providing the residents and visitors the consumer and safety improvements intended by the D.C. Council." 60 D.C. Reg. 8692.

38.     On July 31, 2013, the Commission adopted a Notice of Proposed Rulemaking, which became effective August 9, 2013 and was published in the D.C. Register on August 16, 2013 at 60 D.C. Reg. 11984. The emergency rulemaking expired on November 27, 2013, absent earlier amendment or repeal. This rulemaking was in response to taxicab companies and independent owners who "have requested further time to comply based on exigent circumstances," but the new rules only provided a mechanism under which an "approved payment service provider (PSP), who will apply on behalf of their clients for an extended installation deadline." 60 D.C. Reg. 11984.

39.     Final regulations pertaining to MTS were adopted by the Commission on May 17, 2013, published in the D.C. Register on May 17, 2013 at 60 D.C. Reg 6993 – 7021.

40.     Pursuant to the May 17, 2013 Notice of Formal Rulemaking, the following regulations relevant to this action have been promulgated in the Code of D.C. Municipal Regulations:

> 603.2 MTS implementation. Beginning on September 1, 2013 ("implementation date"):
>
> (a)     Each taxicab shall operate only with an MTS unit that allows a passenger to make a cash payment or cashless payment, which shall be the decision of the passenger;
>
> (b)     Each MTS unit shall be obtained from a PSP that has current approval for the MTS and is operating in compliance with this

13

section and Chapter 4;

(c)    Each MTS unit, including the passenger console and safety feature required by § 603.8 (n), shall be installed by an authorized MTS installation business which certifies that it meets the applicable provisions of this title....

603.6 All costs associated with obtaining an MTS unit, including installation and certification (including those associated with adding the passenger console and safety feature required by § 603.8(n)), operation, compliance with a provision of this title or other applicable law, compliance with an Office order, repair, lease, service and support, maintenance, and upgrade, shall be the responsibility of the taxicab company or independent owner, but may be allocated by written agreement among the taxicab company or independent owner, the PSP that provides it, or any other person.

603.9 MTS service and support requirements.

Each MTS shall function with the service and support of the PSP, which shall at all times operate in compliance with Chapter 4, and shall maintain a data connection to each MTS unit that shall:

(a) Validate the status of the operator's DCTC license (Face Card) in real-time by connecting to the Taxicab Commission Information System (TCIS) to ensure the license is not revoked or suspended, and that the operator is in compliance with the insurance requirements of Chapter 9;

(b) Validate the status of the taximeter component of the MTS unit (such as hired, vacant, or time-off) in real-time to ensure that it cannot be used until the prior trip and the payment process connected with it have ended;

(c) Transmit to the TCIS every twenty-four (24) hours via a single data feed consistent in structure across all PSPs, in a manner as established by the Office, the following data:

(1) The date;

(2) The operator identification (Face Card) number and PVIN, reported in a unique and anonymous manner allowing the PSP to maintain a retrievable record of the operator and vehicle;

(3) The name of the taxicab company, association, or fleet if applicable;

(4) The PSP-assigned tour ID number and time at beginning of tour of duty;

14

(5) The time and mileage of each trip;

(6) The time of pickup and drop-off of each trip;

(7) The geospatially-recorded place of pickup and drop-off of each trip which may be generalized to census tract level;

(8) The number of passengers;

(9) The unique trip number assigned by the PSP;

(10) The taximeter fare and an itemization of the rates and charges pursuant to § 801;

(11) The form of payment (cash payment, cashless payment, voucher, or digital payment), and, if a digital payment, the name of the DDS;

(12) The time at the end of each tour of duty;

(d) Provide the Office with the information necessary to insure that the PSP pays and the Office receives the taxicab passenger surcharge for each taxicab trip, regardless of how the fare is paid; and

(e) Allow the PSP to comply with the integration and other requirements for processing digital payments pursuant to § 408.16.

603.10 Prohibitions under this section.

(a) No operator shall provide taxicab service without an approved MTS unit installed and certified by an authorized MTS installation business.

(b) No operator shall operate a vehicle if the MTS unit is not functioning properly.

(c) No operator shall provide service unless both the operator and the vehicle are on the PSP's inventory when the trip is booked by dispatch or street hail.

(d) No operator shall limit service or refuse to provide service based on the passenger's choice of payment method.

(e) No operator shall access or attempt to access a passenger's payment card information after the payment has been processed.

(f) No operator shall participate in a transaction involving taxicab service in the

15

District where the fare, rates, charges, or payment does not comply with the applicable provisions of this title, including this chapter, and §§ 603 and 801.

(g) No operator shall associate with a PSP if such operator is, at that time, associated with a taxicab company that provides payment card processing for its associated operators, and has applied for or received approval to act as a PSP under Chapter 4.

(h) No taxicab shall be equipped with more than one (1) MTS unit.

(i) No taxicab company or independent owner shall knowingly permit its vehicle to be operated in violation of this section or Chapter 4.

(j) No owner or operator shall alter or tamper with a component of an MTS unit or make any change in the vehicle that prevents the MTS unit from operating in compliance with this title.

(k) No operator shall operate a taxicab in which the MTS has been tampered with, broken, or altered. The operation of a taxicab with a tampered, broken, or altered MTS shall give rise to a rebuttable presumption that the operator knew of the tampering, breaking, or alteration.

41.     With the installation of the MTS, DC taxi drivers including, the Plaintiff drivers and other class members, are obligated to pay to the Commission twenty five cents ($0.25) for every cash or credit card fare. D.C. Mun. Regs. § 31-801.7(b)(2).

## Impossibility of Full Compliance with MTS and Dome Light Requirements within Regulatory Deadlines

42.     Problems with MTS malfunctioning and Dome Light availability have made full industry compliance within the Commission's regulatory deadlines effectively impossible.

43.     DC taxi drivers, including the Plaintiff drivers and other class members, who have installed the MTS in order to comply with Commission requirements continue to run afoul of the Commission's regulations because the MTS malfunctions.

44.     The MTS consists of a meter, credit card reader, and tablet with log-in functions, all of which are dependent on cellular reception in order to function properly. *See*

D.C. Mun. Reg. § 31-603.

45.     The MTS is plagued with poor cellular reception quality and frequent log-in problems, including failing to timely start when a passenger first enters the vehicle, failing to timely start when a taxicab driver begins his or her workday, losing cellular reception during a fare and failing to record all metered mileage, losing cellular reception at the end of a trip and failing to make credit payment possible, and taking an unreasonable amount of time to print receipts thereby causing a taxicab driver to block traffic at the end of trips.

46.     Due to the poor cellular reception quality and frequent log-in problems with the MTS, Plaintiffs have been forced to refuse patrons who cannot pay cash (Mazanderan Aff. 2), lose money on fares when poor cellular reception quality causes the meter to fail to record mileage (Gebresalassie Aff. ¶2 ; Mazanderan Aff. ¶2; Zewdu Aff. ¶2), take fares "off-meter" and charge customers for fares on a non-meter basis (Olorunfemi Aff. ¶1-2), take credit cards payments using credit cards readers other than those integrated into MTS (Olorunfemi Aff. ¶1-2), drive in and around the District of Columbia without a working MTS system (Zewdu Aff. ¶2; Olorunfemi Aff. ¶1-2), and stall traffic while waiting for the MTS system to function (Zewdu Aff. ¶2).

47.     By some or all of the aforementioned acts, DC taxi drivers, including the Plaintiff drivers and other class members, who have installed the MTS within the arbitrary deadline set by the Commission are nevertheless in violation of D.C. Mun. Reg § 31-603 requirements that a taxicab be equipped with a functioning MTS that maintains a data connection sufficient to record metered fares and allow for digital payments and/or of D.C. Mun. Reg § 31-603.10's prohibitions on operating a taxicab if the MTS unit is not functioning

17

properly, limiting service or refusing to provide service based on the passenger's choice of payment method, or participating in a transaction involving taxicab service in the District of Columbia where the fare, rates, charges, or payment does not comply with the Commission's regulations.

48.     Under the circumstances, despite good faith efforts at compliance, DC taxi drivers, including the Plaintiff drivers and other class members, were unable to comply with the September 1, 2013 deadline to equip a taxicab with a fully functioning MTS that meets the Commission's technical specification.

49.     Full industry compliance with the Dome Light requirement by the November 1, 2013 deadline was similarly impossible under the circumstances.

50.     The Commission has authorized two manufacturers and twelve installation locations for the Dome Light. *See* District of Columbia Taxicab Commission, *DC Taxicab Commission Announces Dome Light Manufacturers*, available at http://washingtondispatcher .com/clients/washingtondispatcher/DomeLightsPressRelease.pdf; District of Columbia Taxicab Commission, *Installation Locations* (2013) http://dctaxi.dc.gov/sites/default/ files/dc/sites/dc%20taxi/page_content/attachments/Installation%20Locations-AA_1.pdf.

51.     Despite a regulatory deadline that all licensed taxicabs in the District of Columbia must be equipped with Commission-approved Dome Lights by April 30, 2013, on May 28, 2013, the Commission admitted that installation of Dome Lights under the regulations was not feasible and extended the time for compliance until June 1, 2013. *See DC Taxicab Commission Announces Dome Light Manufacturers*, available at http://washington dispatcher.com/clients/washingtondispatcher/DomeLightsPressRelease.pdf.

52.     Commission policies that extended the regulatory deadline from April 30, 2013 to August 31, 2013 to November 1, 2013 have failed to explain the departures from the Commission's previously announced policies and have stated no basis and purpose for the new unilaterally and arbitrarily selected deadlines.

53.     Under the realities of the marketplace for taxicab parts, full industry compliance with the Dome Light requirement by November 1, 2013 was impossible.  DC taxi drivers, including the Plaintiff drivers and other class members, who have made multiple good-faith efforts to acquire a Dome Light have not been able to acquire a Dome Light as of November 1, 2013 because of a shortage of Dome Lights and installers.

54.     DC taxi drivers, including the Plaintiff drivers and other class members, have expended as many as six hours seeking to acquire Dome Lights during October 2013 and have been consistently turned away by installers who state that there are not enough available Dome Lights for purchase as of November 1, 2013. Installers have placed DC taxi drivers on waitlists of indefinite lengths and been unable to provide any definite date after November 1, 2013 when the Dome Lights will be available for installation.

55.     Despite good faith efforts at compliance, DC taxi drivers, including the Plaintiff drivers and other class members, have not been to locate and install a Dome Light by the November 1, 2013 deadline because of the market shortage of authorized product and installers.

### Operational Flaws with the MTS and Dome Light Arbitrarily Put Plaintiffs' Safety and Livelihood at Risk

56.     On knowledge and belief, the Commission's enforcement of the Dome Light regulations includes ticketing and/or fining taxi drivers whose Dome Lights are not

completely dark and who fail to pick up nearby passengers who hail taxicabs.

57.     The driver-activated switch on the side of the Dome Light that allows the Dome Light to remain dark when a taxicab is off-duty, which is required by D.C. Muc. Reg. § 30-605.5, can only be accessed if the driver exits the taxicab, walks around to the passenger-side door of the taxicab, and reaches the switch on the side of the Dome Light nearest the passenger-side door.

58.     In order to turn the dome dark when a taxicab is off-duty, taxicab drivers must therefore exit their vehicles at the end of the work shift at whatever location their last trip ended, regardless of the safety of that location, weather conditions or the time of day that the trip is completed.

59.     The D.C. Mun. Reg § 31-605 requirement of a Dome Light that can be turned dark only by exiting the taxicab at the location where the last fare is dropped off is patently unsafe and puts DC taxi drivers, including the Plaintiff drivers and other class members, at unnecessary risk of robbery, battery, and assault.

60.     The domes that taxicabs used prior to the implementation of the Dome Light regulation allowed taxicab drivers to turn the domes dark from within inside the taxicab, without any need to exit the taxicab.

61.     On knowledge and belief, the Commission failed to consider the material issue of taxicab driver safety when requiring in rule D.C. Mun. Reg § 31-605 that all taxicabs must be equipped with a Dome Light that can only be turned dark from the outside.

62.     On knowledge and belief, the Commission also failed to consider the material issue of trips traveling and ending in areas of the District of Columbia that have no or weak

20

cellular reception.

63.     The MTS system is based on cellular reception and poor reception quality has caused and continues to cause DC taxi drivers, including the Plaintiff drivers and other class members, to lose just compensation on fares when the meter fails to function properly to count mileage in areas with weak cellular reception. *See also* Martin Di Caro, *For Cab Drivers, Rollout Of Credit Card Payments Has Been Anything But Smooth* (October 31, 2013), available at http://wamu.org/news/13/10/31/technical_glitches_continue_to_bedevil_ credit_card_payments_in_dc_taxicabs.

64.     DC taxi drivers, including the Plaintiff drivers and other class members, have further lost and continue to lose just compensation on fares that end in areas with weak cellular reception if the passenger lacks cash because the credit cards readers do not function.

**Irreparable Harm Despite Good Faith Efforts at Compliance**

65.     As a result of the aforementioned Dome Light and MTS regulations, DC taxi drivers, including the Plaintiff drivers and other class members, have been substantially and irreparably harmed.

66.     DC taxi drivers, including the Plaintiff drivers and other class members, have expended substantial amounts of time and resources seeking to comply with aforementioned regulations. The drivers have not been able to comply with one or more of the requirements despite good faith efforts to do so. First, drivers who have installed the MTS equipment from the exclusive vendors designated by the Commission have experienced significant malfunctions and irregularities in its performance. Consequently, these drivers are unfairly subject to the sanctions contained in the regulations despite every effort to install and maintain

21

the equipment mandated by the regulations. Second, the Dome Light vendors available under the regulations lack sufficient inventory of available Dome Lights and restrict the number of Dome Light installers, thereby precluding taxicab drivers from complying with the relevant regulations. These deficiencies are in no way attributable to the DC taxi drivers, including the Plaintiff drivers and other class members.

67.     The Commission is directly responsible for the harm imposed on the DC taxi drivers, including the Plaintiff drivers and other class members, because it is responsible for restricting authorized Dome Light retailers and installers, making technical specifications for MTS equipment, and setting deadlines for compliance.

68.     As a result of their failure to comply despite good-faith efforts to comply,  DC taxi drivers, including the Plaintiff drivers and other class members, have been prosecuted or are at risk of prosecution under D.C. Mun. Reg. § 31-612. Pursuant to D.C. Mun. Reg. § 31-612, a taxi driver who operates a vehicle without approved equipment is subject to fines between $100 and $750, impoundment of his vehicle, confiscation of his or her MTS unit or other meter, and suspension, revocation, or non-renewal of his license.

69.     Specifically, as a result of their inability to comply with the aforementioned regulations despite good faith efforts, DC taxi drivers, including the Plaintiff drivers and other class members, have either had their taxis impounded and/or been forced to curtail their use and enjoyment of their taxis indefinitely because of the risk of impoundment, license revocation, and license non-renewal.

70.     As applied, the aforementioned regulations violate DC taxi drivers' including the Plaintiff drivers' and other class members' constitutional right to property, which is

constitutes *per se* irreparable harm

71.     The aforementioned regulations further deprive DC taxi drivers, including the Plaintiff drivers and other class members, of their right to earn a livelihood by following the ordinary occupations of life by depriving them of the tools of their livelihood.

72.     DC taxi drivers, including the Plaintiff drivers and other class members, have also suffered extensive economic damages a result of fares lost due to malfunctioning MTS equipment.

73.     As a result of the aforementioned regulations, the general public is in danger of suffering irreparable harm because the regulations create a taxicab shortage. Many taxicabs not in compliance have ceased operating until compliance can be achieved.  The circumstances of a Dome Light shortage and malfunctioning MTS equipment, however, make compliance by the enforcement dates impossible.

74.     On November 1, 2013, the Dome Light regulations went into effect. All taxicab drivers who have not been able to comply with the regulations are subject to penalties, including impoundment of their cars.

## V. STATEMENT OF CLAIMS

### COUNT ONE

#### Regulatory Taking without Just Compensation

75.     The allegations of Paragraphs 1-74 of this Complaint are by reference incorporated herein as allegations of this Count.

76.     The Commission's Dome Light and MTS regulations regulate the Plaintiffs'

23

private property to such an extent that they deprive Plaintiffs of the complete usefulness of their private property and thereby effectively constitute an exercise of the District of Columbia's eminent domain power without actually divesting the Plaintiffs' of title to their property.

77. The regulations have a severe economic impact on the property rights of the individual taxicab owner-operators. For example, Plaintiff Tessema has experienced total loss of his taxicab because of impoundment and Plaintiffs Olorunfemi, Akinadewo, and Ruffin forfeited the use of their taxicabs until they can acquire Dome Lights because of fear of impoundment, penalty, and revocation of their taxicab licenses. As a result, DC taxi drivers, including the Plaintiff drivers and other class members, have been deprived of both the complete use of their taxicabs and the ability to earn "reasonable and just compensation" as required by D.C. Code § 50-302(a)(3).

78. The regulation interferes with the individual taxicab owner-operators reasonable, investment-back expectations regarding use of the property. DC taxi drivers, including the Plaintiff drivers and other class members, invested in their taxicab vehicles with the reasonable expectation of earning a livelihood with that property. The Dome Light and MTS regulations now render those vehicles useless if the vehicles cannot meet the new specifications by the September 1 and November 1, 2013 deadlines. Yet, compliance with the Dome Light regulation is impracticable given the inventory shortage and compliance with the MTS regulation by the deadline is impossible because of MTS malfunctioning. Under the circumstances, there is no way for DC taxi drivers, including the Plaintiff drivers and other class members, to achieve full compliance with the Dome Light and MTS regulations despite

24

good faith efforts, but until they do, their vehicles are useless.

79.     The regulations provide very limited benefit to society and place the burden of the regulations solely upon the individual taxicab owner-operators. While the taxicab standardization sought by the regulations may be viewed as a desirable social goal, society gains nothing from unachievable regulatory requirements. Further, the full burden of the regulation rests solely upon the individual taxicab owner-operators. *See* D.C. Mun. Reg. § 30-603.6. The Commission further increased the burden on individual taxicab owner-operators by naming only a limited number of authorized sellers and installers for both the Dome Lights and MTS, thereby driving down supply and driving up demand.

80.     Despite good faith efforts by individual taxicab owner-operators, many of these owner-operators have not been able to comply with the regulations.

81.     DC taxi drivers, including the Plaintiff drivers and other class members, are entitled to injunctive relief, pursuant to the Establishment Act, D.C. Code § 50-30 I *et seq.*, ordering the Commission to stay the regulations until the taxicab drivers have had a reasonable to comply with the regulations without depriving them of an opportunity to earn "reasonable and just compensation" as required by D.C. Code § 50-302(a)(3).

## COUNT TWO

### Arbitrary Deprivation of Property without Due Process of Law:

82.     The allegations of Paragraphs 1-81 of this Complaint are by reference incorporated herein as allegations of this Count.

83.     The Commission arbitrarily deprived DC taxi drivers, including the Plaintiff drivers and other class members, of their right to property without Due Process of law by

impounding taxicabs and threatening impoundment of taxicabs for violations of the MTS and Dome Light regulations.

84. DC taxi drivers, including the Plaintiff drivers and other class members, who are individual owner-operators, have a Constitutionally-guaranteed property right under the Fourteenth Amendment in their taxicabs.

85. Under the circumstances that DC taxi drivers, including the Plaintiff drivers and other class members, were deprived of their taxicabs, the notice of rulemaking preceding the MTS and Dome Light regulations was inadequate procedural due process.

86. The use of mere notice in the D.C. Register for the September 1, 2013 deadline to install an MTS and the lack of any formal notice of the November 1, 2013 deadline create a serious risk of erroneous deprivation of these property rights. Taxicab drivers are a discrete and identifiable population who are likely to lack the education, language facility, and resources to read the D.C. Register daily. Further, the evolving deadlines for the Dome Light Requirement from April 30, 2013 to August 31, 2013 to November 1, 2013 have not been formally announced in the D.C. Register, creating an unconstitutional lack of notice of regulations.

87. Under the circumstances, the Commission was obligated to directly communicate with the individual taxicab drivers to put them on notice about the regulations, the penalties required by them as well as the evolving deadlines. The Commission's burden in directly communicating to a small affected group of individuals is minimal, particularly because the Commission has all taxicab drivers' addresses on file as result of the licensing.

88. As result of the unconstitutional lack of notice of regulations, DC taxi drivers,

including the Plaintiff drivers and other class members, were harmed by having insufficient time to comply with the regulations, particularly in light of the Dome Light inventory problems and MTS malfunctioning.

89.     Thus, DC taxi drivers, including the Plaintiff drivers and other class members, are entitled to injunctive relief, pursuant to the Establishment Act, D.C. Code § 50-301 et seq., from enforcing the MTS Regulation and the Dome Light Regulation until proper notice is given to the regulations and all taxi operators are given sufficient time to comply with the regulations.

## COUNT THREE

### The Dome Light Regulation is Arbitrary and Capricious or Otherwise Not in Accordance with Law, in Violation of § 2-510 the D.C. Administrative Procedures Act

90.     The allegations of Paragraphs 1-90 of this Complaint are by reference incorporated herein as allegations of this Count.

91.     D.C. Code § 2-510 provides that an agency action is unlawful and must be set aside if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

92.     Defendant acted arbitrarily, capriciously, and otherwise not in accordance with the law by arbitrarily requiring that all taxicabs be equipped with Dome Lights by November 1, 2013 and requiring that all taxicabs not in compliance be subject to impoundment and license revocation because the Commission acted without giving reasoned consideration to the material problem of significant inventory problems with Dome Lights that prevent compliance despite good faith efforts to comply and without giving any reason or basis for that arbitrary deadline.

27

93.     Defendant acted arbitrarily, capriciously, and otherwise not in accordance with the law by enacting a Dome Light requirement without giving reasoned consideration to the material problem of driver safety when the Dome Light can only be turned off or "darkened" from outside the vehicle.

94.     Defendant has further acted arbitrarily, capriciously, and otherwise not in accordance with the law by enacting a Dome Light requirement and compliance deadline through unsubstantiated emergency rulemaking.

95.     D.C. Code § 2-505 provides that an agency may engage in emergency rulemaking only if "the adoption of a rule is necessary for the immediate preservation of the public peace, health, safety, welfare, or morals" and may only adopt such rules "as may be necessary in the circumstances."

96.     Defendant has failed to state any specific problem relating to public peace, health, safety, welfare, or morals that required immediate resolution through emergency rulemaking that mandated Dome Lights.


## COUNT FOUR

**The MTS Regulation is Arbitrary and Capricious or Otherwise Not in Accordance with Law, in Violation of § 2-510 the D.C. Administrative Procedures Act**

97.     The allegations of Paragraphs 1-96 of this Complaint are by reference incorporated herein as allegations of this Count.

98.     Defendant acted arbitrarily, capriciously, and otherwise not in accordance with the law by arbitrarily requiring that all taxicabs be equipped with a fully functioning MTS system by September 1, 2013 and requiring that all taxicabs not in compliance be subject to

28

impoundment and license revocation because the Commission acted without giving reasoned

consideration to the material problem of MTS malfunctioning that prevents compliance

despite good faith efforts to comply and without giving any reason or basis for that arbitrary

deadline.

99.     Defendant acted arbitrarily, capriciously, and otherwise not in accordance

with the law by enacting an MTS requirement without giving reasoned consideration to the

material problem of cellular reception problems causing taxicab drivers to lose just

compensation for fares when the MTS-related meter or credit card reader fails to function.

100.     Defendant has further acted arbitrarily, capriciously, and otherwise not in

accordance with the law by enacting an MTS requirement and compliance deadline through

unsubstantiated emergency rulemaking.

101.     Defendant has failed to state any specific problem relating to public peace,

health, safety, welfare, or morals that required immediate resolution through emergency

rulemaking that mandated an MTS system by September 1, 2013.

## VI. PRAYER FOR RELIEF

A.     Temporarily enjoin and restrain Defendant from enforcing the MTS

Regulation and the Dome Light Regulation during the course of this litigation;

B.     Permanently enjoin and restrain Defendant from enforcing the MTS Regulation

and the Dome Light Regulation until it can assure that the MTS system is reliably functional

and that there are sufficient supplies of Dome Lights available for installation;

C.     Award damages to all of the Plaintiffs and similar class members who have

29

incurred damages due to impoundment and forfeiture as a result of the risk of impoundment;

      D.      Award damages to all of the Plaintiffs and similar class members who have

incurred damages due lost fares as a result of MTS malfunctioning;

      E.      Award attorney's fees and court costs to Plaintiffs; and

      F.      An Order awarding any other relief as the Court deems just, equitable, and

proper.

Dated:  November 5, 2013

                            Respectfully submitted,

                            Richard C. Welch (DC Bar No. 485756)
                            Lauren B. Powell (DC Bar No. 1008301)
                            Olga Metelitsa (DC Bar No. 1016248)
                            Mooney, Green, Saindon, Murphy
                              & Welch, P.C.
                            1920 L Street, N.W. Suite 400
                            Washington, D.C.  20036
                            (202) 783-0010
                            rwelch@mooneygreen.com
                            lpowell@mooneygreen.com
                            ometelitsa@mooneygreen.com

                            *Counsel for Plaintiffs*

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

Kolawole J Akinadewa et al
_____
Plaintiff

vs.                                          Case Number _____

District of Columbia taxicab
Commission
_____
Defendant

**SUMMONS**

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Richard C. Welch
_____
Name of Plaintiff's Attorney

1920 L Street NW, Ste 400
_____
Address

Washington, DC 20036

(202) 783-0010
_____
Telephone

*Clerk of the Court*

By _____
Deputy Clerk

Date _____11/5/13_____

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bản dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828 로 전화주십시오     የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-682-2700) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

FORM SUMMONS - Jan. 2011                                                          CASUM.doc

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

Kolawole Akinadewo
_____
                                    Plaintiff

                    vs.                                    Case Number _____

District of Columbia
_____
                                    Defendant

## SUMMONS

To the above named Defendant:       Mayor's Office

        You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

        You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Richard Welch
_____                              *Clerk of the Court*
Name of Plaintiff's Attorney

1920 L St NW, Suite 400
_____              By _____
Address                                                         Deputy Clerk
Washington DC 20036
_____

202-783-0010
_____              Date _____ 11/5/13
Telephone

如需翻译,请打电话 (202) 879-4828       Veuillez appeler au (202) 879-4828 pour une traduction       Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828 로 전화주십시오       የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

        If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-682-2700) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español



FORM SUMMONS - Jan 2011

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

KOLAWLE AKINADEWO, et al.
_____
Plaintiff

vs.                                    Case Number _____

District of Columbia
_____
Defendant

### SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Richard C Welch
_____
Name of Plaintiff's Attorney

1920 L St N W, Suite 400
_____
Address

Washington, DC 20036
_____

202-783-0010
_____
Telephone

*Clerk of the Court*

By _____
                                    Deputy Clerk

Date _____ 11/5/13

如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화주십시요        የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-682-2700) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

FORM SUMMONS - Jan. 2011                                    CASUM.doc

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

INFORMATION SHEET

_Kolawole Akindelure_                     Case Number: _____

_____vs_____

_District of Columbia_                    Date: _____

☐ One of the defendants is being sued
in their official capacity.

| | |
|---|---|
| Name: _(Please Print)_   Richard C Welch | Relationship to Lawsuit |
| Firm Name: Maney Green Scindon Murphy + Welch | ☑ Attorney for Plaintiff |
| Telephone No.:          Six digit Unified Bar No.: <br> 202 783 0010          485756 | ☐ Self (Pro Se) <br><br> ☐ Other: _____ |

TYPE OF CASE: ☐ Non-Jury      ☐ 6 Person Jury      ☐ 12 Person Jury

Demand: $_____                    Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____      Judge: _____      Calendar #:_____

Case No.:_____      Judge: _____      Calendar#:_____

---

NATURE OF SUIT:      _(Check One Box Only)_

### A. CONTRACTS                                           COLLECTION CASES

☐ 01 Breach of Contract          ☐ 07 Personal Property          ☐ 14 Under $25,000 Pltf. Grants Consent
☐ 02 Breach of Warranty          ☐ 09 Real Property-Real Estate   ☐ 16 Under $25,000 Consent Denied
☐ 06 Negotiable Instrument       ☐ 12 Specific Performance        ☐ 17 OVER $25,000 Pltf. Grants Consent
☐ 15 Special Education Fees      ☐ 13 Employment Discrimination   ☐ 18 OVER $25,000 Consent Denied
☐ 10 Mortgage Foreclosure
    D.C. Code § 42-815

### B. PROPERTY TORTS

☐ 01 Automobile                  ☐ 03 Destruction of Private Property    ☐ 05 Trespass
☐ 02 Conversion                  ☐ 04 Property Damage                    ☐ 06 Traffic Adjudication
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

### C. PERSONAL TORTS

☐ 01 Abuse of Process            ☐ 09 Harassment                ☐ 17 Personal Injury- (Not Automobile,
☐ 02 Alienation of Affection     ☐ 10 Invasion of Privacy           Not Malpractice)
☐ 03 Assault and Battery         ☐ 11 Libel and Slander         ☐ 18 Wrongful Death (Not Malpractice)
☐ 04 Automobile- Personal Injury ☑ 12 Malicious Interference    ☐ 19 Wrongful Eviction
☐ 05 Deceit (Misrepresentation)  ☐ 13 Malicious Prosecution     ☐ 20 Friendly Suit
☐ 06 False Accusation            ☐ 14 Malpractice Legal         ☐ 21 Asbestos
☐ 07 False Arrest                ☐ 15 Malpractice Medical (Including Wrongful Death)   ☐ 22 Toxic/Mass Torts
☐ 08 Fraud                       ☐ 16 Negligence- (Not Automobile,   ☐ 23 Tobacco
                     Not Malpractice)              ☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE ☐ IF USED

CV-496/Jun 13



**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

KOLAWOLE J. AKINADEWO

    Vs.                                    C.A. No.      2013 CA 007525 B

THE DISTRICT OF COLUMBIA

## INITIAL ORDER AND ADDENDUM

      Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

      (1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

      (2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order.  As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

      (3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

      (4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

      (5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

      (6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each Judge's Supplement to the General Order and the General Mediation Order.   Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

                                              Chief Judge Lee F. Satterfield

Case Assigned to:  Judge JOHN M MOTT
Date:  November 5, 2013
Initial Conference: 10:00 am, Friday, February 07, 2014
Location:  Courtroom 221
            500 Indiana Avenue N.W.
            WASHINGTON, DC  20001                  Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Lee F. Satterfield

Caio.doc